UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NAVAJO NATION<br>f.k.a. NAVAJO TRIBE OF INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-945 L<br>Judge Francis M. Allegra |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF RECORD RETENTION ORDER**

Pursuant to RCFC 7(b), Plaintiff the Navajo Nation hereby submits this brief in support of Plaintiff's Motion for Entry of Record Retention Order ("Motion"). Plaintiff seeks entry of the proposed Record Retention Order ("RRO") that accompanies the Motion because records in Defendant's possession concerning Plaintiff's trust assets are critical to determination of liability and damages in this case regardless of whether this case is resolved through alternative dispute resolution procedures or otherwise, Defendant has repeatedly destroyed such Indian trust records in violation of Defendant's own administrative directives and court orders in other pending litigation requiring preservation of such records, and entry of the RRO will provide a great benefit to adjudication of Plaintiff's rights in this case without imposing undue burden on Defendant.

## TABLE OF CONTENTS


QUESTION PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. DEFENDANT EXERCISES FIDUCIARY CONTROL AND SUPERVISION OVER PLAINTIFF'S TRUST ASSETS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. DEFENDANT IS LEGALLY BOUND TO PRESERVE PLAINTIFF'S TRUST RECORDS TO PROTECT PLAINTIFF'S LEGAL RIGHTS . . . . . . . . . . . . . . . . . . . . . 5

III. DEFENDANT HAS GROSSLY AND CONSISTENTLY FAILED TO PRESERVE INDIAN TRUST RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. Defendant's Deficient Record Retention Regime Was Sufficiently Sloppy to Support this Court's Entry of Record Retention Orders in Early 2004 . . . . . . . . . 9

B. Defendant Has Repeatedly Failed to Protect and Preserve Indian Trust Records Notwithstanding this Court's Prior Record Retention Orders . . . . . . . . 10

1. In 2004, DOI let 50 boxes of Indian trust records get drenched, was often unable to locate surveys, failed to perform email backups, and had to address 269 to 350 contaminated boxes of Indian trust records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. In 2005, a NARA employee disposed of numerous permanent Indian trust records, some of which were not recovered, and DOI had long-standing and extensive email backup problems, continued to have many serious IT security challenges, and was still working to address hundreds of contaminated boxes of Indian trust records . . . . . . . . . . . . . 11

3. In 2006, Treasury lost dozens of boxes with unduplicated check-balancing records and had multiple incidents of water-damaged check records and OST had computers, flash drives, and data CDs stolen, while BIA shredded original Navajo records, let Jicarilla records get wet, and had 268 blank backup tapes requiring data recovery, and DOI still had unremediated contaminated records and continued to have serious IT security issues that threatened Indian trust records . . . . 14

4. In just the first five months of 2007, DOI has continued to have over 1,000 IT security problems leaving Indian trust data dangerously insecure and vulnerable, including unsecured appraisal data, while the former Deputy Secretary responsible for Indian trust record retention pled guilty to lying to Congress and the Attorney General and DOI have proposed to repudiate enforceable federal-Indian trust duties . . . . . 18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

I. DEFENDANT'S DOCUMENTED RECENT LOSSES AND DESTRUCTION OF INDIAN TRUST RECORDS AND ITS CONTINUING INADEQUATE RETENTION PROCEDURES SUPPORT ENTRY OF A RECORD RETENTION ORDER HERE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II. THE PROPOSED ORDER WILL BE EFFECTIVE AND NOT IMPOSE UNDUE BURDEN BECAUSE IT IS BASED ON PRIOR ORDERS IN SIMILAR CASES WITH ONLY APPROPRIATE, WELL-FOUNDED MODIFICATIONS . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

### TREATIES AND STATUTES

Treaty Between U.S. and Navajo Tribe of Indians, arts. I, III, XI, Sept. 9, 1849, 9 Stat. 974 . . . . . 20

Treaty Between U.S. and Navajo Tribe of Indians, arts. I, IX, XIII, Aug. 12, 1868, 15 Stat. 667 . . . . . 20

25 U.S.C. § 161a(a) . . . . . 4

25 U.S.C. § 161b . . . . . 4

Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 162a, 4001-4061 . . . . . 4

25 U.S.C. § 162a(c)(1) . . . . . 4

25 U.S.C. § 162a(d) . . . . . 2, 4, 5

25 U.S.C. §§ 311-328 . . . . . 3

Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-396g . . . . . 2

25 U.S.C. § 402 . . . . . 2

25 U.S.C. § 402a . . . . . 2

25 U.S.C. § 406 . . . . . 2, 3

25 U.S.C. § 406(a) . . . . . 8

25 U.S.C. § 407 . . . . . 2

25 U.S.C. § 415 . . . . . 2

25 U.S.C. § 466 . . . . . 2

Navajo and Hopi Relocation Amendments of 1988, Pub. L. 100-666, § 7, 102 Stat. 3929, 3932, as amended, 25 U.S.C. § 640d-30 . . . . . 3

Indian Tribal Judgement Funds Use or Distribution Act, 25 U.S.C. §§ 1401-08 . . . . . 3

Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108 . . . . . 2

National Indian Forest Resources Management Act of 1990, 25 U.S.C. §§ 3101-3120 . . . . . . . . 2

25 U.S.C. § 3715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C. §§ 1701-1757 . . . . . . . . . . . . 2

Federal Records Act, 44 U.S.C. Chapters 21, 29, 31, and 33 . . . . . . . . . . . . . . . . . . . . . . . . . . 6

44 U.S.C. § 3103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

44 U.S.C. § 3105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

44 U.S.C. § 3301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

44 U.S.C. § 3303a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

44 U.S.C. § 3303a(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

44 U.S.C. § 3309 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 24

44 U.S.C. § 3314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Arizona-Idaho Conservation Act of 1988, Pub. L. 100-696, §§ 403, 405,
102 Stat. 4571, 4587, 4591 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**REGULATIONS**

25 C.F.R. § 115.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 C.F.R. § 115.1000(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 C.F.R. § 115.1001(a), (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

25 C.F.R. § 115.700 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 C.F.R. § 115.820 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25 C.F.R. § 115.1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 C.F.R. pt. 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5-8

25 C.F.R. pt. 163 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 8

25 C.F.R. pt. 169 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

25 C.F.R. pt. 211 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5, 8

25 C.F.R. pt. 216 . . . . . . . . . . 2

25 C.F.R. pt. 225 . . . . . . . . . . 2, 5

30 C.F.R. pts. 202-218 . . . . . . . . . . 2, 3, 5, 8

30 C.F.R. § 212.50 . . . . . . . . . . 5, 8

30 C.F.R. § 212.51(b) . . . . . . . . . . 8

30 C.F.R. § 212.200 . . . . . . . . . . 5

36 C.F.R. pts. 1220-38 . . . . . . . . . . 7

36 C.F.R. § 1228.30(d) . . . . . . . . . . 7, 24

36 C.F.R. § 1236.14 . . . . . . . . . . 7, 24

36 C.F.R. § 1236.20(d) . . . . . . . . . . 7, 24

**CASES**

Armstrong v. Executive Office of the President, 1 F.3d 1274 (D.C. Cir. 1993) . . . . . . . . . . 6

Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Norton, 211 F. Supp. 2d 157 (D.D.C. 2002) . . . . . . . . . . 10, 24

Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) . . . . . . . . . . 21

Cobell v. Babbitt, 37 F.Supp.2d 6 (D.D.C. 1999) . . . . . . . . . . 6

Cobell v. Babbitt, 91 F. Supp.2d 1 (D.D.C. 1999), aff'd sub nom. Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . 5, 6, 20

Cobell v. Kempthorne, 455 F.3d 301 (D.C. Cir. 2006) . . . . . . . . . . 16, 22

Cobell v. Norton, 224 F.R.D. 1 (D.D.C. 2004) . . . . . . . . . . 10, 11, 14

Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001) . . . . . . . . . . 5, 6

