UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NAVAJO NATION,<br>f.k.a. NAVAJO TRIBE OF INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-945 L<br>Judge Francis M. Allegra<br>**Electronically filed June 21, 2007** |

**Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order**

RONALD J. TENPAS
Acting Assistant Attorney General

ROBERT W. RODRIGUES
Trial Attorney
LAURA MAROLDY
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
JOHN H. MARTIN
Trail Attorney
United States Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044 - 0663

**TABLE OF CONTENTS**


Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Plaintiff Has Failed To Meet The Laguna Test For Entry Of A Record Retention Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. Plaintiff has Failed to Meet the Test Established in Laguna . . . . . . . . . . . . . . . . . . . 4

II. Interior's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate the Bases for an Order in Navajo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Interior has issued numerous Directives to ensure Preservation of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. The Acting Deputy Solicitor's March 12, 2007 Departmental Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

2. Interior Policy Memoranda Regarding the Movement of Inactive Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Opening of the AIRR and the Box Inventory Search System "BISS" . . . . . . . . . . . 10

C. Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Treasury's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate the Bases for an Order in Navajo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. The Material Offered by Plaintiff in its Motion Does Not Justify An RRO . . . . . . . . . . . . 14

Plaintiffs Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. Hard-Copy Records are Protected and Preserved Under Current Regulations, Guidelines, Directives, and Practices . . . . . . . . . . . . 16

2. The NARA Office of the Inspector General Promptly Investigated the NARA Episode to Which Plaintiff Refers; and the Lone Individual Responsible Has Resigned . . . . . . . . . . . . . . . . . . 17

3. The Steven Griles Plea and the March 1, 2007 letter from

Secretary Kempthorne and Attorney General Gonzales to the U.S. Senate Committee On Indian Affairs, Have No Relevance To Whether Plaintiff is Entitled to an RRO in this Case . . . . . . . . . . . . . . 18

4. The Ft. Defiance Agency Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5. The Reported Thefts from Yakama Tribal Offices Do Not Demonstrate Any Risk to Navajo Trust Records . . . . . . . . . . . . . . . . . . . . 20

6. The Department of the Treasury Took Prompt and Appropriate Steps to Mitigate the Effects of the Two Incidents Plaintiff Identifies; and There is No Indication Navajo-Related Documents Were Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7. Electronic Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V. Plaintiff's Proposed Retention Order is Burdensome and Misdirected . . . . . . . . . . . . . . . . 27

A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. Plaintiff's Proposed RRO is Ineffective and Overbroad under the Test of Laguna . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. The PPRO Extends the Review of Inactive Records to Agencies in Addition To the Department of the Interior . . . . . . . . . . . . . . . . . . . . . . 29

2. The PPRO Unacceptably Extends to Active Records . . . . . . . . . . . . . . . . 30

3. The Time Frames for Completion of Designation and Review are Substantially Extended, Including No Time Limits for Designation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4. Further Provisions Delaying the Record Review Process . . . . . . . . . . . . . 32

5. Extraneous Advocacy Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. The Burdensome Impact of the PPRO on Agencies' Missions . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

Capricorn Power Co., v. Siemens Westinghouse Power Corp.,
220 F.R.D. 429 (W.D. Pa. 2004) . . . . . 5

Chambers v. NASCO, Inc.,
501 U.S. 32 (1991) . . . . . 4, 40

Cobell v. Kempthorne,
455 F.3d 301 (D.C. Cir. 2006) (en banc) . . . . . 26

Coleman v. Am. Red Cross,
23 F.3d 1091 (6th Cir. 1994) . . . . . 29

Herbert v. Lando,
441 U.S. 153 (1979) . . . . . 28

In re Potash,
1994 WL 1108312 (D. Minn. Dec. 5, 1994) . . . . . 33

In re Prudential Ins. Co. Of America Sales Practices Litigation,
169 F.R.D. 598 (D. N.J. 1997) . . . . . 33

Kanemoto v. Reno,
41 F.3d. 641 (Fed. Cir. 1994) . . . . . 4

Leyh v. Modicon, Inc.,
881 F.Supp. 420 (S.D. Ind. 1995) . . . . . 37

Mack v. Great Atl. & Pac. Tea Co.,
871 F.2d 179 (1st Cir. 1989) . . . . . 28

Pueblo of Laguna v. United States,
60 Fed. Cl. 133 (Fed. Cl. 2004) . . . . . passim

Quality Aero Tech., Inc. v. Telemetrie Elektronik GmbH,
212 F.R.D. 313 (E.D.N.C. 2002) . . . . . 29

Rincon Band v. United States,
No. 80-A, 1980 U.S. Ct. Cl. LEXIS 1029 (Ct. Cl. February 29, 1980) . . . . . 29

Roadway Express, Inc., v. Piper,
447 U.S. 752 (1980) . . . . . 40

Treppel v. Biovail Corp.,
233 F.R.D. 363 (S.D.N.Y. 2006) . . . . . . . . . . 5

Williams v. Mass. Mut. Life Ins. Co.,
226 F.R.D. 144 (D. Mass. 2005) . . . . . . . . . . 5

Zubulake v. UBS Warburg LLC,
217 F.R.D. 309 (S.D.N.Y. 2003) . . . . . . . . . . 28

**FEDERAL STATUTES**

44 U.S.C. § 3541 . . . . . . . . . . 24
Public Law 93 - 638 . . . . . . . . . . 20, 21

**FEDERAL RULES**

Fed. R. Civ.P. 26 (b)(1) . . . . . . . . . . 28
Fed. R. Civ.P. 26 (b)(2) . . . . . . . . . . 28

# Exhibit List

1. Memorandum of Steven Griles, Deputy Secretary of the Interior, April 6, 2004

1a. Department Memorandum, March 20, 2002

2. Memorandum of Steven Griles regarding preservation obligations, July 9, 2004

3. Memorandum of Steven Griles regarding preservation obligations, July 13, 2004

4. Memorandum of Steven Griles regarding preservation obligations, October 26, 2006

5. Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007

6. Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005

7. Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006

7a. Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007

8. Declaration by Ethel J. Abeita, June 21, 2007

8a. Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003

9. Declaration from Omar Bradley Regional Director, Navajo Region, June 21, 2007

10. Memorandum from Ann Meister, April 1, 2004

11. FMS Insider

12. PD Webb

13. Memorandum of Nancy Fleetwood, February 23, 2007

14. Memorandum of Richard L. Gregg, February 14, 2006

15. Memorandum of Kenneth R. Papaj, August 10, 2006

16. Memorandum of Kenneth R. Papaj, February 16, 2007

17. Federal Register 43899 regarding BISS, July 29, 2005

18. FISMA Report FY2006

19. 19th Interior Report, November 1, 2004

20. 20th Interior Report, February 1, 2004 [sic] actual date is 2005

21. 21st Interior Report, May 2, 2005

22. 22nd Interior Report, August 1, 2005

23. 26th Interior Report, July 27, 2006

24. 28th Interior Report, February 1, 2007

25. 29th Interior Report, May 1, 2007

26. Letter from Jason Baron to Dennis Gingold, September 28, 2005

26 a. Letter from Jason Baron to Abraham Haspel, September 13, 2005

27. Letter from Jason Baron to Dennis Gingold, December 9, 2005

28. 25th Interior Report, May 1, 2006

29. 30th Treasury Report

30. 27th Treasury Report

31. Declaration of Lawrence K. Ruffin, June 21, 2007

32. Declaration of Rita Bratcher, June 21, 2007

33. Declaration of Steven Tilley, June 21, 2007

34. Declaration of Gregory Pomicter, June 21, 2007

35. DOI Email Policies

36. Proposed Form of Order

37. 28th Treasury Report

38. 23rd Interior Report, November 1, 2005

39. Memorandum of Wallace K. Fung, July 2, 1999.

40. Memorandum of Richard L. Gregg, August 30, 1999

41. Memorandum of Donald V. Hammond, April 1, 2002

42. Memorandum of Richard L. Gregg, April 2, 2002

43. Financial Management Service & Bureau of Public Debt. (Dept. Of Treasury) Periodic Reminders regarding record retention, 2004-2007

**Preliminary Statement**

It is Plaintiff's burden to show that the record retention order sought here is necessary, and that it would not be unduly burdensome. Plaintiff has not met its burden. First, Plaintiff has not established, and cannot establish, that the order is necessary. In its attempt to show necessity, Plaintiff describes incidents in which documents allegedly were damaged or lost, but in doing so, Plaintiff relies on material that it presents incompletely or out of context. When put in their proper context, these incidents either are irrelevant or confirm that Defendant responds promptly and adequately to situations in which it identifies documents or other material that is or may be at risk. In light of the fact that Defendant has implemented rigorous document retention practices and has taken other actions to protect relevant documents and to remove or mitigate any significant risks that such documents will be damaged or destroyed, Plaintiff has failed to satisfy its heavy burden to show that a record retention order is necessary.

Plaintiff has also failed to satisfy the second part of its burden because it has not established that the proposed order is effective and not overbroad. To the contrary, the preservation – or more accurately – the discovery order Plaintiff requests is overly broad and places severe burdens on the agencies involved. For example, to comply with the proposed order would be so time consuming and labor intensive that it would be virtually impossible for the National Archives and Records Administration ("NARA") to do so, and it would severely curtail NARA's ability to work for other members of the public. Similarly, the demands placed on the Bureau of Indian Affairs ("BIA") by the proposed order would detract from BIA's ongoing work for Plaintiff and its members, as well as for all other tribes which it serves. Moreover, the search for records by the Treasury would involve high dollar costs, excessive time requirements, and a great drain on its resources. Finally, it should be stressed that most of the substance of the proposed record retention order is directed towards entry

of a records access and comprehensive discovery order providing Plaintiff immediate authority to proceed with burdensome discovery that exceeds the scope permitted by the Rules of the Court of Federal Claims ("RCFC"), or as conducted in most of the active tribal trust cases. Plaintiff's proposed order covers both active and inactive documents and, if implemented, would prevent the Bureau of Indian Affairs ("BIA") from moving inactive documents to the American Indian Records Repository ("AIRR"), which is BIA's new, central archives facility in Lenexa, Kansas, for indexing, archiving and safe and proper storage.