Cobell v. Norton, No. 96-1285 (D.D.C. filed June 10, 1996) . . . . . . . . . . 10

Navajo Tribe of Indians v. United States, 364 F.2d 320 (Ct. Cl. 1966) . . . . . . . . . . 2

Navajo Tribe of Indians v. United States, 624 F.2d 981 (Ct. Cl. 1980) . . . . . . . . . . 2, 5

Navajo Tribe v. United States, 228 Ct. Cl. 924 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Navajo Tribe v. United States, 231 Ct. Cl. 1057 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Navajo Tribe of Indians v. United States, 9 Cl. Ct. 227 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 1-3

Nevada v. United States, 463 U.S. 110 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Pueblo of Laguna v. United States, 60 Fed. Cl. 133 (2004) . . . . . . . . . . . . . . . . . . . . 9, 10, 21-24

Seminole Nation v. United States, 316 U.S. 286 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United Med. Supply Co., Inc. v. United States, 73 Fed. Cl. 35 (2006) . . . . . . . . . . . . . . 21, 22, 24

United States v. Cherokee Nation of Okla., 480 U.S. 700 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Mason, 412 U.S. 391 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Mitchell, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Navajo Nation, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003) . . . . . . . . . . . . . . . . . . . . 4

**RULES**

RCFC 7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**

DOI Office of Inspector General, Semi-Annual Report to Congress (Oct. 2005) . . . . . . . . . . . . 13

DOI Status Report to the Court Number Seventeen (May 1, 2004) . . . . . . . . . . . . . . . . . . . . . . 11

DOI Status Report to the Court Number Nineteen (Nov. 1, 2004) . . . . . . . . . . . . . . . . . . . . . . . 11

DOI Status Report to the Court Number Twenty (Feb. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 11

DOI Status Report to the Court Number Twenty-One (May 2, 2005) . . . . . . . . . . . . . . . . . . . . 12

DOI Status Report to the Court Number Twenty-Two (Aug. 1, 2005) . . . . . . . . . . . . . . . . . 11, 12

DOI Status Report to the Court Number Twenty-Three (Nov. 1, 2005) . . . . . . . . . . . . . . . . 13, 14

DOI Status Report to the Court Number Twenty-Five (May 1, 2006) . . . . . . . . . . . 12, 14, 15, 23

DOI Status Report to the Court Number Twenty-Six (July 27, 2006) . . . . . . . . . . . . . . . . . . . . . . 15

DOI Status Report to the Court Number Twenty-Eight (Feb. 1, 2007) . . . . . . . . . . . . . 15, 18, 23

George G. Bogert & George T. Bogert, The Law of Trusts & Trustees § 962
(2d ed. revd. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

George T. Bogert, Trusts §§ 14-142 (Practitioner's ed. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

H.R. Rep. No. 103-778 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3467 . . . . . . . . . . . . . . . . . . . 20

NARA, Disposition of Federal Records: a Records Management Handbook 140
(2000 web ed.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 24

Testimony of Hon. Earl E. Devaney, Inspector General for DOI,
before Subcommittee on Energy and Resources, U.S. House of
Representatives (Sept. 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## QUESTION PRESENTED

Is entry of a Record Retention Order ("RRO") prohibiting destruction and establishing mechanisms for indexing and production of records relevant to this case in Defendant's possession, custody, or control warranted where such records are critical to determinations of liability and damages in this action, Defendant has repeatedly destroyed or lost and continues to destroy or lose irreplaceable Indian trust records in violation of Defendant's own administrative directives and court orders in other pending litigation requiring their preservation, and entry of an RRO here will preserve such records necessary for resolution of this case without imposing undue burden on Defendant?

## STATEMENT OF THE CASE

### I. DEFENDANT EXERCISES FIDUCIARY CONTROL AND SUPERVISION OVER PLAINTIFF'S TRUST ASSETS.

Plaintiff is a federally recognized Indian tribe that occupies the largest Indian Reservation in the United States. *United States v. Navajo Nation*, 537 U.S. 488, 495 (2003).

> The Navajo Indian Reservation, which was created by the Treaty of 1868, is located in parts of New Mexico, Arizona and Utah. Legal title to the Reservation . . . [has been] held by the United States in trust for the Tribe at all times material herein. . . . [T]he natural resources on the Reservation, like the Reservation itself, [a]re held by the United States in trust for the Tribe. The Tribe [i]s the beneficial owner of these natural resources.
>
> . . . . At all times material to this action, the defendant had a responsibility to supervise the affairs of the Tribe, which is prohibited by law from alienating its property without the defendant's consent. From the creation of the reservation, certain rights and responsibilities arose. One of the rights which plaintiff obtained was the right to the natural resources on its tribal reservation lands. The creation of the Reservation also placed certain responsibilities on defendant since it had control and supervision over tribal resources. The Court of Claims has found that a special or fiduciary relationship exists between the Government and the plaintiff Navajo Tribe with respect to tribal property. This special trust relationship and the responsibilities it creates covers the tribal natural resources in issue in this case.

*Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 227, 231-32 (1985). Defendant may not fail to discharge its fiduciary responsibilities over those trust assets "without rendering, or assuming an

obligation to render, just compensation for them." *United States v. Cherokee Nation*, 480 U.S. 700, 707 (1987); *see United States v. Mitchell*, 463 U.S. 206, 224-226 (1983); 25 U.S.C. § 162a(d).

Pursuant to the above relationship, Defendant has controlled and supervised the use or disposition of various resources at Plaintiff's Reservation from the mid-1800s to the present, including timber and gravel, and more recently, oil and gas, coal, uranium, vanadium, and other resources. Compl. ¶¶ 10-11; Ans. ¶¶ 10-11 (admitting revenue generated from use or disposition of Plaintiff's property and averring that Defendant "participated" in the authorization and management of such leases and agreements). Indeed, numerous prior decisions of this Court and its predecessors have enforced federal trust duties concerning a wide range of Navajo trust assets. *See, e.g., Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336, 344, 440 (1986) (concerning numerous timber claims); *Navajo Tribe*, 9 Cl. Ct. at 231 (concerning vanadium, uranium, copper, rock, sand, and gravel); *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 989-91 (Ct. Cl. 1980) (concerning timber and monies); *Navajo Tribe of Indians v. United States*, 364 F.2d 320, 322 (Ct. Cl. 1966) (concerning oil, gas, and helium).

Defendant's control and supervision of this use or disposition has taken place under various statutory, regulatory, and contractual schemes, including without limitation the Indian Mineral Leasing Act of 1938 ("IMLA"), 25 U.S.C. §§ 396a-396g; *see* 25 C.F.R. pts. 211, 216, the Indian Mineral Development Act of 1982, 25 U.S.C. §§ 2101-2108; *see* 25 C.F.R. pt. 225, the Federal Oil and Gas Royalty Management Act of 1982 ("FOGRMA"), 30 U.S.C. §§ 1701-1757; *see* 30 C.F.R. pts. 202-218, several Indian timber statutes dating from the early 1900s, 25 U.S.C. §§ 406, 407, 466, and the National Indian Forest Resources Management Act of 1990 ("NIFRMA"), 25 U.S.C. §§ 3101-3120; *see* 25 C.F.R. pt. 163. Other statutory and regulatory schemes govern Defendant's control and supervision of leasing land held in trust for Plaintiff, *see* 25 U.S.C. §§ 402, 402a, 415,

3715; 25 C.F.R. pt. 162, and grants of rights-of-way over Plaintiff's lands, *see* 25 U.S.C. §§ 311-328; 25 C.F.R. pt. 169.

Pursuant to the above federal statutes and regulations, proceeds generated from the use or disposition of Plaintiff's trust lands and other resources historically have been paid to Defendant. In particular, third-party contractors who remove Indian trust resources or lease trust lands typically pay for and document those transactions directly to Defendant and that documentation provides the sole method for determining the proper returns to trust beneficiaries such as Plaintiff. *See, e.g.,* 25 C.F.R. § 162.108 (summarizing Defendant's duties for handling payments under and administration of Indian leases); 25 U.S.C. § 406(a) (governing Indian timber payments); 25 C.F.R. §§ 163.22 (same), 211.40 (incorporating 30 C.F.R. ch. II to payments for Indian minerals); 30 C.F.R. pt. 218 (governing collection of minerals royalties, rents, bonuses, and other monies for federal leases).