At the outset, the Government, in part through its various departments, including the Departments of the Interior and Treasury (hereinafter "Interior" and "Treasury"), represents that it has in other tribal trust cases demonstrated a commitment to the preservation of tribal trust documents. See, e.g., Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007 Ex. 5. This commitment and demonstrated performance outweighs Plaintiff's attempts to show a separate retention and preservation order is necessary, independent of the preservation commitment required by the RCFC. Further, the vast majority of the provisions in Plaintiff's proposed retention order ("PPRO") do not address preservation at all. Rather, the PPRO is overly burdensome in that it sets forth a schedule requiring that the Government simultaneously make available potentially relevant documents, both active and inactive, in a massive number of records sites involving many different federal agencies, on and off the Navajo Reservation. Indeed, it essentially holds those documents captive until all of the PPRO's conditions regarding the timing, nature and extent of Plaintiff's document review have been exacted, in complete disregard of the carefully considered and developed policies and practices of the federal agency responsible for the records, and beyond the scope of traditional rules of discovery.

Plaintiff simply has not demonstrated that any document collections are exposed to real danger of destruction. Nor can it do so, based on any facts of which Defendant is aware. In addition, Plaintiff's PPRO is a cumbersome discovery order, utilizing a sledgehammer to gain access to agency documents when good faith negotiations could potentially resolve issues between the parties.

Defendant is willing to consider negotiation of a discovery stipulation executed by the parties covering relevant document collections or documents which may lead to relevant evidence.[1/] Defendant is equally willing to reiterate its commitment, and the commitment of its agencies, to the preservation of Navajo Nation documents. However, Defendant does not believe that a wholesale substitution of the draconian discovery provisions of the proposed order for the discovery tools provided under the RCFC (particularly in a document identified as a Record Retention Order) is either appropriate or equitable. Also inappropriate is any attempt by Plaintiff to substitute its own judgment for the judgment of the agencies involved here, with respect to the proper document management processes.

## Argument

### I. Plaintiff Has Failed To Meet The Laguna Test For Entry Of A Record Retention Order

#### A. Background

As in the present case, Plaintiffs in Jicarilla Apache Nation v. United States, No. 02-25L, and Pueblo of Laguna v. United States, No. 02-24L, filed motions seeking entry of a record retention order ("RRO"). Defendant opposed Plaintiffs' motions based, in part, on two specific grounds: (1)

[1/] Prior to May 31, 2007, Defendant attempted to negotiate a stipulation with Plaintiff concerning a preservation commitment and document discovery procedures, executed by the Parties and the Court. Plaintiff rejected Defendant's proposal and filed their present motion without prior notice to the Government.

that the Court lacked jurisdiction to enter the proposed order because it was in large part a disguised injunctive order; and (2) that Plaintiff failed to establish it was entitled to the entry of the requested injunctive relief. See e.g., Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order ("Def.'s Opp."), filed November 5, 2003; Pueblo of Laguna v. United States, supra.[2]

On March 19, 2004, the Court granted Plaintiffs' motions and found that it had jurisdiction to issue an RRO. In doing so, the Court relied in large part on the inherent powers of the Court to preserve material evidence and to take appropriate action to control and schedule discovery under the RCFC 16. See Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 136-138 (Fed. Cl. 2004). However, the Court also recognized that its inherent authority should be used only with the utmost restraint because such authority is indeed powerful. See id. at 137 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).

**B. Plaintiff has Failed to Meet the Test Established in Laguna**

In Laguna, this Court set out a two prong test which the proponent of an RRO must satisfy. In that case, the Court explained that "one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome." Id. at 138. To satisfy this two prong test, the Court said that a proponent first must show that "absent a court order, there is significant risk that relevant evidence

[2] In Jicarilla and Laguna, Defendant pointed out that the agencies potentially affected by the proposed RRO already had devised and implemented sound procedures for maintaining the integrity and accessibility of records that were moved, whether electronically or physically, and that the proposed RRO would go far beyond those measures by involving the Court and Plaintiff even in the most minor and routine agency operations. See Def.'s Opp., at 16-19. Moreover, because the RRO was in essence a disguised request for injunctive relief, the Government, citing Kanemoto v. Reno, 41 F.3d. 641, 644-45 (Fed. Cir. 1994), argued that the Court lacked jurisdiction to grant such relief. See Def.'s Opp., at 16-19. Defendant also argued that Plaintiff had failed to meet the traditional four-factor test for entry of an injunction. While Defendant recognizes the Court's decision in Laguna, Defendant respectfully reasserts the foregoing arguments in the current Navajo PPRO proceeding.

will be lost or destroyed . . . ." Id. (emphasis added). Second, to show that a preservation order is not unduly burdensome, "the proponent must show that the particular steps to be adopted will be effective, but not overbroad . . . ." Id.[3]

The Laguna decision is instructive for other reasons as well. Specifically, the Court recognized that Plaintiff was asking for more than a preservation order:

> [Plaintiff] . . . would have this Court prohibit generally the destruction of records relevant to this case absent its prior written concurrence. . . . It would also have this Court impose significant restrictions on the inter and intra agency transfer of such records, including the transfer of records from the Department of the Interior to the National Archives and Records Administration, by essentially requiring that plaintiff be offered an opportunity to examine such records prior to their movement.

Laguna, 60 Fed. Cl. at 140.

Ultimately, this Court declined to order the broad transfer restrictions proposed by Plaintiff. See id. at 140. In doing so, the Court concluded that such provisions would unduly burden the operations of various agencies in two ways:

(1) By impacting the daily and routine movement of records; and

(2) By injecting Plaintiff into agency processes that are designed to avoid the loss or destruction of records by allowing Plaintiff to interfere with agency decision making and discretion with respect to retention of records.

See id.

[3] The Laguna two prong test has been followed by other courts with some variations. See, e.g., Treppel v. Biovail Corp., 233 F.R.D. 363, 370 - 71 (S.D.N.Y. 2006); Williams v. Mass. Mut. Life Ins. Co., 226 F.R.D. 144, 147 (D. Mass. 2005). Another case, Capricorn Power Co., v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) presents a three factor analysis for entry of a record retention order. These factors include: (1) level of concern the court has for continuing existence and maintenance of integrity of evidence absent court order; (2) irreparable harm likely to result to the party seeking preservation of evidence; and (3) capability of a party to maintain evidence sought to be preserved, and the physical, spatial and financial burdens created by ordering preservation. See id. at 433-34.

Plaintiff fails to meet the Laguna test. First, Plaintiff's attempts to show that there is a "significant risk" to relevant documents fail. It is simply not enough for Plaintiff to rely on incomplete and out of context quotes from the quarterly reports filed by the Departments of the Interior and Treasury in Cobell v. Kempthorne, No. 96-1285 (D.D.C.) (hereinafter "Cobell"). See supra, Section I. Plaintiff also fails to satisfy its burden because it has not shown, and cannot show that there is a "significant risk" that documents will be damaged or lost by virtue of the Government's showing of the preservation activities it has undertaken since Jicarilla, as set forth in Section II.

Plaintiff likewise fails to demonstrate that the PPRO will be effective but not overbroad, the second element of the Laguna test. The majority of the provisions of Plaintiff's proposed order do not address preservation at all but rather seek to ensure Plaintiff's access to documents, data, and tangible things on terms and conditions which go far beyond anything contemplated by the discovery rules of the Court of Federal Claims. The burdensome nature of Plaintiff's order is described and analyzed at Section IV as well as in the attached declarations of agency representatives who would be required to shoulder Plaintiff's extraordinary demands.

## II. Interior's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate Any Basis for an Order in Navajo

The key provisions of the March 19, 2004 Jicarilla and Laguna orders essentially mirror each other in that they require the United States and its agencies and employees to take reasonable steps to preserve information that is relevant or may lead to the discovery of information relevant to the litigation. In addition, the parties are directed to meet and confer regarding the indexation of "documents, data, and tangible things" anticipated to be subject to discovery in those cases. Also included in those orders are scheduling provisions for the movement of inactive records of the

Department of the Interior. Both orders remain in effect through the present day. Plaintiffs in those cases have never commenced any proceedings in this Court claiming any violation of those orders by the Government.

Since the entry of the aforenoted RRO's by this Court, the federal agencies having the vast preponderance of relevant documents, namely Interior and Treasury, have undertaken a number of steps to ensure compliance. These steps include: (1) sending preservation directives to agency personnel; (2) training agency personnel; (3) development of records movement protocols; (4) the opening of the AIRR and the creation of the Box Inventory Search System ("BISS"); and (5) a policy emphasis on movement of inactive records to the AIRR to protect trust records.

Most importantly, when this Court entered its orders in Jicarilla and Laguna, Interior was in the process of developing a comprehensive records management program to address the specific weaknesses. Abeita Dec., ¶¶ 3-6. In the three years since then, Interior has adopted an institutional records program with three main components: (1) the centralization of all inactive records in an archival - quality records facility, the AIRR, for preservation and indexation Abeita Dec., ¶¶ 5-9; (2) the adoption of NARA-approved records retention schedules requiring the indefinite retention of Indian fiduciary trust records; Abeita Dec., ¶ 16; and (3) extensive training of Interior and Tribal personnel in records management and safeguarding trust records has been underscored by the issuance of periodic directives to all Interior employees and contractors, as discussed below.