Defendant holds proceeds from the use or disposition of Plaintiff's resources in trust for Plaintiff and exclusively manages them for Plaintiff's benefit. Compl. ¶ 10; Ans. ¶ 10. Defendant also holds and historically has held other funds in trust for Plaintiff, including trust funds resulting from settlement of and awards for various claims brought against Defendant. *See id.*; Navajo and Hopi Relocation Amendments of 1988, Pub. L. 100-666, § 7, 102 Stat. 3929, 3932, as amended, 25 U.S.C. § 640d-30 (concerning Navajo Rehabilitation Trust Fund); Indian Tribal Judgment Funds Use or Distribution Act, 25 U.S.C. §§ 1401-08; Arizona-Idaho Conservation Act of 1988, Pub. L. 100-696, §§ 403, 405, 102 Stat. 4571, 4587, 4591 (establishing Navajo Trust Fund based on proceeds of sale of Phoenix Indian High School); *Navajo Tribe v. United States*, 231 Ct. Cl. 1057 (1982) (settlement); *Navajo Tribe v. United States*, 228 Ct. Cl. 924 (1981) (settlement); *Navajo Tribe*, 9 Cl. Ct. at 272-73 (award); *Navajo Tribe*, 9 Cl. Ct. at 440 (award). Defendant, through the Department of the Treasury ("DOT" or "Treasury") in coordination with the Department of the Interior ("DOI"

or "Interior"), is required to invest all these trust funds either in public debt securities with suitable maturities and bearing interest rates determined by Defendant in light of the market, 25 U.S.C. § 161a(a), or in guaranteed or public debt obligations of the United States, *id.* § 162a(c)(1).

Numerous statutory provisions define in detail Defendant's additional fiduciary duties regarding Plaintiff's trust funds. For example, under the Indian Trust Fund Management Reform Act of 1994 ("Indian Trust Reform Act"), 25 U.S.C. §§ 162a & 4001-4061, Defendant is required to account for the daily and annual balance of all funds held in trust for Indian tribes, such as Plaintiff. 25 U.S.C. § 4011(a). Defendant also is required to provide an annual audit of such trust funds and quarterly statements identifying the source, type, and status of the funds; the beginning balances; the gains and losses; receipts and disbursements; and the ending balances. *Id.* § 4011(b)-(c). Defendant's proper discharge of its trust duties regarding Plaintiff's trust funds also includes compliance with the following:

> (1) Providing adequate systems for accounting for and reporting trust fund balances.
> (2) Providing adequate controls over receipts and disbursements.
> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
> (4) Determining accurate cash balances.
> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.

*Id.* § 162a(d); *see also* 25 U.S.C. §§ 161a, 161b; 25 C.F.R. §§ 115.700-.820.

The express terms and necessary implications of all these statutes and regulations, in accordance with the law of trusts, govern and define Defendant's management duties regarding Plaintiff's trust assets, including both trust resources and trust funds. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474-79 & nn.3-4 (2003) (concerning building maintenance); *Nevada v. United States*, 463 U.S. 110, 142 (1983) ("[W]here only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a

beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States.") (Rehnquist, J.); *United States v. Mason*, 412 U.S. 391, 398 (1973); *Cobell v. Norton*, 240 F.3d 1081, 1098-99 (D.C. Cir. 2001) (concerning individual Indian money trust accounts); *Navajo Tribe*, 624 F.2d at 986-88 (rejecting contentions that enforceable fiduciary duties require express provision in treaty, statute, or other document and are limited to such precise terms). Under those principles, Defendant's conduct should be judged "'by the most exacting fiduciary standards.'" *Cobell*, 240 F.3d at 1099 (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)). Moreover, Defendant "'cannot escape [its] role as trustee by donning the mantle of administrator[.]'" *Id.* (citation omitted).

## II. DEFENDANT IS LEGALLY BOUND TO PRESERVE PLAINTIFF'S TRUST RECORDS TO PROTECT PLAINTIFF'S LEGAL RIGHTS.

As a necessary corollary to the above fiduciary management and accounting duties arising out of Defendant's control and supervision over the use or disposition of Plaintiff's trust assets under the Indian Trust Reform Act, the IMLA, the FOGRMA, the NIFRMA, and other governing statutes, Defendant (and others handling the use or disposition of Plaintiff's trust assets under Defendant's direction) must generate and preserve all records that document Defendant's (mis)management of Plaintiff's trust assets. *See* 25 U.S.C. § 162a(d)(1)-(5) (concerning funds); 25 C.F.R. §§ 115.1001 (funds), 162.112 (leases), 163.22(c) (timber), 211.46 (minerals), 225.35 (minerals); 30 C.F.R. §§ 212.50, .50, .200 (minerals). Because "'[t]he records are the base for the entire trust operation,'" *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 43 (D.D.C. 1999) (quoting trial testimony of the Department of the Interior's Acting Special Trustee), *aff'd sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001), a trustee such as Defendant here has a fundamental duty "to keep full, accurate, and orderly

records of the status of the trust administration and of all transactions thereunder." George G. Bogert & George T. Bogert, The Law of Trusts & Trustees § 962, at 18 (2d ed. rev. 1983).

In other words, "Interior is under the duty to retrieve and retain all information . . . necessary to render an accurate accounting of all . . . [Indian assets] held in trust by the United States." *Cobell II*, 91 F. Supp. 2d at 42, 58, and those who administer Indian trust assets must, among other things, "maintain and complete existing records" and "recover missing records where possible[.]" *Cobell III*, 240 F.3d at 1105; *see also Cobell v. Babbitt* ("*Cobell I*"), 37 F. Supp. 2d 6, 23 (D.D.C. 1999) ("it is basic hornbook law that the trustee has the duties of retaining trust documents, keeping records, furnishing information to the beneficiary, and providing an accounting") (citing George T. Bogert, Trusts §§ 14-142 (Practitioner's ed. 1987)). As DOI's Indian timber regulations provide, the preparation and filing of information regarding the disposition of Indian trust assets "must allow the Secretary to maintain [her] trust responsibility through written verification that all required deposits, payments, and disbursements have been made." 25 C.F.R. § 162.22(c).

These fiduciary duties are also given effect in the Federal Records Act. The statutes collectively known as the Federal Records Act, 44 U.S.C. Chapters 21, 29, 31, and 33, define the term "records" very broadly, 44 U.S.C. § 3301, and provide that "each Federal agency shall make and preserve records . . . to protect the legal and financial rights of the Government *and of persons directly affected by the agency's activities*[,]" *id.* § 3101 (emphasis added). *See generally Armstrong v. Executive Office of the President*, 1 F.3d 1274, 1278-79, 1287 (D.C. Cir. 1993) (explaining application of the Act and holding that it applies to substantive e-mails). The Act requires each agency to establish safeguards against the loss or removal of necessary and required records, 44 U.S.C. § 3105, and prescribes record transfer requirements, *id.* § 3103, and exclusive procedures for disposal of federal records, *id.* § 3314. Consistent with these various provisions, DOI regulations

governing the management and administration of Indian trust funds and Indian leases recognize that records concerning "the organizations, functions, policies, procedures, operations, or other activities undertaken in the performance of a federal trust function" thereunder are necessary to "adequately document essential transactions [and] furnish information necessary to protect [Indians'] legal and financial rights" and that they must be preserved in accordance with the Federal Records Act. 25 C.F.R. §§ 115.001, 115.1000(a)(2), 115.1001(a)-(b) (concerning funds); 25 C.F.R. §§ 162.111(a)(2), 162.112(a)-(b) (concerning leasing records).