### A. Interior has Issued Numerous Directives to Ensure Preservation of Evidence

Both Interior and Treasury officials have sent a number of preservation directives and periodic reminders to agency management and staff since March of 2004. Specifically, on April 6, 2004, the Deputy Secretary of the Interior issued a memorandum to the heads of various components

and subagencies of the Interior Department about the document preservation orders issued in the Jicarilla and Laguna cases.[4] Exhibit 1.[5] That memorandum reaffirmed the existing duties, responsibilities, and obligations of Interior officials and employees to preserve Indian trust documents as set forth in the Departmental Memorandum dated March 20, 2002. See Ex. 1a & Ex. 1 at 2. The April 2004 memorandum also imposed preservation and retention obligations pertaining to relevant or potentially relevant data and information on the telephone and voice-mail systems of the Interior Department. See id.

Since the issuance of those memoranda by the Deputy Secretary, Interior has published periodic reminders containing instructions regarding certain preservation obligations. Some of the publications have occurred on July 9, 2004, July 13, 2004, and October 26, 2006. See Exs. 2, 3, 4.

1. The Acting Deputy Solicitor's March 12, 2007 Departmental Memorandum

On March 12, 2007, Lawrence J. Jensen, the Deputy Solicitor of the Department of the Interior, issued a Departmental Memorandum to the heads of various components and sub-agencies of the Interior Department[6] reiterating Interior's policy regarding the preservation and retention of Indian trust-related documents and data. See Ex. 5. Among other things, the memorandum

---

[4] The recipients of the memorandum were the Secretary; Acting Solicitor; Assistant Secretary - Fish and Wildlife and Parks; Assistant Secretary - Indians Affairs; Assistant Secretary - Land and Minerals Management; Assistant Secretary - Policy; Inspector General; Direct, U.S. Geological Survey; Director, Bureau of Land Management; Director, Minerals Management Service; Commissioner, Bureau of Reclamation; Active Director, Bureau of Indian Affairs; Special Trustee for American Indians; Director, Office of Trust Records; Director, Office of Historical Trust Accounting; Associate Director, Minerals Revenue Management, MMS; Regional Director, Southwest Region, BIA; Superintendent, Jicarilla Agency, BIA; Superintendent, Laguna Agency, BIA; Superintendent, Southern Pueblos Agency, BIA.

[5] "Exhibit" is hereinafter abbreviated as "Ex." and the plural "Exs."

[6] The recipients of the memorandum were essentially the same as those identified in footnote 4.

identified, by name, the Tribes (including Plaintiff herein) or groups that had filed trust accounting and trust mismanagement cases against Defendant. See id. Using the broad language set forth by the Court in the document preservation order in Laguna, and Jicarilla, supra, the memorandum mandated the preservation of "all documents, data, and tangible things in the possession, custody or control" of Interior employees, bureaus, and offices that may be relevant to the subject matter of the Tribal Trust cases.[7] Id. at 2. The memorandum applied to all paper documents, electronically stored information, and other materials, such as maps, videos, calendars, and charts, and it also applied to materials stored at off-site storage facilities and Federal Records Centers (FRCs). See id. As noted, that memorandum specified that Navajo trust-related records were among those required to be preserved in compliance with the memorandum. Further, the memorandum instructed Interior employees about the obligations imposed by the recent amendments to the Federal Rules of Civil Procedure to preserve electronically stored information and directed them to comply with those obligations. See id. at 3.

2. Interior Policy Memoranda Regarding the Movement of Inactive Records

The Department of the Interior recognizes the critical importance of preserving inactive Indian trust records and, in pursuit of this important task, has partnered with NARA to move those documents to the AIRR. See, Ex. 8a. As part of the process of transferring those inactive documents

---

[7] The Office of the Solicitor defined "relevant information" as

> reflecting, referring or relating to (1) any asset, such as funds, land, minerals, forestry, sand and gravel, or other resources, that is, or at any time has been, held in trust by the United States or its agents for the Plaintiff; (2) policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets; (3) proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets; (4) reports, appraisals, reconciliations or evaluations of any trust assets; and (5) information that serves to identify, locate, or link any relevant information, such as file inventories, file folders and indices.

to the AIRR, the documents are carefully indexed and filed in an archive where the entrances and exits of researchers and employees alike are carefully monitored and controlled. Thus, any suggestion by Plaintiff that inactive BIA documents should be retained for Plaintiff's convenience on the Navajo Reservation is contradictory to Plaintiff's stated objective of document preservation because the documents would in fact be more secure at the AIRR as well as be better protected from potential environmental harms such as natural catastrophe or changes in temperature and humidity. See Part B., infra, describing the AIRR.

Interior's policy to move inactive records to the AIRR as soon as possible is manifest in several Interior records, three of which are included with this brief: (1) Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005 ("Cason Decl.") Ex. 6; (2) Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006. ("Abeita Memo") Ex. 7; and (3) Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007, Ex. 7a. These memoranda underscore the importance of delivery of inactive records to the AIRR and set out the procedures for expeditiously accomplishing the objective. In keeping with this policy and, as noted by Ms. Abeita, Interior plans to send any inactive records from the Navajo reservation on a priority basis in the upcoming summer months. See Declaration of Omar Bradley, Ex. 9 (hereinafter "Bradley Decl."); and Declaration of Ethel Abeita, Ex. 8 at ¶ 14 (hereinafter "Abeita Decl.").

**B. Opening of the AIRR and the Box Inventory Search System "BISS"**

In collaboration with NARA, Interior has built a state-of-the-art underground document storage facility to consolidate in a single location all inactive federal Indian records. See Memorandum of Understanding Between the Department of the Interior and the National Archives

and Records Administration, September 12, 2003. Ex. 8a. The facility was built in Lenexa, Kansas, and completed in 2004. See Abeita Decl., Ex. 8, ¶ 5. It is co-administered by the Office of Trust Records ("OTR") and NARA. The AIRR is a state of the art facility built to archive standards and is equipped with controls to regulate humidity, temperature, particulate matter and ultraviolet light. See id. ¶¶ 5- 6. The AIRR provides secure access for research by individual Indians, tribes, and historians, with permission from Interior, and for Interior staff conducting historical accounting work. The AIRR has sufficient future capacity to hold all of the Interior's American Indian records. Id. at ¶ 6. Currently, the AIRR contains in excess of 150,000 boxes of inactive records of which approximately 15,000 boxes are BIA Navajo records. See id. ¶ 9.

Records movement plans for delivery of Indian trust documents are described in the June 21, 2007 Abeita Decl., Ex. 8, ¶¶ 9-14. See also Bradley Decl., Ex. 9, ¶¶ 11-18. As noted in detail in the Chain of Custody plan, pickup, delivery, and verification of contents of boxes shipped are all carefully confirmed, both at the point of origin and at the point of delivery. See Abeita Decl., Ex. 8, ¶¶ 9-14. Ultimately, upon arrival of inactive boxes to the AIRR, the contents are indexed using the BISS, as described below. The indexed contents are then archived at the AIRR.

Inactive Indian trust records stored at the AIRR are electronically indexed to the document level in the BISS. See Abeita Decl., Ex. 8, ¶ 11. If there are no file folders and the box is identified as coming from a trust program, a document level index is compiled for the entire box contents. Information as to where the records originated is printed on the outside of each box, and this information is also entered into the BISS. For example, this identifier could be an agency location code, a regional office location code or a Federal Records Center code. Typically, BISS entries will include a file title and the category of the document (such as a bill for collections or financial data

reports) and will also capture date ranges of information contained in a file folder. See id. ¶¶ 11-12.

### C. Training

The BIA also provides training to its personnel and to tribal records personnel with respect to the proper management of Indian trust records. The Office of Trust Records trains new employees as they are hired and provides advanced training to longer-term employees. Abeita Decl., Ex. 8 at ¶ 18 and Ex. 2 to Abeita Decl. In the previous year, OTR held over 100 training events. In the last two and a half years, over 2,000 people have received records training, including 156 from the BIA Navajo Region. Abeita Decl., ¶ 18. In addition to training by OTR, courses are also offered by the Office of Trust Training of the Office of the Special Trustee for American Indians. See e.g., 29th Interior Report, Ex. 25 at 23; 23rd Interior Report, Ex. 38 at 7; 28th Interior Report, Ex. 24 at 44.[8/] Courses offered under the Indian Fiduciary Trust Training Program include specialty courses ranging from "Trust Fundamentals" to "Trust Accounting." Additionally, there is a curriculum leading to a Certified Indian Fiduciary Trust Specialist certification.[9/] See id.

---

[8/] Hereinafter, reference to the Cobell Quarterly Reports will be abbreviated as follows: "___ Interior/ Treasury Report at ___."

[9/] Data concerning the number of attendees for the various courses are also reported in the Quarterly Cobell Reports filed by the Department of the Interior under the "Office of Trust Records" and "Indian Fiduciary Trust Training Program" sections.

## III. Treasury's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate Any Basis for an Order in Navajo

Treasury has implemented retention policies and procedures for documents relating to Tribal trust funds.[10] Treasury's retention policy relies in part on a successful structure that it developed to comply with a retention order issued in connection with Cobell, supra. See generally Exs. 11 and 39-40. Shortly after the filing of Tribal trust accounting and trust mismanagement cases in the Spring of 2002, Treasury instructed its employees to take steps to "preserve any potentially relevant documents and to perform an initial identification of what documents we have."[11] Ex. 41 (with attachments). Treasury stressed that its employees have to "retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules." Id. This directive remains in full force and effect today. Id.; see also Exs. 10-12 and 42.

In addition to the foregoing Treasury Department directive, the Treasury bureaus that have program responsibilities relating to Tribal trust funds, i.e., the Financial Management Service (FMS) and the Bureau of Public Debt (BPD), have implemented their own document retention policies and procedures specifically for the Tribal trust cases, as well as the Cobell litigation. See, e.g., Exs. 42,

---

[10] To the extent that this case involves Treasury, that involvement pertains to Treasury's asserted role as a co-trustee for funds held in trust for Plaintiff.

[11] Treasury applies its retention policies, described at Exhibits 10-16 and 39-43, to records in a wide variety of media. Treasury defines "record" to include:

> any handwritten, typed or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies, writings, drafts, transcripts, and minutes). The term "record" also includes documentary material in other forms (such as electronic documents or presentations, electronic mail, magnetic tapes, computer disks, audio or video records, slides, microfilm and motion pictures).