Under the Federal Records Act, federal records such as those concerning Indian trust asset management may be disposed of only pursuant to schedules approved or promulgated by the Archivist of the United States, through the National Archives and Records Administration ("NARA"). *See* 44 U.S.C. § 3303a(a), (d); *see generally* 36 C.F.R. pts. 1220-38 (governing federal records management) In addition, the Act provides that:

> [r]ecords pertaining to claims and demands by or against the Government of the United States or to accounts in which the Government . . . is concerned . . . may not be disposed of by the head of an agency under authorization granted under this chapter, unless the claims, demands, and accounts, have been settled and adjusted in the General Accounting Office [("GAO")], except upon the written approval of the Comptroller General of the United States.

44 U.S.C. § 3309; *see* 36 C.F.R. § 1228.30(d) (requiring GAO approval before or concurrently with seeking NARA approval for disposal of such records).

Regulations promulgated under the Federal Records Act similarly define records that are essential to protect the legal and financial rights of those affected by Government activities as "vital," 36 C.F.R. § 1236.14, and require that they be "adequately protected, accessible, and immediately usable[,]" *id.* § 1236.20(d). In turn, NARA's Records Management Handbook provides that NARA approval for continued maintenance of records is "unnecessary when a court order

requires the retention of records beyond the scheduled retention period[,]" and that NARA will withdraw previously granted disposal authority "whenever the disposal would harm Government interests or individual rights[,]" NARA, Disposition of Federal Records: a Records Management Handbook 140 (2000 web ed.), *available at* www.archives.gov/records-mgmt/pdf/dfr-2000.pdf. These provisions of NARA's own Handbook establish that Defendant's lead record-keeping agency understands the legal requirements relevant to the retention and preservation of records.

Consistent with the above, regulations promulgated by DOI's Minerals Management Service ("MMS") regarding collection, payment, and auditing of rents, royalties, and other payments for disposition of Plaintiff's valuable nonrenewable mineral resources provide that such records must be maintained when an audit or investigation is underway until the recordholder is released by written notice. 30 C.F.R. §§ 212.50, 212.51(b). Unfortunately, those regulations also provide, regardless of whether the trustee has yet accounted to the beneficiary, that such Indian mineral leasing records need only be maintained for 6 years after they are generated "unless the recordholder is notified, in writing, that records must be maintained for a longer period." *Id*. The regulations thus properly require preservation of records relevant to pending disputes, but do not also provide for notice thereof, to take such records out of the standard six-year record destruction schedule.

In summary, Defendant has affirmative fiduciary and statutory duties to preserve all Plaintiff's trust records in Defendant's possession, custody, or control. This duty is automatically reinforced for pending litigation about discharge of Defendant's trust management duties, even though Defendant's regulations do not fully implement that additional duty. Plaintiff is especially entitled to compliance with this enhanced duty here because Defendant maintains *exclusive* control over many transactions and records regarding the administration of Plaintiff's trust assets. *See, e.g.,* 25 U.S.C. § 406(a); 25 C.F.R. §§ 162.108, 163.22, 211.40; 30 C.F.R. pt. 218. Such records will

often provide the *only* documentation that Plaintiff can review to ensure proper management of Plaintiff's trust assets. Finally, NARA's Records Management Handbook *expressly* provides for suspension of standard record destruction schedules when courts enter record retention orders.

## III. DEFENDANT HAS GROSSLY AND CONSISTENTLY FAILED TO PRESERVE INDIAN TRUST RECORDS.

Defendant has consistently failed to preserve Indian trust records notwithstanding the above statutory, regulatory, and fiduciary duties as well as numerous reports detailing Defendant's record retention deficiencies, numerous administrative directives reiterating record retention requirements, and numerous court orders requiring preservation of such records in pending related litigation. While this Court recognized these circumstances in entering record retention orders in similar litigation in March 2004, Defendant's self-admitted and court-recognized Indian trust record retention deficiencies have continued.

### A. Defendant's Deficient Record Retention Regime Was Sufficiently Sloppy to Support this Court's Entry of Record Retention Orders in Early 2004.

In March 2004, this Court entered record retention orders similar to that requested here in *Pueblo of Laguna v. United States*, No. 02-24L and *Jicarilla Apache Nation v. United States*, No. 02-25L. *See Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004); Order, *Jicarilla Apache Nation v. United States*, No. 02-25L (C.F.C. March 19, 2004). In ruling that such an order was warranted then, the Court noted numerous

> examples of the government's mishandling of Indian records, among them: many instances of the destruction of documents, including electronic records, containing, or possibly containing, Indian-related information; the unsatisfactory oversight of administrative procedures; the inability of management to respond effectively when made aware of violations; the general disrepair of many facilities in which Indian records have been stored; the insufficient implementation of regulations regarding Indian-record retention and the lack of suitable systems and methods for ensuring preservation; the lack of security for computers containing Indian data; and numerous examples of improper attempts to transfer Indian records.

*Pueblo of Laguna*, 60 Fed. Cl. at 138 (concerning matters documented in *Cobell v. Norton* (now *Kempthorne*), No. 96-1285 (D.D.C. filed June 1996)).

Moreover, this Court recognized that many of the above Indian trust record retention issues "continued notwithstanding efforts by the Department of Interior [("DOI")] and other government agencies to make meaningful administrative changes" and that Defendant did "not contest that documents or data relevant to the *Cobell* litigation have been lost or destroyed." *Id.* at 139. Based on this record, the Court concluded that "the failures evidenced in *Cobell* appear to be so pervasive and systematic as to provide ample support for the issuance of a document preservation order in this case." *Id.*; *cf. Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Norton*, 211 F. Supp. 2d 157, 158-59 (D.D.C. 2002) (noting substantial commonalities between *Cobell* and other pending cases regarding breach of fiduciary duties in federal management of tribal trust assets).

**B. Defendant Has Repeatedly Failed to Protect and Preserve Indian Trust Records Notwithstanding this Court's Prior Record Retention Orders.**

Notwithstanding entry of record retention orders in *Laguna* and *Jicarilla* and prior record retention orders in *Cobell*, Defendant has continued to fail to preserve or protect Indian trust records from loss or destruction. Such deficiencies since completion of briefing on the record retention orders in *Laguna* and *Jicarilla* include copious examples over the following three-plus years.

**1. In 2004, DOI let 50 boxes of Indian trust records get drenched, was often unable to locate surveys, failed to perform email backups, and had to address 269 to 350 contaminated boxes of Indian trust records.**

In February 2004, an entire pallet containing 50 boxes of records at DOI's Office of Trust Records ("OTR") in Albuquerque was "'wet from the top down'" from a roof leak that caused one of the inside walls to look "'like a mini waterfall.'" *Cobell v. Norton*, 224 F.R.D. 1, 6 (D.D.C. 2004) (quoting OTR letters). At the same time that incident was reported, OTR reported that 350 boxes

of records had been identified as being moldy, and for which the initial cleaning process was not successful. *Id.*

In May 2004, DOI reported that Bureau of Land Management ("BLM") cadastral surveyors were often unable to locate surveys conducted by the Bureau of Indian Affairs ("BIA") from the 19th and 20th centuries and that such "[i]ncomplete records can lead to errors in current official surveys and impair the bona fide rights of individual Indians, tribes and fee land owners." DOI Status Report to the Court Number Seventeen 12 (May 1, 2004), *available at* www.doi.gov/ost/trustdocuments/CourtDocs/QuarterlyReports/Quarterly_17.pdf. In November 2004, DOI reported these issues again and that "BLM will continue to search for the records as surveys are performed." DOI Status Report to the Court Number Nineteen 12 (Nov. 1, 2004) ("19th Interior Report"), *available at* www.doi.gov/ost/trustdocuments/ CourtDocs/QuarterlyReports/Quarterly_19.pdf.