Ex. 41.

10. These policies and procedures are not only widely available to employees on the Departmental components' Intranet, but are also included in periodic reminders and discussed within the bureaus. Exs. 11, 12, 43. In addition to existing procedures for the retention of documents in paper format, both FMS and BPD have procedures in place to assure retention of electronic documents potentially relevant to Indian tribal trust funds. See Exs.12, 43.

## IV. The Material Offered by Plaintiff in its Motion Does Not Justify An RRO

### Plaintiff's Arguments

In the absence of hard evidence to support its request for an overly broad document retention and discovery order, Plaintiff presents at pages 9 - 21 of its brief a selection of incomplete or out-of-context quotes from the Interior and Treasury quarterly reports filed with the court in Cobell v. Kempthorne, No. 96 - 1285 (D.D.C).

In addition, Plaintiff quotes from the RROs entered by this Court in Laguna v. United States, 60 Fed. Cl. 133 (2004), and Jicarilla Apache Nation v. United States, No. 02-25L, (March 19, 2004 Order) (CFC). Specifically, Plaintiff sets forth the Court's recitation of the general types of perceived mishandling of records by the government on which those orders were based. See Laguna, 60 Fed. Cl. at 138.

However, examples from more than three years ago do not reflect the current status of the agencies' record retention and record remediation processes, however. In reality, many of the circumstances that formed the basis for the Jicarilla and Laguna orders have been mitigated by actions undertaken by Interior since then. Specifically, the previously-claimed scattering of historical Indian documents in less than adequate facilities has been effectively countered by the opening of the AIRR, which, as noted above, is a centralized, state of the art archival facility where historical Native

American documents and records are housed, indexed and, if necessary, remediated for use by individual Native Americans, tribes, academics, researchers, and other interested persons under comprehensive archival protocols. See Defendant's Opposition at 11-12. Any shortcomings in the indexing of inactive tribal records have been significantly improved by implementation of the BISS.

In addition, since 2004, Interior and Treasury, the primary record-keeping agencies for purposes of this case, have implemented regulations, guidelines and directives regarding Indian trust record retention as well as the movement of the trust records between records centers or between their current location and the AIRR for final archiving. See Defendant's Opposition at 8-11. This implementation has included comprehensive and redundant verification procedures for the movement of trust records, including inventorying and shrink-wrap packaging of records boxes to ensure that trust records verifiably reach their destination, usually the AIRR, without damage, loss or harm. See id.

Under Interior's and Treasury's current practices for retention and preservation of Indian trust records, the agencies' assessment of any reports of damage, and actions in response thereto, potentially involving trust records has been prompt. In addition, Interior's and Treasury's documented remediation has mitigated or cured any harm to the records involved, as explained further below.

Plaintiff divides its discussion of alleged incidents of document mishandling purportedly relevant to Navajo between hard-copy records and electronic records. For its examples, Plaintiff relies almost exclusively on information produced by Interior and Treasury in Quarterly Reports filed in Cobell, supra. As Defendant explains below, Plaintiff's method of presentation causes confusion and may give an incorrect impression regarding the number, nature, or outcome of the incidents to

which Plaintiff refers. Also as discussed below, Plaintiff's description of the incidents are frequently incomplete and fail to mention the prompt remediation completed by Interior and Treasury.

1. Hard-Copy Records are Protected and Preserved Under Current Regulations, Guidelines, Directives, and Practices

Under various headings and in several sections in its brief, Plaintiff refers to a collection of 269 boxes of records "that were or may have been damaged or contaminated by mold, mildew, mouse droppings, or other adverse elements." 19th Interior Report, Ex. 19 at 31. While Plaintiff's scattered references to the same incident might give the impression that there are several incidents involving several hundred moldy or contaminated boxes, such is not the case. See, e.g., Plaintiff's Brief in support of Plaintiff's Motion for record Retention Order, May 21, 2007 at 11, 12, and 14 (hereinafter "Plaintiff's Brief."). Moreover, as noted below, not all the boxes contained trust records.

As of November 1, 2004, Interior proactively identified 269 boxes that had potentially been damaged. As Interior's investigation continued, this increased to 283 boxes as of February 1, 2005. These boxes were immediately turned over to a remediation contractor for review and assessment. See 20th Interior Report, Ex. 20 at 32. By May 2, 2005, the remediation contractor concluded that less than half, or 140 boxes, required further attention to address partial legibility of some records. Moreover, the contractor estimated that less than 1% of the total pages assessed appeared completely illegible. See 21st Interior Report, Ex. 21 at 30.

The contractor's report was provided to NARA which commenced remediation activities on or about August 1, 2005. See 22nd Interior Report, Ex. 22 at 35. By April 2006, NARA completed remediation of all the original 283 boxes with the exception of six boxes. See 26th Interior Report, Ex. 23 at 23. In November, 2006, the Conservation Contractor of the Office of Trust Records determined that two of the six boxes could contain trust records and should therefore undergo further

remediation. See 28th Interior Report, Ex. 24 at 16.

In summary, what began as a report of claimed mold and mildew damage to approximately 300 boxes ultimately was reduced by Interior's prompt and careful assessment and various degrees of cleaning and remediation to two boxes of documents that were likely to contain trust-related records and which would require labor-intensive remediation. That remediation was projected to be completed in the second or third quarter of 2007. See id.

2. The Office of the Inspector General at NARA Promptly Investigated the NARA Episode to Which Plaintiff Refers; and the Lone Individual Responsible Has Resigned

Plaintiff also references an occurrence at the headquarters building of NARA. The matter is described in a September 28, 2005 letter from Jason R. Baron, Director of Litigation for NARA, to Dennis Gingold, attorney of record for Plaintiff in Cobell. See Ex. 26; see also Ex. 26a. In essence, the situation involved the attempted discarding by a single NARA employee of hard-copy folders and records from the Department of Veteran's Affairs, the Department of the Interior, the United States Army, the War Department, and the Navy Department. Documents were found in various unauthorized locations at NARA, including a waste basket, dumpster and trash compactor at the Main Archives building at 9th Street and Constitution Avenue. The initial identification of these discarded records began on September 1, 2005. NARA's Office of the Inspector General conducted an investigation in September and October of that year. As noted in Mr. Baron's September 28, 2005 correspondence, the NARA staff determined that approximately 250 of the actual files that corresponded to the approximately 275 Consolidated Chippewa non-record file covers and jackets recovered in various trash areas in September 2005 were intact and in NARA's permanent holdings. NARA staff thereafter conducted a search for the remaining 25 files. See December 9, 2005 letter

from Jason R. Baron to Dennis Gingold, Ex. 27.

It is difficult to imagine how the foregoing events support or are even relevant to entry of an RRO in the Navajo case, especially when the facts indicate the actions involved were attributable to a single disgruntled employee, who has since resigned. Indeed, the Jicarilla and Laguna RROs were in effect at the time of the incidents but clearly were not effective in preventing these incidents. These facts establish that the incidents are not probative of the necessity for an RRO in this case and so should be disregarded or recognized simply as the actions of one individual who no longer has access to the documents at issue.

3. The Steven Griles Plea and the March 1, 2007 letter from Secretary Kempthorne and Attorney General Gonzales to the U.S. Senate Committee On Indian Affairs Have No Relevance To Whether Plaintiff is Entitled to an RRO in this Case

The directives given by high-level decision-makers such as Mr. Jensen and others to retain hard-copy and electronic data relevant to the issues presented by Plaintiffs' complaints, whether in Jicarilla, Laguna, or Navajo or any other Tribal accounting cases, and the concrete actions taken, such as construction of the AIRR and training programs, are dispositive measures already undertaken in good faith by the Agency. They show that a record retention order is not necessary here.

This Court should not be distracted from that fact by Plaintiff's rhetoric concerning the Steven Griles plea or executive branch recommendations regarding legislative solutions to Indian trust litigation. See Plaintiff's Brief at 18 - 19. The March 2007 plea by Steven Griles, former Deputy Secretary of the Interior, concerned a charge of obstruction of proceedings before the United States Senate. It was based on Mr. Griles' statement and testimony provided to the Senate Indian Affairs Committee ("SIAC") in an October 2005 Senate interview and a November 2005 Senate hearing. It had nothing whatsoever to do with the retention or preservation of Indian trust

documents.

Plaintiff suggests, without any attempt at explanation, that the plea has relevance to its motion, in light of certain directives provided by Mr. Griles and relied on by the United States in support of its opposition to entry of the RRO in the Jicarilla and Laguna litigation. Yet there is no evidence that the Griles memoranda were not genuinely directed to achieving compliance with court orders requiring document retention, nor that they were ineffective in doing so. Thus, the outcome of Mr. Griles' appearance before the SIAC does not in any way undermine the legitimacy of his orders for Departmental compliance with the Jicarilla and Laguna RROs. In the absence of facts to present to this Court, Plaintiff's speculation as to the relationship between Mr. Griles' legal problems and the effectiveness of the Griles' memorandum is pure speculation. See Plaintiff's Brief pp. 18 - 19. This Court should disregard Plaintiff's attempt to cloud the issue with references to situations that lack any relevance to the alleged need for an RRO in this case.

Similarly, correspondence by the Secretary of the Interior and the Attorney General to a United States Senator proposing legislation to modify the Government's federal trust obligations to Indian tribes is plainly irrelevant to whether there is any significant risk of damage to relevant historic or current operating records of the Navajo Nation. See Plaintiff's Brief, page 19. The proposed legislation may never pass. In addition, it says nothing about trust records relevant to Plaintiff's case. Moreover, the legislation would in no way modify any trust obligations at issue in the Navajo litigation. The Court should not be distracted by this irrelevant material, which has no bearing on whether it is appropriate to enter any RRO in this case.