Between July and December 2004, two BIA internal mail servers failed to send emails to the BIA's digital safe. DOI Status Report to the Court Number Twenty 8 (Feb. 1, 2005), *available at* www.doi.gov/ost/trustdocuments/CourtDocs/QuarterlyReports/Quarterly_20.pdf.

In September 2004, DOI hired a contractor to "assess and prescribe treatment for records that were or may have been damaged or contaminated by mold, mildew, mouse droppings, and other adverse elements." 19th Interior Report at 31. At the end of that quarter, there were 269 such boxes that needed to be assessed at OTR. *Id.*

**2. In 2005, a NARA employee disposed of numerous permanent Indian trust records, some of which were not recovered, and DOI had long-standing and extensive email backup problems, continued to have many serious IT security challenges, and was still working to address hundreds of contaminated boxes of Indian trust records.**

In February through June 2005, DOI had problems transmitting emails to ZANTAX, a contractor that archived emails sent to and from certain bureaus and offices. DOI Status Report to

the Court Number Twenty-Two 10-11 (Aug. 1, 2005) ("22nd Interior Report"), *available at* www.ost.doi.gov/trustdocuments/Court Docs/QuarterlyReports/Quarterly_22.pdf. The affected agencies included the BIA, the BLM, the Office of Surface Mining, the Office of the Solicitor, and DOI's National Business Center ("NBC"). *Id.* at 11. DOI was still working on some of those issues as of August 2005. *Id.*

By May 2005, it was determined that 140 of the above-referenced OTR boxes that had been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements had records that were at least partially illegible or unclear. DOI Status Report to the Court Number Twenty-One 30 (May 2, 2005), *available at* www.doi.gov/ost/trustdocuments/CourtDocs/QuarterlyReports/Quarterly_ 21.pdf.

By June 2005, the total of damaged or contaminated OTR boxes had increased to 285 and they were shipped to NARA for remediation. 22nd Interior Report, *supra*, at 35.

In August 2005, DOI reported that it had remediated and closed out 453 information technology ("IT") security weaknesses over the preceding quarter but identified 521 new such weaknesses so that 1,260 open IT security weaknesses were being tracked at the end of the preceding quarter. DOI Status Report to the Court Number Twenty-Five 9 (May 1, 2006) ("25th Interior Report"), *available at* www.doi.gov/ost/ trustdocuments/CourtDocs/QuarterlyReports/Quarterly_ 25.pdf. DOI also reported that it must address "many challenges" concerning its IT systems, including "integration, performance, funding, security, and data integrity[.]" *Id.* at 12.

In September 2005, a NARA employee in seven separate incidents disposed of numerous permanent federal records of DOI and other federal agencies. Letter from Jason R. Baron, Director of Litigation, Office of General Counsel, NARA, to Dennis Gingold 1 (Sept. 28, 2005), attached to Notice of Filing of Sept. 2005 Status Report by DOI OTR, *Cobell v. Norton*, No. 1:96CV 01285

(D.D.C. Oct. 1, 2005), *available at* www.usdoj.gov/civil/cases/cobell/docs/pdf/10172005_notice.pdf. While many of these records were later found in trash baskets, a dumpster, and a trash compactor, including numerous files for the Chippewa Tribe, the Flathead Agency, and the Billings area office, *id.* at 2-3, about 25 identified Consolidated Chippewa files remained unrecovered as of December 2005, *see* Letter from Jason R. Baron, Director of Litigation, Office of General Counsel, NARA, to Dennis Gingold, Esq. 2 (Sept. 28, 2005), attached to Notice of Filing of Nov. 2005 Status Report by DOI OTR, *Cobell v. Norton*, No. 1:96CV 01285 (D.D.C. Dec. 15, 2005), *available at* www.usdoj.gov/civil/cases/cobell/docs/pdf/12152005_notice.pdf.

In October 2005, the DOI Office of the Inspector General ("OIG") reported that the DOI's network security was seriously vulnerable to hackers. DOI OIG, Semi-Annual Report to Congress 3-4 (Oct. 2005), *available at* www.doioig.gov/upload/SemiAnnual_Oct-05-Sm.pdf. "With few exceptions," the OIG could compromise bureaus' information technology ("IT") infrastructures, and could access some of DOI's most sensitive information, such as financial- and privacy-related data. *Id.* at 3. Furthermore, DOI was slow in responding to the OIG's recommendations, "specifically on those involving sensitive- and privacy-related information." *Id.* Also, DOI's plan to remedy IT security weaknesses was "ineffective" and its process for that was "incomplete, inaccurate, and misleading" because DOI had failed to identify or describe IT security weaknesses and planned corrective action. *Id.* at 4. "In addition, about half (64 of 133) of the weaknesses reported as corrected that we tested were not corrected. As a result, DOI lacks assurance that the most critical security weaknesses are being corrected first and that its systems and data are adequately safeguarded." *Id.*

In November 2005, DOI reported long-standing, substantial, and widespread email backup problems. DOI Status Report to the Court Number Twenty-Three 8-9 (Nov. 1, 2005), *available at*

www.doi.gov/ost/trustdocuments/CourtDocs/QuarterlyReports/Quarterly_23.pdf. As a result of those problems, the Office of Special Trustee had to send 160 backup tapes to a contractor to recover missing data from February through September 2005, the NBC office in Washington, DC, had to send 419 backup tapes concerning August 2004 through August 2005, the Office of the Solicitor had to send 96 backup tapes concerning February through October 2005, and the BIA expected to send 280 backup tapes concerning October 2003 through January 2005, since BIA tapes covering earlier periods already had been sent to the contractor. *Id.*

By December 2005, remediation was still pending for 46 of OTR's damaged and contaminated Indian trust record boxes apparently first identified in February 2004. *Compare* 25th Interior Report, *supra*, at 22 *with Cobell*, 224 F.R.D. at 6.

**3. In 2006, Treasury lost dozens of boxes with unduplicated check-balancing records and had multiple incidents of water-damaged check records and OST had computers, flash drives, and data CDs stolen, while BIA shredded original Navajo records, let Jicarilla records get wet, and had 268 blank backup tapes requiring data recovery, and DOI still had unremediated contaminated records and continued to have serious IT security issues that threatened Indian trust records.**

In January 2006, the DOI OIG issued a report that detailed IT security vulnerabilities that would allow unauthorized users access to sensitive data located on DOI's NBC network. 25th Interior Report, *supra*, at 8. The concern was that the IT Center could be physically entered by anyone with access to the Main Interior Building. *Id.* As of May 2006, DOI had implemented corrective actions for a majority of the vulnerabilities while some identified vulnerabilities remained outstanding. *Id.*

In February 2006, OTR was notified of allegations of destruction of trust records at the BIA Fort Defiance Agency, within the Navajo Nation. 25th Interior Report, *supra*, at 22. A subsequent investigation "concluded that approximately one cubic foot of documents, comprised of original

incomplete sand and gravel permits (which were considered to be records) and non-record duplicate copies of archaeological clearances and reports were shredded by Agency staff." *Id.* As a follow-up to this record destruction, "OTR provided records management briefings specifically targeted to the managers of BIA programs in the BIA Navajo Region. . . . to reinforce the record keeping responsibilities of managers." *Id.* at 22-23.

By April 2006, NARA had completed remediation of all but six of approximately 283 boxes requiring remediation dating back to February 2004. DOI Status Report to the Court Number Twenty-Six 23 (July 27, 2006), *available at* www.doi.gov/indiantrust/26th%20Report%20to%20 the%20Court%208-1-06.pdf. "The materials NARA could not repair consisted of one box that has about 25% of its contents covered with a tar-like substance; one entire box that had mold and the files are stuck together; and one box of green bar printouts from 1989 oil and gas royalty disbursements that have holes in the printout caused by insects[; and]. . . [t]hree boxes [that] have extensive water damage and the contents are stuck together . . . [such that] NARA recommended the contents should not be separated or further damage will result." *Id.*

In May 2006, DOI reported that out of 280 BIA backup tapes sent to a contractor for data recovery, 268 tapes were blank and 12 tapes had only partial data. 25th Interior Report, *supra*, at 6. By December 2006, DOI had awarded a contract for forensic analysis of the 268 blank backup tapes. DOI Status Report to the Court Number Twenty-Eight 46 (Feb. 1, 2007) ("28th Interior Report"), *available at* www.doi.gov/indiantrust/pdf/Status_Report_to_the_Court_Number_Twenty_Eight_2_1_07.pdf.