4. The Ft. Defiance Agency Incident

Plaintiff identified one episode of alleged destruction of trust and non-trust documents on the

Navajo Reservation, at the BIA Fort Defiance Agency. Following an immediate investigation by the BIA, the agency determined that a single box (i.e., one cubic foot) of original, incomplete sand and gravel permits and duplicate copies of archeological clearances had been discarded in error by agency staff. There is no evidence that the documents in that box, including the archeological clearances, have any impact on the Plaintiff's claims in this lawsuit. However, as part of the remediation plan for this incident, the Office of Trust Records (OTR) provided management briefings targeted to the managers of BIA programs in the BIA Navajo agencies. As noted in the 25th Interior Report, Ex. 28 at 22-23. "[T]he purpose of the training was to reinforce the record keeping responsibilities of managers." Id. at 23.

5. The Reported Thefts from Yakama Tribal Offices Do Not Demonstrate Any Risk to Navajo Trust Records

In a threadbare attempt to bolster its motion, Plaintiff relies on the reported theft of certain Yakama Nation property, including four tribal computers, four tribal flash drives and an unknown number of tribal CDs from the Yakama Reservation. See 29th Interior Report, Ex. 25 at 43. In light of the fact that the Yakama Nation has contracted with Interior pursuant to Public Law 93 - 638 to assume contractual responsibility for various tribal functions in Tribal Offices, it makes no sense to ascribe to the Department of the Interior responsibility for the theft from a Yakama Tribal facility of Yakama equipment used to perform contractual obligations undertaken by the Tribe. Even more difficult to understand is how an incident of theft of tribal equipment located in a tribal office in the State of Washington supports entry of a record retention order in the Navajo case. Indeed, thieves are not likely to concern themselves with any judicial orders. The Yakama incident does not demonstrate any significant risk of records loss affecting the Navajo Nation and should be

disregarded by the Court in this proceeding.[12]

6. The Department of the Treasury Took Prompt and Appropriate Steps to Mitigate the Effects of the Two Incidents Plaintiff Identifies; and There is No Indication Navajo-Related Documents Were Involved

Plaintiff identifies two incidents involving Treasury documents being exposed to water, as supposed support for entry of an RRO in this case. (Plaintiff's Brief, at 15-16). Again, Plaintiff's reliance is misplaced. Those incidents, like several others on which Plaintiffs relies, have no relevance to the question of whether an RRO should be entered. First, there is no indication that any of the documents involved included Navajo-related documents. In addition, Plaintiff's incomplete descriptions of the events and subsequent remediation failed to report the follow-up developments by the Department of Treasury, as reported in the 30th Treasury Report, Ex. 29, which are presented here, and which are necessary to an accurate understanding of the events in question and whether they support Plaintiff's motion.

Plaintiff, quoting from the 27th Treasury Report, Ex. 30 at 1, reported that microfilm working copies of negotiated Treasury checks were water damaged when the basement of the Financial Management Service Office in Hyattsville, Maryland, flooded with rains, exposing the bottom drawers of certain file cabinets to water. See Plaintiff's Brief, pp. 15 - 16. The 30th Treasury Report,

---

[12] Plaintiff also reported that in January 2007, "someone tried to break into the BLM computer room containing servers for the Legacy Rehost 2000 system." See Plaintiff Brief, p. 18 citing 29th Interior Report, at 44, Ex. 25. Plaintiff failed to report remediation efforts by BLM, despite the fact that those remediation measures were described in the same Interior Report quoted by Plaintiff. Specifically, "although the lock was not compromised, BLM coordinated with GSA (the building owner) to install an additional metal plate over the lock mechanism to prevent similar break-in attempts in the future." Id. As with the Yakama Public Law 93-638 contract situation, incidents such as this one cannot be used to establish a significant risk of loss of Navajo documents. If anything, these incidents have relevance only in that they demonstrate the speed of remediation responses by the agency. Again, it seems unlikely that thieves would be influenced by a judicial order.

Ex. 29 at 1, describes the successful remediation activities as follows:

> FMS procured the services of a contractor to wash approximately 2000 (roughly one sixth) of the water-exposed cartridges, because those cartridges contain check copies for which original checks may not be available. Washing the microfilm should remediate any adhesions (film layers sticking together), thereby preventing further damage to the images on the microfilm and restoring the functioning of the microfilm (i.e., by enabling it to be fed through a microfilm reader). The microfilm washing services are expected to be completed by the end of June 2007.

Plaintiff also raises a July, 2006 incident, where a water sprinkler burst at the Washington National Records Center in Suitland, Maryland, affecting several boxes of FMS and BPD records. See Plaintiff's Brief, p. 16. However, Plaintiff failed to point out that the 30th Treasury Report, dated June 1, 2007, stated that all of the boxes had been remediated by a contractor and all documents dried and returned to the Washington National Records[13/]. See Ex. 29, p.1, ¶ 2.

In sum, the incidents on which Plaintiff relies to support its request for an extraordinarily broad RRO lack substance as well as relevance. As Defendant explains, infra, Plaintiff's claims with respect to electronic records likewise fail to support the relief it seeks.

7. Electronic Records

With respect to electronic records, Plaintiff continues to rely upon irrelevant matter in support of its request for an RRO. The first example provided by Plaintiff involving electronic records

---

[13/] One final Treasury - related incident cited by Plaintiff in support of its motion concerns 37 boxes of records at a federal reserve bank which were not located during a recent inventory. See Plaintiff's Brief, p. 17. Plaintiff states that "[s]ome of the boxes contained 'control' information that was used in balancing Treasury checks and out-of-balance Treasury checks and which might not be available from other sources." [sic.] 28th Treasury Report at 1, Ex. 37. Had Plaintiff read the next sentence in the Report, it would have learned the following more specific information: "Some of the information in the three 'control boxes' may not be available from other sources, but the information should no longer be needed for any adjustment purposes because of the passage of time." Id. Finally, given that the dates of material in these boxes date from 2003 - 2005, their significance to the Navajo action is likely marginal at best.

appears at page 11 of the Plaintiff's Brief. There, Plaintiff selectively quotes from the 20th Interior Report at 8, Ex. 20, noting that between July and December 2004, two BIA servers failed to send emails to ZANTAZ. However, Plaintiff neglected to review the next few sentences of the Report:

> The configuration was immediately corrected with the installation of a new version of ZANTAZ software. BIA captured e-mail between and within the two servers during the time in question on backup tapes. During the next reporting period, BIA expects to transfer the content on back-up tapes to ZANTAZ to ensure the digital safe has a copy of the e-mails that were not captured live.

20th Interior Report, at 8 Ex. 20.[14] (emphasis supplied)

Plaintiff also reports on an additional claimed email-related problem at page 13, where Plaintiff refers to "wide-spread email backup problems." Plaintiff's characterization of the problem is erroneous. Specifically, had Plaintiff performed even a cursory review of the 23rd Interior Report at 8-9, Ex. 38, it would have noted reference to the particular problem as a ZStage issue. Specifically, the Report explains as follows:

> ZStage refers to a ZANTAZ software indicator which shows whether an email message has been properly processed . . . (i.e., sent to the Zantaz email receptacle for processing.). During this reporting period, OST discovered a limited processing problem identified by reviewing ZStage data and took steps to mitigate it.

Id. As the 23rd Report explains, affected agencies such as the Office of the Special Trustee (OST), the National Business Center (NBC), the Solicitor's Office (SOL), and BIA forwarded backup tapes to Zantaz in order to retrieve undelivered email messages. That process is discussed in detail in the Report. See id. at 8-9. In addition, the 25th Interior Report, Ex. 28 at 5-6, details the upgrading of servers at the aforenoted agencies to correct the ZStage problems which had caused a failure to

[14] In addition, it is DOI policy to require employees to print and save hard copies of any substantive email. Thus between the backup tapes and the "print and save" policy, chances of lost email seem extremely remote. See Ex. 35 regarding Interior Email Policies.

process email to Zantaz. The e-mail problems of OST, SOL, and NBC were resolved by July 27, 2006, and all emails were properly re-processed. See 26th Interior Report, Ex. 23 at 5-6.

Without any substantive explanation, Plaintiff also includes other IT-related matters in support of its motion. For example, at page 21, Plaintiff simply notes that in May of 2007, there were a total of 2,041 "IT weaknesses" outstanding with approximately 85% of the total number in the low or medium risk level.[15] Plaintiff fails to explain how the alleged "weaknesses" support Plaintiff's position that there is a significant risk that evidence relevant to the claims and defenses in the Navajo lawsuit will be lost or stolen. Indeed, Plaintiff fails to connect, in any way, the purported weaknesses to any identified risk to relevant evidence. Simply put, there is no showing whatsoever that these supposed weaknesses have anything to do with Navajo Nation trust information.

In response to Plaintiff's unexplained data, Defendant submits the Declaration of Lawrence K. Ruffin, Chief Information Security Officer in the Office of Interior's Chief Information Officer, June 21, 2007, Ex. 31. ("Ruffin Decl."). Mr. Ruffin's testimony is that, based on his extensive experience in information technology ("IT") security matters, the volume and types of weaknesses concerning Interior's networks are similar to other organizations with comparable users, systems, and work stations. See Ruffin Decl., Ex. 31, ¶11. Mr. Ruffin also testifies as to the process by which Interior and its contractors identify and prioritize remediation of weaknesses. See id. at ¶¶ 13 and 14. He also provides examples, to put them in an appropriate context. See id. at ¶ 11.

Moreover, Mr. Ruffin also describes the results of the FY 2006 Interior survey prepared pursuant to the Federal Information Security Management Act (FISMA), 44 U.S.C. § 3541 et seq.

---

[15] Plaintiff makes additional references to raw numbers of security weaknesses also without explanation as to their general significance or any purported connection between the security risks and relevant evidence. E.g., Plaintiff's Brief at 12.