In June 2006, microfilm working copies of negotiated Treasury checks were water damaged when the basement of the Financial Management Service Office in Hyattsville, Maryland flooded from rains, exposing to water the bottom drawers of a large group of file cabinets. Notice of Filing

of Twenty-Seventh Quarterly Report on Actions Taken by Dept. of Treasury [("Treasury")], *Cobell v. Kempthorne*, No. 1:96CV01285, report enclosure ("27th Treasury Report") at 1 (D.D.C. Sept. 1, 2006), *available at* www.usdoj.gov/civil/cases/cobell/docs/pdf/09012006_notice.pdf. As of December 2006, the water-exposed cartridges had been packed into approximately 200 boxes and moved to a secure area and sample microfilm cartridges had been sent to a contractor for assessment. Notice of Filing of Twenty-Eighth Quarterly Report on Actions Taken by Treasury, *Cobell v. Kempthorne*, No. 1:96CV01285, report enclosure ("28th Treasury Report") at 1 (D.D.C. Dec. 1, 2006), *available at* www.usdoj.gov/civil/cases/cobell/docs/pdf/12012006_notice.pdf.

In July 2006, a sprinkler burst from a water main break at the Washington National Records Center in Suitland, Maryland, affecting approximately 124 boxes of records of Treasury's Financial Management Services, some of which boxes contained "types of records that could include [Individual Indian Money]-related records (e.g., Treasury checks and check claim documents)." 27th Treasury Report, *supra*, at 2. As of December 2006, the affected boxes had been sent to a contractor to be freeze-dried, and some records had been returned in good condition, although it was reported that it might take several more months for the contractor to dry the remaining records and return them. 28th Treasury Report, *supra*, at 1.

In July 2006, the United States Court of Appeals for the District of Columbia Circuit issued a decision in the ongoing *Cobell* litigation recognizing that "the evidence of flaw's in Interior's IT security is extensive" and that "an individual with the requisite skills and resources could gain access to many of Interior's systems" and "may indeed . . . even alter [Individual Indian Trust Data] . . ." *Cobell v. Kempthorne*, 455 F.3d 301, 315 (D.C. Cir. 2006); *see id.* at 308-11 (reviewing extensive findings of fact by district court, "which Interior does not challenge").

In August 2006, a water leak from an exhaust vent to an overhead heater affected six boxes of records at the BIA Jicarilla Agency Records Center. Letter from Robert W. Rodrigues, Envt. & Nat. Resources Div., U.S. Dept. of Justice, to Deidre A. Lujan *et al.*, Nordhaus Law Firm, LLP 1-2 (Oct. 13, 2006), attached hereto as Plaintiff's Exhibit 1. While the affected boxes included one containing trust fund reports and investment files and all of the affected records had to be reboxed, only one of the boxes had records that were water-stained but spread out to dry. *Id.* at 2. The incident was only reported to the Jicarilla Apache Nation in October 2006 in response to an inquiry by attorneys for the Jicarilla Apache Nation who had observed the site at issue. *See id.* at 1.

In September 2006, DOI's Inspector General provided broad context for DOI's ongoing record retention deficiencies in formal testimony to the House of Representatives. Testimony of Hon. Earl E. Devaney, Inspector General for DOI, before Subcommittee on Energy and Resources, U.S. House of Representatives (Sept. 13, 2006), *available at* http://www.doioig.gov/uploadPDF/Testimony_of_Earl_Devaney_MMS.pdf. Most pointedly, DOI's Inspector General testified that the culture at DOI inherited by Secretary Kempthorne "sustains managerial irresponsibility and a lack of accountability" because "[s]imply stated, short of a crime, anything goes at the highest levels of the Department of the Interior." *Id.* at 5. Examples include "intricate deviations from statutory, regulatory and policy requirements to reach a predetermined end[,]" "massive project collapses[,]" and "failure to hold the leadership of the Department accountable[, which] sets the stage for the remainder of the workforce." *Id.* at 5, 7.

In December 2006, Treasury reported that 37 boxes of records at the Federal Reserve Bank of St. Louis dating from 2003, 2004, and 2005 were not located during an inventory. 28th Treasury Report, *supra*, at 1. Some of the boxes contained "control" information that was used in balancing

Treasury checks and adjusting out-of-balance Treasury checks and which might not be available from other sources. *Id.*

Also in December 2006, four computers, four flash drives, and an unknown number of CDs were stolen from an office operated by a tribe on behalf of DOI's Office of Special Trustee. Notice of Filing of Interior Defendants' Twenty-Ninth Status Report, *Cobell v. Kempthorne*, No. 1:96CV 01285, report enclosure ("29th Interior Report") at 43 (D.D.C. May 1, 2007), *available at* www.usdoj.gov/civil/cases/cobell/docs/pdf/05012007-notice.pdf. As of May 2007, the matter remained under investigation, though it had been determined that the stolen data files contained information on real property, lessees, and lessors. *Id.*

**4. In just the first five months of 2007, DOI has continued to have over 1,000 IT security problems leaving Indian trust data dangerously insecure and vulnerable, including unsecured appraisal data, while the former Deputy Secretary responsible for Indian trust record retention pled guilty to lying to Congress and the Attorney General and DOI have proposed to repudiate enforceable federal-Indian trust duties.**

In January 2007, someone tried to break into the BLM computer room containing servers for the Legacy Rehost 2000 system. 29th Interior Report, *supra*, at 44, 55. Perhaps including the forgoing, in February 2007, DOI reported that it had eliminated 266 IT security weaknesses but identified 444 new ones so that 1,880 weaknesses remained outstanding. 28th Interior Report at 44.

In March 2007, ZANTAZ, DOI's email archiving contractor, notified DOI that a file containing pass codes was inadvertently sent to another ZANTAZ customer. 29th Interior Report, *supra*, at 44. That same month, former Deputy Secretary of the Interior James Steven Griles pleaded guilty to obstruction of proceedings before the United States Senate, based on providing materially false and misleading statements and testimony to the Senate Indian Affairs Committee in an October 2005 Senate interview and a November 2005 Senate hearing. Plea Agreement*, United States v.*

*James Steven Griles*, No. 1:07CR00079-ESH-1, at 1 (D.D.C. March 21, 2007); *id.*, Attach. A at 6, *available at* www.usdoj.gov/criminal/pr/press_releases/2007/03/2007_5070_3_03-23-07griles- plea. pdf. This is significant here because Defendant has previously relied on directives issued by Mr. Griles regarding Indian trust record retention as a basis for why this Court should not enter record retention orders relating to pending Indian trust mismanagement litigation. *See, e.g.,* Memo from J. Steven Griles, Dep. Sec. of Interior, to All Employees (March 20, 2002), attached hereto as Plaintiff's Exhibit 2; Def.'s Opp. to Pl.'s Mot. for Entry of Pl.'s Record Retention Order, *Jicarilla Apache Nation v. United States*, No. 02-25L (C.F.C. Nov. 5, 2003), at 3, App. 8 (April 2003 Griles memo), App. 27 (March 2002 Griles memo); *see especially id.* at 22 (arguing that "[t]he few incidents identified by plaintiffs [sic] occurring after these measures were put in place, were isolated incidents, appropriately dealt with by the agencies involved.").