See Ruffin Decl., Ex. 31, ¶5.[16] That report, prepared by Interior's Office of Inspector General, concluded that Interior had made good progress in its system inventory, Plans of Actions and Milestones, and incident responses over the year 2005. The significant improvement in incident response recognizes Interior's accomplishments in the remediation context. See id. at ¶¶ 15 and 16; see also Ex. 18. This subject area in particular was regarded by the Court as significant in its deliberation over entry of an RRO in Laguna. See Pueblo of Laguna, supra, 60 Fed. Cl. at 138.

Finally, Mr. Ruffin describes the substantial efforts undertaken by Interior in dealing with unauthorized system penetration. See Ruffin Decl., Ex. 31, ¶18. Specifically, he explains that, in addition to securing systems through the enterprise risk management processes and C & A process, Interior employs several other technologies as follows:

> Interior deploys a variety of incident detection and prevention technologies as part of a defense-in-depth strategy to monitor, detect, protect, and respond to potential incidents resulting from intruder attempts. These Intrusion Detection Systems and Intrusion Prevention Systems (IDS/IPS) are strategically positioned in various locations by bureaus and offices within their network infrastructures. Interior has also positioned a robust IDS/IPS architecture at the perimeter of Interiors's ESN that provides a Wide-Area Network (WAN) that connects some of Interior's bureaus/offices to the Internet. IDS and IPS sensors are configured to monitor network traffic in real-time to detect know attack signatures and alert security personnel as part of Interior's incident monitoring, detection, and response processes. IPS sensors are also capable of proactively blocking and preventing potentially malicious network traffic without manual intervention. Interior's application and database servers and other networking devices are configured to automatically log security events. Other security devices automatically monitor those security event logs and alert security administrators about potential attacks, system compromises, system misuse, and other types of related incidents.

Id. at ¶18.

On page 16 of Plaintiff's brief, there is yet another example of Plaintiff's quoting a source

---

[16] The FY 2006 survey is the latest FISMA Survey for Interior available.

wholly out of context. Here, Plaintiff cites to an opinion by the U.S. Court of Appeals for the District of Columbia in an attempt to show that Interior's IT security is flawed and that hackers could gain access to Interior's computer systems and alter trust-related data. However, Plaintiff simply misconstrues the opinion of the appellate court by not presenting the immediately-following paragraphs of the opinion, in which the appellate court found that the lower court had abused its discretion in granting injunctive relief against the Interior. See Cobell v. Kempthorne, 455 F.3d 301, 315 (D.C. Cir. 2006) (en banc). Rather than supporting the entry of the PPRO, that decision undercuts Plaintiff's argument. The appellate court there found, as is equally true here, that plaintiffs had presented no evidence that anyone had altered any trust data, that any such actions were imminent or that the effects of any such alterations would prevent plaintiffs from obtaining the relief sought. To the contrary, the court determined that:

> [A]s the district court acknowledged, "it is generally considered impossible to create a perfectly secure IT environment." The inherently imperfect nature of IT security means that if we granted injunctive relief here, based only on Interior's security vulnerabilities and not on a showing of some imminent threat or specific reason to be concerned that IITD [Individual Indian Trust Data] is a target, we would essentially be justifying perpetual judicial oversight of Interior's computer systems. In order to return to normal operations, Interior would be faced with the nearly impossible task of ensuring that its systems have no exploitable weaknesses whatsoever, rather than addressing a more specific danger to IITD. Moreover, nearly any system administrator who maintains data for private trusts could be in danger of facing similar claims for relief, as only the unreachable goal of perfect security would be sufficient to counter general fears of data tampering by internal threats or external hackers. At the very least, something more than a list of vulnerabilities is required to show that the class members may be harmed, as the next consideration – the harm faced by Interior – weighs so heavily against granting injunctive relief.

Id. at 315-16 (citation omitted) (emphasis added).

Not only does Plaintiff's quote misconstrue the opinion of the appellate court, but the matters raised in that case bears little or no relationship to this case or the potentially relevant Navajo records.

Accordingly, the language quoted by Plaintiff has no application here.

## V. Plaintiff's Proposed Retention Order is Burdensome and Misdirected

### A. Introduction

As noted above, Plaintiff has failed to show that the PPRO is necessary because it has not met the "significant risk" test set out by this Court in Laguna. Most of the examples of incidents specified by Plaintiff at pages 9-21 of its brief confirm – rather than question – Defendant's commitment to and execution of expeditious remediation of any records identified as subject to a mishap of some type, and ultimately, return of the records to their collection whether at a federal records center, the AIRR, or some other agency location.

In many ways, "PPRO" is a misnomer since the vast bulk of the Order's proposed text is directed to ensuring Plaintiff's convenience, rather than the safety and security of the documents. There is indeed an obvious contradiction between Plaintiff's desire to review Navajo documents and data in its backyard over several months or longer versus reviewing them in the AIRR archival facility, indexed and secured from potential mishaps at busy Navajo agencies, storage, and headquarters facilities. As noted above, approximately 15,000 boxes of Navajo documents currently await Plaintiff's review at the AIRR, whereas approximately 1,000 boxes of inactive trust records are located in various Navajo BIA facilities and are awaiting transfer to the AIRR, with the bulk located at the Window Rock Regional Headquarters. See Bradley Decl., Ex. 9 ¶ 11; cf. Abeita Decl., Ex 8 ¶ 14.[17] Should this Court reject Defendant's assertion that documents would be safer and better preserved if transferred to the AIRR, Defendant respectfully suggests that the access which Plaintiff

---

[17] Note that Bradley's reference to 1,000 boxes refers only to trust records while Abeita's reference to 2,000 boxes includes both trust and non-trust records.

seeks should be discussed and negotiated between the Parties and put in the form of a stipulation instead of a burdensome, expedited discovery order captioned as a record retention order.[18]

---

[18]Rule 26(b)(2) provides that the Court "shall" limit discovery under certain conditions. One such circumstance is where the Court "determines that . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." RCFC 26(b)(2)

As a matter of logic, what constitutes reasonable discovery in light of this Rule should inform what the Court can order a party to preserve. The caselaw applying RCFC 26(b)(2) (and its counterpart in the Federal Rules) therefore casts light on the question whether Plaintiff's proposed Order is reasonable and appropriate for this lawsuit. As Defendant explains, infra, that proposed Order is not reasonable and this Court should reject it because it forces Defendant to preserve (and produce) an unreasonably broad range and large volume of documents from numerous locations, at high, and even potentially crippling, expense to the agencies involved, with no showing that those documents have relevance to the claims and defenses in this case.

"[T]he discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they 'be construed to secure the just, *speedy*, and *inexpensive* determination of every action.' (Emphasis added.) To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .' Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." Herbert v. Lando, 441 U.S. 153, 177 (1979).

Similarly, "[a]lthough judicial discretion is not unrestrained -courts must apply a set of general principles, *see, e.g.,* Fed. R. Civ.P. 26 – parties have a correlative obligation to tailor [discovery requests] to suit the particular exigencies of the litigation. They ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir. 1989)(upholding the trial court's decision that certain interrogatories requiring defendant to produce certain information regarding defendant's job vacancies and how they were filled were "'overbroad and the burden on the defendant ... would outweigh significantly any [corresponding] benefit to plaintiff's case.'" 871 F.2d at 186.)

As the court noted in Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003), "whether production of documents is unduly burdensome or expensive turns primarily on whether it [sic] is kept in an *accessible or inaccessible* format (a distinction that corresponds closely to the expense of production). In the world of paper documents, for example, a document is accessible if it is readily available in a usable format and reasonably indexed. Examples of inaccessible paper documents could include (a) documents in storage in a difficult to reach place; (b) documents converted to microfiche and not easily readable; or (c) documents kept haphazardly, with no indexing system, in quantities that make page-by-page searches impracticable." 217 F.R.D. at 318. Similarly, the court noted that the answer to whether a

**B. Plaintiff's Proposed RRO is Ineffective and Overbroad under the Test of Laguna**

Beyond the foregoing threshold objections, Defendant hereby identifies several more specific problems with the PPRO.

1. The PPRO Extends the Review of Inactive Records to Agencies in Addition To the Department of the Interior

The Jicarilla and Laguna RROs limited review by Plaintiff exclusively to Department of the Interior inactive records.[19] Other agencies, including Treasury, the Forest Service (FS), the NARA, the Department of Energy (DOE), and the Nuclear Regulatory Commission (NRC), while subject to the preservation requirements of the RROs, were not included in the "Document Inspection" sections. See §§ 2(a) - (d), Laguna and Jicarilla RROs. In the instant case, Defendant has failed to

---

request imposed 'undue burden or expense,' boiled down to "'how important is the sought-after evidence in comparison to the cost of production?'" 217 F.R.D. at 322-23.

Other courts have likewise imposed restrictions on discovery requests deemed overly broad when compared to the importance of the materials sought or the cost of locating or producing them. See, e.g., Coleman v. Am. Red Cross, 23 F.3d 1091, 1098 (6th Cir. 1994) (plaintiff's request that would have required the defendant to search every file that exists at its national headquarters for any documents that may be of any relevance to any matter in the case, held overly burdensome); and Quality Aero Tech., Inc. v. Telemetrie Elektronik GmbH, 212 F.R.D. 313, 318 (E.D.N.C. 2002)(request seeking potentially voluminous materials – "all documents" relating to an international project – held unduly burdensome).

Likewise, in Rincon Band v. United States, No. 80-A, 1980 U.S. Ct. Cl. LEXIS 1029, *3 (Ct. Cl. February 29, 1980), which involved claims brought by an Indian band, the U.S. Court of Claims refused to order the United States to produce its collection of publicly-available documents potentially relevant to those claims, where "the original documents or evidence have been equally accessible to both parties if they are willing to exert the necessary effort to sort them out." This has particular application to the burdens Plaintiff seeks to impose on NARA here.

In short, other federal courts set appropriate limits on the burdens litigants may impose on each other in their search for documents and information, and this Court should do so here.