Also in March 2007, the Secretary of the Interior and the Attorney General proposed legislation that, among other things, would "[r]elieve[] the government of all historical accounting obligations, and deem[] account balances accurate[,]" "require[] conversion of all Tribal trust lands into Tribal-managed trust status within 10 years[,]" "[e]nd[] all tribal historical accounting claims, cash mismanagement, and land mismanagement issues[,]" and "prevent future mismanagement liability claims for any residual responsibilities that the government would continue to provide[.]" Letter from Dirk Kempthorne, Sec. of Interior, & Alberto R. Gonzales, Attorney General, to Byron Dorgan, Chairman, Comm. on Indian Affairs, U.S. Senate (March 1, 2007) at enclosure, *available at* indian.senate.gov/public/_files/letterfromkempthorne.pdf. Essentially, Defendant's lead attorney and its primary trustee-delegatee proposed a unilateral termination of all enforceable federal trust duties to Indian tribes without any prior consultation with the beneficiaries of that trust relationship. *See id.* at 2 (noting only prior discussions with Senate staff). While this unilateral proposal to

repudiate enforceable federal-Indian trust duties did not directly threaten Indian trust record retention under existing statutory mandates, it raises substantial concern for how seriously Defendant takes its fiduciary obligations to Plaintiff and other Indian tribes because a permanent federal-Indian trust relationship was fully paid for in advance through various treaty and statutory cessions of land and other rights by tribes. *Cf. Cobell v. Babbitt*, 91 F. Supp. 2d 1, 6 (D.D.C. 1999), *aff'd*, 240 F.3d 1081, 1110 (D.C. Cir. 2001) (United States has long benefitted from vast Indian land cessions exchanged for trust relationship); H.R. Rep. No. 103-778, at 9-10 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3467, 3468-69 (same). Indeed, contrary to the recent suggestion that the federal-tribal trust relationship is a gratuity that may be dispensed with unilaterally, the United States by formal treaties undertook permanent commitments to protect and legislate on behalf of the Navajo in exchange for both cessions of land and cessation of war. *See* Treaty Between U.S. and Navajo Tribe of Indians, arts. I, III, XI, Sept. 9, 1849, 9 Stat. 974; Treaty Between U.S. and Navajo Tribe of Indians, arts. I, IX, XIII, Aug. 12, 1868, 15 Stat. 667.

In April 2007, Congressman Tom Davis, Ranking Member of the House Committee on Oversight and Government Reform, issued a report giving DOI a second consecutive annual failing grade for computer security. Seventh Report Card on Computer Security at Federal Departments and Agencies (April 12, 2007), *available at* republicans.oversight.house.gov/Media/PDFs/FY06 FISMA.pdf. That same month—less than one month ago—the Director of Information Security and Privacy for the BIA Chief Information Office testified that "[t]oday, BIA IT security is inadequate and ineffective" and Individual Indian Trust Data "remain[s] dangerously insecure and vulnerable." Second Aff. [sic—Decl.] of Joan Tyler ¶ 9 (April 25, 2007) ("Tyler Decl."), *attached to* Pl.'s Opp. to Defs.' Mot. to Vacate Consent Order Regarding IT Security, *Cobell v. Kempthorne*, No. 96-1285

(D.D.C. May 7, 2007), *available at* http://indiantrust.com/index.cfm?FuseAction=PDFTypes.Home &PDFType_id=6&IsRecent=1.

In May 2007—just earlier this month—DOI reported that it had eliminated 418 IT security weaknesses during that reporting period but identified 542 new weaknesses, so that 2,014 IT weaknesses remained outstanding. 29th Interior Report, *supra*, at 42. Of those, 1,062 concern trust bureaus, thereby not including the National Park Service or the U.S. Geologic Service. *Id.* Of that smaller category, 155 (14.6%) IT security weaknesses were rated has having a high risk impact level, 474 (44.6%) had a medium risk impact level, and 433 (40.8%) had a low risk impact level. *Id.*

Also in May 2007, DOI reported that an appraisal record containing general Indian trust data had been found on a personal computer connected to the DOI National Business Center's network, requiring relocation of the record to a storage device and performance of a forensics analysis to ensure that there was no malicious code or other evidence of compromise that would pose a threat to the information. 29th Interior Report, *supra*, at 44, 56. Thus, not a month has gone by so far this year without some new revelation, admission, or report about further failures by the Department of the Interior—Defendant's primary trustee-delegate—to preserve and protect Indian trust records.

## ARGUMENT

This Court has previously held that it has authority to issue orders protecting and preserving potential evidence. *Pueblo of Laguna*, 60 Fed. Cl. at 135, 137; *see also United Med. Supply Co., Inc. v. United States*, 73 Fed. Cl. 35, 36 (2006) (following same). The Court also has required that "one seeking a preservation order demonstrate that it is necessary and not unduly burdensome." *Pueblo of Laguna*, 60 Fed. Cl. at 138; *see United Med. Supply Co.*, 73 Fed. Cl. at 36 (quoting same); *cf. Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 434 (W.D. Pa. 2004) (finding that *Pueblo of Laguna* test "does not appear to have adequate precision or sufficient

depth of analysis of the factors . . . germane to every preservation order"). Plaintiff here easily meets this Court's two requirements, as explained below. First, Defendant has continued to put at significant risk and even improperly destroy Navajo trust records notwithstanding all the prior relevant record retention directives and orders. Moreover, the proposed record retention order here—modeled on the Court's prior record retention orders in similar litigation—is sufficiently narrowly tailored that it will not unduly burden operations of Defendant's agencies.

## I. DEFENDANT'S DOCUMENTED RECENT LOSSES AND DESTRUCTION OF INDIAN TRUST RECORDS AND ITS CONTINUING INADEQUATE RETENTION PROCEDURES SUPPORT ENTRY OF A RECORD RETENTION ORDER HERE.

To satisfy the first prong of this Court's test for entry of a record retention order, "the proponent ordinarily must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed—a burden often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place." *Pueblo of Laguna*, 60 Fed. Cl. at 138; *see United Med. Supply Co.*, 73 Fed. Cl. at 36-37 (quoting same). The present circumstances readily satisfy both alternative requirements for entry of record retention order. Plaintiff has made a lengthy and particularized showing that Plaintiff's trust records in Defendant's possession, custody, or control have been destroyed and otherwise face significant risks of loss and destruction due to inadequate record retention procedures.

As elaborated in detail above, serious, ongoing, and systemic problems permeate Defendant's Indian trust records management and retention programs notwithstanding numerous internal administrative directives at the highest level (some by a now-admitted obstructor of Congress), numerous court decisions and other reports confirming Defendant's deficient record management practices for Indian trust records, and various court orders specifically mandating record retention. *See supra* pp. 9-20; *Pueblo of Laguna*, 60 Fed. Cl. at 138-39; *Cobell*, 455 F.3d at 308-11, 315. Entry

of a record retention order specific to this case is needed because Defendant's own administrative record retention policies and directives have proven to be ineffective alone, and previous record retention orders entered in other cases do not cover the records at issue here. *See, e.g., Pueblo of Laguna*, 60 Fed. Cl. at 139 (concerning *Cobell* orders), 141 (defining obligations "relevant to . . . the pending litigation"); *compare* Pl.'s Ex. 2 (2002 Griles memo requiring that DOI employees "must preserve Tribal Trust Documents involving all Tribes") *with supra* pp. 9-20 (documenting Defendant's record retention deficiencies from 2004 to present). Indeed, just last year, notwithstanding all that has gone on before, BIA Agency staff for the Navajo Nation shredded "approximately one cubic foot of documents" including "original incomplete sand and gravel permits (which were considered to be records)[,]" thereby requiring "records management briefings specifically targeted to the managers of BIA programs in the BIA Navajo Region. . . . to reinforce the record keeping responsibilities of managers." 25th Interior Report, *supra*, at 22-23.