[19] Just as with the PPRO here, Plaintiffs' proposed orders in Jicarilla and Laguna also sought to control movement of active records going so far as to require the federal agencies involved to seek permission from Plaintiff prior to records movement. The Court rejected Plaintiffs' request in those cases, and should do so here, as well.

show why these agencies should be subject to immediate document production obligations according to the schedule set out in the PPRO at § 2(e), particularly in the absence of any well-articulated claims offering some guidance as to relevant evidence for these non-Interior agencies and organizations. Thus, any document access and production provision in any RRO which might be entered in this case should not extend to Treasury, FS, NARA, DOE, or NRC.

2. The PPRO Unacceptably Extends to Active Records

Contrary to the Jicarilla and Laguna RROs, the PPRO contemplates review of both inactive and active records. While Section 2 of Plaintiff's PPRO is entitled "Document Inspection and Production," and it specifically refers to review of inactive Navajo Trust Records, § 2(e) requires a "meet and confer" which in part is directed to scheduling review of active records.[20] This includes active records at BIA offices at the Chinle Agency, the Fort Defiance Agency, the Western Navajo Agency, the Eastern Navajo Agency, the Shiprock Agency, the AIRR, the Federal Records Centers, the Office of Trust Records (OTR), the Office of Special Trustee (OST), and any other federal agencies with Navajo records ranging from NARA to Department of Energy. An RRO here should also be limited to inactive records.

3. The Time Frames for Completion of Designation and Review are Substantially Extended, Including No Time Limits for Designation.

Plaintiff has increased the time frames for it to complete the various activities for which the PPRO provides compared to the Jicarilla and Laguna RRO's. For example, Plaintiff has increased its allowed inspection period by one third to 90 days from the date records are made available. PPRO § 2(c). This is to be contrasted with the 63 days allowed under the Laguna and Jicarilla RROs § 2 (c).

---

[20] The "meet and confer" is also meant to cover additional inactive records at agencies and offices other than the BIA Navajo offices, the AIRR, OTR, and OST.

More notable in the context of records found in Plaintiff's designation is PPRO § 2(b)ii, which provides as follows:

> (ii) Plaintiff shall designate boxes or records listed in the provided indices that Plaintiff wishes to review for Navajo Trust Records at *any time*.

PPRO § 2(b)(ii) (emphasis supplied). Putting the burden on the government, § 2(b)(ii) goes on to provide that:

> [I]f Defendant has informed Plaintiff in writing that it intends to move certain records to another location, then Plaintiff should make designations for those records within 90 days after receiving such notice.[21]

Id. The terms proposed by Plaintiff are problematic for several reasons. First, under the PPRO, Plaintiff is permitted to designate boxes or records "at any time" for review absent Defendant notifying Plaintiff in writing that it intends to move records to "another location." Indeed, the language is so broad that it contemplates control of document movement within the territorial borders of the reservation itself. This is made clear as well by the language in § 2(b)(iii) of the PPRO which contemplates that documents should remain at the reservation facilities in which they are found for Plaintiff's review. In a reservation such as the Navajo, where inactive records are located in several of the six geographically scattered agencies as well as the two regional headquarters locations in Window Rock, Arizona, and Gallup, New Mexico, this provision would likely lead to simultaneous document reviews in different parts of the reservation. Put another way, § 2(b)(iii) denies the agency discretion to move inactive documents to a single site in order to make the review process more economical for both parties and less disruptive for the agencies. Other notable increases in timing requirements between the PPRO and the Jicarilla and Laguna RROs include an increase from 90 to

---

[21] Again, in the PPRO, 90 days (instead of 60 days) has become the default period within which Plaintiff has to designate documents for scanning.

120 days as the amount of time that must expire between the date a box is presented for review and when a box can be moved absent commencement of review by Plaintiff. See PPRO § 2(d). Only after inaction by Plaintiff for the 120 days could Defendant move the boxes at issue. See id.

The effects of these provisions are to delay the transfer of inactive records to the security of the AIRR, to hamper agency operations and any attempt to consolidate the records for review or transfer, by restricting movement of the documents within the reservation, and to permit or even require (as a practical matter) the simultaneous review of documents at scattered sites on the reservation. Such restrictions decrease, rather than enhance, the security of documents while increasing the burdens on the agencies involved.

4. Further Provisions Delaying the Record Review Process

Under the terms of the Jicarilla and Laguna RRO § 2(d), Defendant is permitted to remove inactive records "in accordance with its normal procedures and protocols" once designated records had been copied or imaged. Under the PPRO, Defendant is precluded from moving designated records until copies of the records are actually produced to the Plaintiff. The actual production of copied or imaged records can reasonably add several weeks or, potentially, months to the amount of time required to move the inactive records to the AIRR archive in Lenexa. That has the compound effect of delaying the indexing and secure storage of these records at the AIRR.

5. Extraneous Advocacy Provisions

At Section 3(a) of the PPRO, there is a provision which constitutes Plaintiff's gloss on the trustee's purported record-keeping duties. The provision states as follows:

> Pursuant to Defendants' duties as a trustee to create, maintain in a businesslike manner, and make available to Plaintiff trust records related to Plaintiff's trust assets, Defendants could be expected to have maintained and to provide document-level indices and inventories for each location that may

contain Plaintiff's trust records. PPRO § 3(a).

The language appears without citation to any case law, statute or regulation. Certainly, Defendant is not aware of any such document-level indexation requirement in the law. Indeed, in the Jicarilla and Laguna RROs, there is no such language. Rather, this Court directs the parties to "develop a plan for indexing documents, data, and tangible things reasonably anticipated to be subject to discovery in this case." Jicarilla and Laguna RROs § 3(a).

Plaintiff excised the Court's language quoted immediately above and instead substituted language purporting to make "document-level indices" the standard unit for purposes of indexation. Particularly as Plaintiff failed to cite any statute or regulation imposing a requirement for "document-level indices," Defendant urges that the language not be included in any Order or other requirement imposed by the Court in response to Plaintiff's proposed RRO.

### C. The Burdensome Impact of the PPRO on Agencies' Missions

As this court held in Laguna,"one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome." Laguna, 60 Fed. Cl. at 138. Accordingly, in addition to making the required showing of necessity, "the proponent must show that the particular steps to be adopted will be effective *but not overbroad* – the court will neither lightly exercise its inherent power to protect evidence nor indulge in an exercise in futility." Laguna, 60 Fed. Cl. at 138 (emphasis supplied) (citing In re Potash, 1994 WL 1108312, at *8 (D. Minn. Dec. 5, 1994); and Prudential Ins. Co. Of America Sales Practices Litigation, 169 F.R.D. 598, 616-17 (D. N.J. 1997)).

As Defendant has explained elsewhere in this memorandum, Plaintiff failed to discharge its obligation to show that the order it seeks is necessary. In addition, Plaintiff failed to show that the order is not unduly burdensome or that the "particular steps to be adopted will be effective but not

overbroad," as it must do to meet the requirements this Court enunciated in Laguna, 60 Fed. Cl. at 138. In contrast, the attached declarations from the United States government agencies whose records and operations would be most directly and severely affected by PPRO (namely, NARA, Interior, and Treasury) show that the order would impose undue burdens, and that the measures to be adopted are overly broad as well as unnecessary.

NARA's mission involves preserving and making available to the public for research those records of the United States determined to be "permanently valuable." Declaration of Steven D. Tilley ("Tilley Decl."), Ex. 33, ¶¶ 4, 9, 16, and 17; Declaration of Gregory Pomicter ("Pomicter Decl."), Ex. 34, ¶¶ 4, 5, 10, 18, and 19[22/]. As the attached NARA declarations establish, to locate all Navajo-related records amongst NARA's holdings would be a massive and severely burdensome undertaking. Tilley Decl., Ex. 33, ¶¶ 6-8 and 10-13 ; Pomicter Decl., Ex. 34, ¶¶ 7-9 and 12-13. NARA's vast archival holdings are organized or classified in over 500 record group designations. Tilley Decl., Ex. 33, ¶ 6. In general, federal records are arranged by the name of the government agency with which they are associated and each such agency has its own filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. Id. Rather, the records of each agency are arranged and filed by the agency's own bookkeeping and filing system, in accordance with existing file plans and records series set out in each agency's records schedules. Id. Consequently, NARA archivists are not generally able to search records of all government agencies under the search term "Navajo" to locate all records relating to this tribe. Id.

---

[22/] Steven D. Tilley is the Director of the Textual Archives Services Division in the Access Programs unit of NARA's Office of Records Services, Washington DC. Tilley Decl., Ex. 33, ¶ 1. Gregory Pomicter is the Assistant for Operations in the Office of Regional Records Services of NARA. Pomicter Decl., Ex. 34, ¶ 1.

Moreover, although many records relating to the Navajo would be expected to be found within Interior's record groups, NARA archivists are also aware of many record groups outside of DOI that also might conceivably contain Navajo-related records. Id. See also, Pomicter Decl., Ex. 34, ¶¶ 7-9 and 12 (discussing NARA's regional archival holdings, as well as the fact that a general search under the name "Navajo" is not possible, and that universe of record collections potentially containing Navajo-related records encompasses the records of many agencies, not just the BIA) .

In short, millions of unindexed pages of records amongst the NARA holdings might contain Navajo-related records of some type. Tilley Decl., Ex. 33, ¶¶ 6 and 13; Pomicter Decl., Ex. 34, ¶¶ 7 and 13. There are 25,777 cubic feet of BIA records held at Main Archives, alone. Tilley Decl., Ex. 33, ¶ 14. An additional 43,345 cubic feet of BIA records are held in NARA's regional archival facilities. Pomicter Decl., Ex. 34, ¶¶ 8 and 14. In addition, Navajo-related records may be located amongst the NARA holdings of records originating from various other government agencies. Tilley Decl., Ex. 33, ¶ 6; Pomicter Decl. Ex. 34, ¶ 7. Just the subset of "likely places" to find Navajo-related records itself amounts to an estimated 34,383 cubic feet of records. Tilley Decl., Ex. 33, ¶ 12.