Subsequent events establish that the above-referenced Navajo trust record destruction is not a mere isolated incident. Specifically, since then 268 needed BIA backup tapes have been found to be blank and requiring forensic analysis, 25th Interior Report, *supra*, at 6; 28th Interior Report, *supra* at 46, approximately 200 boxes of Treasury check microfilm cartridges and 124 boxes including Treasury checks and check claim documents have been affected by leaking water in different cities, 27th Treasury Report, *supra*, at 1-2; 28th Treasury Report, *supra*, at 1, Jicarilla trust records have been subject to leaking water notwithstanding entry of a record retention order specifically protecting those documents, *compare* Pl.'s Ex. 1 *with* Order, *Jicarilla Apache Nation v. United States*, No. 02-25L (C.F.C. March 19, 2004), dozens of boxes of Treasury checks have been lost, 28th Treasury Report, *supra*, at 1, computers and data storage devices for DOI's Office of Special Trustee have been stolen, *see* 29th Interior Report, *supra*, at 43, and even within the last month, electronic Indian

trust data "remain[s] dangerously insecure and vulnerable." Tyler Decl., *supra*, ¶ 9; *Assiniboine*, 211 F. Supp. 2d at 158-59 (recognizing that the same management, systems, and IT security applies for tribal and individual Indian trust funds and resources). These circumstances well establish significant, ongoing risks that relevant evidence for this case will be lost or destroyed absent entry of a record retention order specific to this case.

## II. THE PROPOSED ORDER WILL BE EFFECTIVE AND NOT IMPOSE UNDUE BURDEN BECAUSE IT IS BASED ON PRIOR ORDERS IN SIMILAR CASES WITH ONLY APPROPRIATE, WELL-FOUNDED MODIFICATIONS.

The proposed record retention order here satisfies this Court's requirement that such an order not be "unduly burdensome[,]" such that "the particular steps to be adopted will be effective, but not overbroad[,]" because "the court will neither lightly exercise its inherent power to protect evidence nor indulge in an exercise in futility." *Pueblo of Laguna*, 60 Fed. Cl. at 138; *see United Med. Supply Co.*, 73 Fed. Cl. at 37 (quoting same and citing additional cases adopting same). The accompanying proposed order satisfies this requirement in large part because it is consistent with existing statutes, regulations, and departmental policies mandating preservation of Indian trust records and records relevant to pending litigation. *Compare* [Proposed] Record Retention Order *with* Pl.'s Ex. 2 (2002 Griles memo); 44 U.S.C. § 3309; 36 C.F.R. §§ 1228.30(d), 1236.14, 1236.20(d); NARA Records Management Handbook, *supra*, at 140. Moreover, the accompanying proposed order is largely based on this Court's prior record retention orders in *Pueblo of Laguna*, No. 02-24L (March 19, 2004) and *Jicarilla Apache Nation*, No. 02-25L (March 19, 2004) and the identical amendment to each of April 18, 2005. *See* Redline of proposed Navajo Record Retention Order to Laguna Record Retention Order (May 21, 2007) ("Proposed Navajo RRO"), attached hereto as Plaintiff's Exhibit 3. The changes to the form of those orders reflect the different factual circumstances facing the parties concerning Navajo trust records, lessons learned through application of the earlier orders, and

amendments to the Federal Rules of Civil Procedure that, while not applicable in this Court, may inform the evolving treatment of electronic information. *See id.*

When record retention orders were entered in *Jicarilla* and *Laguna*, the parties were focused primarily on documents at OTR in Albuquerque, while Defendant was in the process of a massive migration of records to the American Indian Records Repository ("AIRR") in Lenexa, Kansas, and the central issue facing the parties was an orderly and timely review of documents before that move. Plaintiff believes that any Navajo records at OTR have long since been moved to Kansas. Thus, the proposed order is revised to reflect the likelihood that significant concentrations of documents relevant to this case are either still at BIA Navajo Regional or Agency offices or are already in Kansas. The proposed order allows for a more orderly review schedule by not triggering a specific timetable for review and production until Plaintiff designates records for review. *See* Proposed Navajo RRO ¶ 2(b)(ii). That provision provides an exception to that flexibility when the Defendant indicates that it desires to move records from the BIA Navajo offices, in which case the proposed order gives Plaintiff a limited period of time in which to designate the records for review prior to their movement. *See id.* Except in such circumstances, Plaintiff asserts that the resources of both parties can be better conserved and managed by allowing for more targeted review of on-Reservation collections as specific needs are identified. This contrasts to the concentrated review of over 6,000 boxes in Albuquerque in the *Jicarilla* and *Laguna* cases to facilitate the Defendant's movement of those boxes. That massive review placed significant burdens on both parties.

In the lessons learned category, Defendant's limited ability to produce useful inventories of documents is significant. While Defendant has a legal duty to provide detailed inventories sufficient to allow Plaintiff to identify the nature and location of its trust records, the reality is that the quality and precision of the inventories maintained by Defendant vary from location to location but are

generally wholly inadequate to locate documents with any level of certainty. Even the "flagship" Box Index Search System ("BISS") database used at the AIRR is significantly both over- and under-inclusive. Of over 6,000 boxes reviewed by the *Jicarilla* and *Laguna* plaintiffs, many contained no relevant records. Similarly, the box-level focus of the BISS (with some elements of file-level coding and very limited and incomplete document-level information) all but insures that a tribe using the BISS to identify boxes for review will not and cannot identify all boxes that contain relevant information. In light of the varying challenges facing the parties regarding indices and inventories, the proposed order here affirms Defendant's duty to provide meaningful inventories but also incorporates a realistic approach that allows the parties to address indexation and inventorying on a collection-by-collection basis in hopes that they can collaboratively arrive at workable resolutions. Accordingly, the concept of a global "indexation plan" is omitted from the proposed order. *See* Proposed Navajo RRO ¶ 3.

In addition, the proposed order contains additional provisions derived from recent amendments to the Federal Rules of Civil Procedure reflecting the evolving treatment of electronic data. While those amendments are not yet incorporated in the Rules of this Court, Plaintiff suggests that several aspects of those amendments should be incorporated into this order. For example, in proposed paragraph 2(c), Plaintiff has included language reflecting the amendments to Federal Rule of Civil Procedure 34(a) regarding the production of electronic data and other media "in reasonably usable form" and the ability of a party to also "sample" or "test" data, in addition to copying or inspecting it. Plaintiff also has included the phrase "data or data compilations in any medium" in the proposed paragraph 5(a) definition of "Documents, data, and tangible things" to track the language of Federal Rule of Civil Procedure 34(a) as amended. While Plaintiff does not believe that any of these revisions changes the intent of the prior similar orders entered by this Court, they may

provide greater clarity in certain situations and will more readily address the handling of electronic information in discovery.

Finally, a provision has been specifically added to the proposed order to specify that "[t]he parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Navajo Trust Records in a manner that will minimize the disruption of ongoing governmental activities." Proposed Navajo RRO ¶ 2(f). Especially when considered with the experience gained from over three years of implementation of the *Jicarilla* and *Laguna* record retention orders, the record retention order provisions proposed here will be effective at preserving relevant evidence for this case and facilitating efficient identification and production of that evidence without being overly broad or imposing any undue burden on Defendant.

## CONCLUSION

For the foregoing reasons, Plaintiff, the Navajo Nation, requests that the Court approve and enter the submitted Record Retention Order.

Respectfully submitted,

*/s/ Alan R. Taradash*

Alan R. Taradash
Nordhaus Law Firm, LLP
405 Dr. Martin Luther King, Jr. Ave. NE
Albuquerque, NM 87102
telephone: 505-243-4275
facsimile: 505-243-4464

Attorney of Record for Plaintiff
Navajo Nation

Dated: May 21, 2007

Of Counsel for Plaintiff:

Thomas J. Peckham
Daniel I.S.J. Rey-Bear
Deidre A. Lujan
Dana L. Bobroff
Nordhaus Law Firm, LLP
405 Dr. Martin Luther King, Jr. Ave. NE
Albuquerque, NM 87102
telephone: 505-243-4275
facsimile: 505-243-4464

Donald H. Grove
Nordhaus Law Firm LLP
1401 K Street NW, Suite 801
Washington, DC 2006
telephone: 202-530-1920
facsimile: 202-530-1270