Furthermore, to attempt to identify and segregate "Navajo Trust Records" from other Navajo-related records, once the latter are identified, would be a project so labor-intensive and consuming it is virtually impossible for NARA to perform. Tilley Decl., Ex. 33, ¶¶ 8-9; Pomicter Decl., Ex. 34, ¶ 11. In addition, as the Tilley and Pomicter Declarations also establish, the broad requirements of the proposed order concerning indexing Navajo-related records would impose a crippling burden on NARA. For example, to index just the 25,777 cubic feet of BIA records located at the Main Archives of NARA would require 386,655 hours of labor, or 193.33 person/years of labor. Tilley Decl., Ex. 33, ¶ 14. In other words, it would require the equivalent of 20 archivists spending 9.7

years of their time indexing, or 100 archivists spending a full 2 years of their time, to index just the subset of BIA records located at NARA's Main Archives. Tilley Decl., Ex. 33, ¶ 14. Likewise, to review and index the additional 43,345 cubic feet of BIA records held in NARA's regional archival facilities, would take an additional 650,175 hours, or 325 person-years, of work. Pomicter Decl., Ex. 34, ¶ 14. As Gregory Pomicter's Declaration also establishes, that equates to 20 archivists spending 16 1/4 years each, just to identify and index Navajo-related records from one agency (BIA) held in the regional archives. Id.

To pull the required numbers of NARA archivists away from all of the other functions they perform, to index Navajo-related records, would cripple NARA. Tilley Decl., Ex. 33, ¶ 18; Pomicter Decl., Ex. 34, ¶ 14. Furthermore, it would interfere with all of the other competing priority work performed on a daily basis by NARA staff, including handling reference requests; processing a backlog of more than a million cubic feet of records awaiting being made available to the public; accessioning approximately 35,000 cubic feet of new records per year; performing preservation work on existing archival record collections; and screening records for privacy-related information and to ensure that only unclassified records are opened. Tilley Decl., Ex. 33, ¶¶ 9 and 14; Pomicter Decl., Ex. 34, ¶¶ 10, 14, and 20. NARA fields, and follows-up on, over 1,000,000 reference requests per year from around the United States and around the world. Tilley Decl., Ex. 33, ¶ 9; Pomicter Decl. Ex. 24, ¶ 10. If its limited staff and budget must be allocated instead to the measures set forth in the PPRO, handling reference requests, and the other work NARA performs for members of the public will be severely curtailed. Tilley Decl. Ex. 33, ¶¶ 13, 14, and 20; Pomicter Decl., ¶¶ 13, 14, and 22. Plaintiff is not entitled to document retention and discovery measures that would cripple a

government agency's ability to serve the public.[23] In short, there can be no question that, as to NARA, the proposed order is not only unnecessary, but unduly burdensome.

Likewise, the proposed order would unduly burden the Regional Office and the program and agency offices of BIA that serve the Navajo Tribe and its members. The attached Declaration of Omar Bradley, the Regional Director of the Navajo Regional Office, shows that a mandate that inactive Navajo trust records be kept on-site at those offices, and produced there for Plaintiff's inspection and review, contravenes Plaintiff's stated desire to preserve the records in a safe environment. Bradley Decl., Ex. 9, ¶¶ 8, 17, and 18. In addition, the offices involved are not designed or staffed to serve as record repositories or inspection venues. Id. at ¶¶ 17 and 22. The financial and other burdens of forcing those offices and staffs to take on such responsibilities are heavy, and would divert resources from already-strained budgets. Id. at ¶¶ 23-25 and 28. In addition to personnel costs, the potential need for purchase of additional copiers, scanners, paper, ink, file folders, boxes, equipment maintenance and additional space for storage and inspections could exceed $100,000. Id. at ¶ 28.

Moreover, inspection of trust records on site at the offices where they currently reside would result in diversion of BIA staff to document production activities, to the detriment of important ongoing work for the Tribe and its members. Id. at ¶¶ 25-29. The regional program office in Window Rock, Arizona, serves as just one example of the hardships and undue burdens posed by

---

[23] See, e.g., Leyh v. Modicon, Inc., 881 F.Supp. 420 (S.D. Ind. 1995)(A plaintiff who brought a discrimination action was not allowed to depose the EEOC investigator because the possibility that relevant admissions might be uncovered was outweighed by the burden of subjecting EEOC to depositions of its investigators as a matter of course, since EEOC's principal responsibility was to serve public as a whole, not individual litigants).

Plaintiff's requested order. Id. at ¶ 32. The bulk of the inactive records, awaiting shipment to the security of the AIRR, presently are located there. Id. at ¶¶ 10 and 15-17. The Window Rock office handles all of the realty functions for the Navajo Tribe, including maintenance and oversight of the Tribe's and individuals' Rights of Way, leases, permits, unresolved rights, trespass matters, and minerals. Id. at ¶ 11. The office is located in an historic building. Id. It has 15 employees, carrying out the functions of the office. Id. It has no conference room or any room that would accommodate the production or inspection of documents. Id. It is at capacity now, in terms of accommodating people and documents. Id. at 33. To force the BIA to produce records for inspection there (or at other program and agency offices) would not only divert staff and other resources to document production and inspection activities, it would also hamper the day-to-day performance of the realty functions carried out there. Id. at ¶¶ 13-14, 20, 21-24, and 33. Likewise, there is a danger that the work needed to comply with the proposed order would displace trust reform initiatives, which currently are priorities for the affected offices. Id. at ¶ 26.

Even if personnel could be hired to assist in the tasks contemplated or required by the proposed order, budget constraints would force the offices concerned to borrow funds from other BIA programs to pay for the costs incurred. Id. at ¶ 26. Furthermore, experienced employees with the best knowledge of the contents of the active and inactive records within their areas of responsibility would have to devote time and attention to supervising any new staffers that could be hired, all to the detriment of their day-to-day mission. Id. at ¶ 27.

Such circumstances of course arise whether inactive or active records are at issue. Production and inspection of active Navajo records at the Navajo Regional office and program and field offices serving the Navajo would place additional undue burdens not only on the BIA, but on

the persons it serves, by disrupting the day-to-day activities of the offices concerned. Id. at ¶¶ 29-33. BIA staff members need access to active Navajo records throughout their work-day to perform their jobs. Id. at ¶ 31. If they are required to make those records available for inspection and production as set forth in the PPRO, services to the Tribe and others will be hampered and delayed. Id. at ¶¶ 23-24, 26, 27, and 30-31.

For all of the reasons noted above, and as further set forth in the attached Bradley Declaration, this Court should reject the PPRO because it saddles the Interior and BIA with undue burdens and requires measures that are not only overly broad but unnecessary. Moreover, those measures cut against Plaintiff's stated desire to preserve trust records.

The attached Declaration of Rita Bratcher of the Department of the Treasury (hereinafter "Bratcher Decl.", Ex. 32), also makes clear that the proposed measures are unduly burdensome and overly broad as applied to Treasury's records. To conduct a search for Navajo-related trust records held by Treasury, pursuant to the PPRO, would entail a search similar in scope to the one Treasury undertook in connection with the Cobell litigation. Bratcher Decl., Ex. 32, ¶¶ 3-4. Accordingly, the search conducted in Cobell provides an apt analogy for the search Plaintiff's PRRO contemplates in this case, and indicates the financial and other burdens the PPRO would impose on Treasury. The Cobell search took 14 months, required research at 37 facilities in 24 cities, and involved the work of 2,200 people. Id. at ¶¶ 5 and 7. It considered over 6 billion records and cost over $3.9 million, yet yielded relatively few records relating to the individuals whose records were sought. Id. Such high dollar costs, time requirements, and drains on human resources epitomize the phrases "unduly burdensome" and "overly broad" in the context of a discovery order; they do so even more in the context of a purported preservation and retention order.

In summary, Plaintiff's proposed RRO fails to meet the standards this court enunciated in Laguna. As this Court made clear, those requirements are informed by the United States Supreme Court's admonition that "'[b]ecause of their very potency,' . . . 'inherent powers [such as those this court relied on in holding that entry of a retention order lay within its "inherent power"] must be exercised with restraint and discretion."' Laguna, 60 Fed. Cl. at 137 (citing Chambers, 501 U.S. at 44; and Roadway Express, Inc., v. Piper, 447 U.S. 752, 764 (1980)). Accordingly, should this Court decide a preservation order is necessary (which Defendant does not concede), the burdens imposed by such an order should not exceed those described in the Conclusion, infra.

Furthermore, as Defendant notes elsewhere in this memorandum, the provisions of the PPRO, i.e., the "particular steps to be taken," are aimed at compelling production and inspection of documents, rather than preserving them. In other words, the proposed order is a discovery order more than a document preservation order. This, too, shows the overbreadth of the measures plaintiff seeks in the name of "preservation" of records. It forms an additional and independent reason the proposed order is not appropriate in this case and should be rejected.

**CONCLUSION**

In light of Plaintiff's failure to meet the Laguna test devised by this Court for entry of an RRO, the Government respectfully urges that no RRO be entered in this case. In the event the Court finds an RRO is required, the Government urges that the Court enter Sections 1, 4, 5, 6, and 8 of the Laguna RRO, which are preservation-directed and allow the parties to negotiate an appropriate stipulation to address any records access issues, i.e., discovery provisions, whether in the context of an ADR proceeding or otherwise.

Dated: June 21st, 2007.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

s/Robert W. Rodrigues
ROBERT W. RODRIGUES
Trial Attorney
LAURA MAROLDY
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
JOHN H. MARTIN
Trail Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202.353.8839
Facsimile: 202.305.0506
Email: robert.rodrigues@usdoj.gov

Of Counsel:
Rachel Howard
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury

Gladys Orr Cojocari
Tom Kearns
Candace Beck
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Jason R. Baron
Director of Litigation
Office of the General Counsel
National Archives and Records Administration
8601 Adelphi Road, Suite 3110
College Park, MD 20740