# Exhibit 31

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **NAVAJO NATION, f.k.a. NAVAJO TRIBE OF INDIANS,** Plaintiff | ) | Case No. 1:06-cv-00945-L |
| | ) | Judge Francis Allegra |
| v. | ) | |
| **UNITED STATES,** Defendant | ) | **DECLARATION OF Lawrence K. Ruffin** |

I, Lawrence K. Ruffin, as Chief Information Security Officer (CISO), Cyber Security Division, Office of the Chief Information Officer, Department of the Interior (Interior), pursuant to 28 U.S.C. § 1746 do hereby declare and state:

1. I have held the position of Chief Information Security Officer (CISO) in the Office of the Chief Information Officer (OCIO) since April 30, 2006. I previously was the Deputy CISO, beginning May 15, 2005. I currently hold both the Certified Information Systems Security Professional (CISSP) and Certification and Accreditation Professional (CAP) certifications from the International Information Systems Security Certification Consortium (ISC). I have held a variety of computer security-related positions with the Federal Government over the past 24 years.

2. In my current position at OCIO, I am responsible for providing management and leadership for the Cyber Security Division (CSD) within the Office of

the Chief Information Officer (CIO). I serve as the CIO's management advisor and senior consultant regarding development, publication, and implementation of Departmental information technology security policies, standards and guidance, as well as coordination of all aspects of the Department's information security protection program, which directly supports all of DOI's information assurance objectives.

3. I am aware of the litigation filed by the Navajo Nation against the United States on December 29, 2007. Navajo Nation f.k.a. Navajo Tribe of Indians v. United States of America, No. 06-945L (C.F.C.), and I have reviewed the Plaintiff's motion for the entry of a record retention order in this case and proposed order.

4. Interior is a large, decentralized agency with over 73,000 employees and 180,000 volunteers located at approximately 2,400 operating locations across the United States, Puerto Rico, U.S. territories, and elsewhere. As of the end of the Third Quarter of the FY2007 FISMA reporting cycle, the CIO had identified 164 certified and accredited information systems, including Major Applications (MAs) and General Support Systems (GSSs), and 11 contractor systems, all of which support Interior's various programs and missions, including but not limited to National Critical Infrastructure, Indian Trust, Financial Management and Law Enforcement. The 175 information systems represent, in aggregate, approximately 75,000 end-user workstations, 6,500 servers using a variety of operating systems (i.e., hosting applications and databases), 1,500 networking devices (i.e., routers/switches), and 560 databases.

5. Enterprise risks are defined as known vulnerabilities and/or weaknesses in an information system. Vulnerabilities in information systems are types of weaknesses that may exist within a security program or IT environment. Enterprise risks are identified in IT security programs or information systems with the goal of reducing those risks to a level commensurate with the risks to information and information systems and their associated confidentiality, integrity, and availability objectives and security requirements. Interior accomplishes enterprise risk management through Certification and Accreditation (C&A) of its information systems and implementation of Plan of Actions and Milestones (POA&M) processes, as prescribed for all federal agencies by the Federal Information Security Management Act (FISMA), 44 U.S.C. § 35, and by adhering to OMB requirements and National Institute of Standards and Technology (NIST) standards.

6. In 2002, FISMA was enacted to provide a comprehensive framework to secure federal government's information and IT resources. FISMA requires federal agencies to implement security programs that protect information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction. Specifically, FISMA requires that agencies are equipped with security programs and other mechanisms to identify and assess risks and implement policies and procedures to reduce those risks, test and evaluate security controls, plan for continuity of operations, maintain subordinate plans for providing information security, plan for security throughout the life cycle of information systems, plan corrective actions, train employees and contractors, and detect, report, and respond to security incidents.

7. FISMA and the Office of Management and Budget (OMB) require that agencies adhere to the NIST standards and guidelines relating to IT security issued in the form of Special Publications (SPs) or Federal Information Processing Standard Publications (FIPS PUBS). NIST articulates, through a variety of standards, a Risk Management Framework by which agencies are expected to implement IT security programs that address and implement those standards, including, but not limited to, C&A programs, processes, and procedures through which agencies identify and implement appropriate security controls based on the potential risk impact to information and information systems and to reduce vulnerabilities and weaknesses to a level commensurate with those risks. The NIST standards recognize that it is not feasible to eliminate all risks to information or information systems, and does not require that agencies do so. The NIST standards require, however, that any known risks be sufficiently documented, understood, and managed efficiently and effectively.

8. FISMA also requires Inspector Generals (IGs) to carry out annual independent evaluations of their agency's IT security programs. IG evaluations must include testing of management, as well as operational and technical controls of a representative subset of all information systems as specified in NIST pursuant to the evaluation criteria specified in NIST SP 800-53A, and through other forms of security evaluations and tests. In addition, the evaluation must include an assessment of the agency's compliance with FISMA.

9. In addition to the annual internal control reviews (ICRs) and security testing and evaluation (ST&E) conducted as part of the C&A processes once every

three years, or sooner in the event of a major change to a system, enterprise risks are identified by Interior through routine vulnerability scanning. Interior requires system owners[1] to create corrective action plans (using POA&Ms as described in ¶ 12) for identified weaknesses requiring further action to correct or mitigate associated risks. Formal acceptance of all remaining risks that are not considered to be "negligible" or non significant must be made by a senior level management official who is a Designated Approval Authority (DAA). Those risks must be eliminated or reduced to a level acceptable to the DAA.[2] Newly identified POA&M weaknesses are analyzed as to the seriousness, the time to mitigate, the resources available and the need to keep the system running even with the vulnerability unmitigated or unremediated.

10. As part of identifying its enterprise risks, Interior issued OCIO Directive 2006-008 directing all bureaus and offices to adhere to particular NIST and FIPS Pubs standards in performing C&A for all information systems. C&A is the process by which Interior identifies the information types within an information system and documents those types within the system security plan; selects and implements appropriate security controls; assesses security controls for proper implementation and effectiveness; receives authorization to operate (ATO) by a DAA following the DAA's

---

[1] A system owner, of which there are multiple individuals within each bureau at Interior, is an agency official responsible for the overall procurement, development, integration, modification, or operation and maintenance of an information system.

[2] The authority to be a DAA has been delegated to the Inspector General, the Solicitor, the Special Trustee for the American Indians, Assistant Secretary of Policy, Management and Budget, the Assistant Secretary for Fish and Wildlife and Parks, the Assistant Secretary of Indian Affairs, the Assistant Secretary of Land and Minerals Management, and the Assistant Secretary of Water and Science. Such authority may also be further delegated to the corresponding Deputy Assistant Secretaries and/or heads of bureaus/offices. See Secretarial Order 3255, Amendment No. 1 (attached hereto as Exhibit 1).

determination of risk to Interior's organizational operations; and periodically assesses selected security controls.

11. Once a weakness is identified, it is assessed by Interior as a "low," "moderate," or "high" risk following standard risk assessment methodologies specified by NIST for all federal agencies. Risk level determinations for vulnerabilities in information systems are determined by considering compensating and/or mitigating controls, the existence of recognized threat sources and their respective motivations, the likelihood of a threat source to exploit a given vulnerability or weakness, and the potential impact to the information or information system. Examples of "high" risk weaknesses to an information system include unauthorized access to an information system, issues with physical environment, virus detection, particular patches being out of date, and insufficient technical support availability. Examples of "moderate" risk weaknesses include having passwords that fail to expire, passwords are not changed at least every ninety days, and particular patches being out of date. Finally, examples of "low" risk weaknesses are when applications do not lock out user after 15 minutes non-use, building plumbing lines endanger system, and failure to ensure that training occurs.

12. In my opinion, and based on my experience working in various related capacities for other agencies, the volume and types of weaknesses being tracked through Interior's POA&M process are similar to that of any other organization having a comparable size, scope, and complexity to Interior's IT environment (e.g., 175 C&A systems; and approximately 75,000 end-user workstations, 6,500 servers, 1,500 networking devices, and 560 databases). An information system with a "high" risk

weakness is typically allowed to continue to operate, but a corrective action plan must be put in place as soon as possible to eliminate or reduce the risk to an acceptable level. For information systems with "moderate" risk weaknesses, corrective actions are needed and a plan must be developed to incorporate these actions within a reasonable period of time. For information systems with "low" risk weaknesses, the DAA must determine whether corrective actions are still required or decide to accept the risk. Of the weaknesses identified in the first three quarters of OMB/FISMA's 2007 reporting cycle, approximately 20% were determined to be of high risk.

13. Software vendors continuously identify and rectify vulnerabilities in their software and provide security patches to Interior, which Interior applies to all of its computers on a regular and on an as-needed basis, prioritized based on the criticality of each vulnerability. In addition, Interior monitors continuously for additional vulnerabilities through frequent use of vulnerability scanners and by routinely rescanning the systems to identify those vulnerabilities requiring additional security patching. New weaknesses reported on POA&Ms reflect the results achieved from Interior's continuous monitoring processes. As new weaknesses are discovered, Interior constantly must reprioritize planned corrective actions based on risk levels and available resources (i.e., staff and budgetary). This does not imply, however, that all "high" risks are necessarily corrected before any "moderate" or "low" risk weaknesses, as the time required to implement corrective actions vary depending on complexities involved.

14. Since FY05 Q3, on average, Interior is mitigating/correcting and closing approximately 23 percent of existing open POA&M weaknesses from the start of each quarter. However, over that same period, Interior identified 31 percent new POA&M weaknesses as compared to existing open POA&M weaknesses over previous quarters (Figure 1). Several factors account for the apparent increase in identified weaknesses, including, but not limited to, increased security control requirements and evaluation criteria; varying levels or regulatory oversight; increased rigor in ST&Es during C&As; and re-certification and re-accreditation activities. The continuing numbers of newly identified vulnerabilities and weaknesses discovered and reported in POA&Ms are a testament to the continuous monitoring and significant work being performed by both the OIG and Interior's bureaus and offices in performing routine and increasingly more robust security testing, evaluations, and assessments of the effectiveness of management, operational, and technical security controls associated with IT security programs and information systems. Through these processes, it is Interior's goal to proactively identify as many weaknesses as possible for the purpose of eliminating and/or mitigating those risks to an acceptable level even before they have any negative impact on Interior's information or information systems.




**Figure 1 – POA&M Weakness Trending Analysis**

15. In fulfilling their oversight responsibilities, agency inspector generals (IGs) are required to evaluate agency compliance with FISMA and submit their reports to OMB annually. Interior's Office of the Inspector General (OIG) FY2006 FISMA Report (Report No. NSM-EV-OIG-0002-2006) issued in September 2006 indicated that "DOI has made good progress in improving its system inventory, Plans of Actions and Milestones (POA&M), and ensuring security requirements are included in its contracts." In addition, the report cited Interior as making substantial progress in the area of incident response, which includes remediation. The report (Figure 2) identifies a number of IT security program improvements made by Interior. For example, Interior's POA&M process has improved, bureaus have made significant strides to implement Interior's guidance, regarding identifying and mitigating enterprise risks. The OIG's report further affirms that Interior initiated a number of efforts during FY06. While many of the expected improvements were not expected to be realized until fiscal year 2007, because the re-certification and re-accreditation of systems and institutionalization of other related policy and process improvements are not scheduled to be completed until the end of FY2007, Interior is nevertheless already realizing benefits from its enterprise

risk management processes. I understand that the OIG expects to complete the FY07 annual FISMA evaluation report by late September or early October 2007.




**Figure 2 – OIG FY2006 FISMA Report**

16. On February 27, 2006, Interior issued OCIO Directive 2006-007 to further improve risk management practices. The directive included a robust POA&M process standard for reporting and managing remediation activities for vulnerabilities and weaknesses associated with information systems and risks associated with security of information. To ensure weaknesses are not prematurely closed prior to their satisfactory resolution, the process standard requires evidence of completion of corrective actions to be maintained and certifications of completion signed by responsible staff with concurrence from responsible senior management officials. Additionally, as noted earlier, Interior issued OCIO Directive 2006-008 on March 14,

2006 requiring bureaus and offices to implement the most current NIST IT security standards, i.e., NIST 800-53A, in their execution of Interior's C&A processes. In FY2006, Interior was an early adopter of the draft NIST SP 800-53A evaluation criteria, and issued OCIO Directive 2006-005 on January 31, 2006, ahead of NIST's final release. The Directive revised annual ICR guidance and incorporated evaluation criteria aligned with the NIST SP 800-53 families of security controls. These Directives apply to all of Interior's 175 information systems.

17. Interior has undertaken a number of major initiatives to modernize and consolidate its IT infrastructure, particularly in the areas of financial management and networking. These efforts are not just aimed at enhancing service delivery to the public, improving IT efficiencies, and eliminating costly redundancies, but also to enhance the overall security of Interior's information and information systems. For example, Interior has implemented a web blocking capability to minimize potential risks associated with internal users downloading and installing malicious code from the internet. Additionally, projects like the Enterprise Services Network (ESN), which was implemented in 2005, have contributed to Interior's ability to move itself towards the centralization needed to provide greater security, improved efficiency, and cost savings. ESN is Interior's wide-area network (WAN) and provides interconnectivity and Internet connectivity for many of Interior's bureaus and offices. Through ESN, Interior has consolidated multiple Internet gateways, previously implemented by each bureau and/or office, into a single gateway centrally managed by the Department. This has resulted in an increased hardening of Interior's Internet-facing perimeter network against potential threats. This hardening is

accomplished through implementation of a standardized and robust security architecture, deployment of security infrastructure protection devices, and consistent implementation of security configuration standards on ESN managed devices. ESN also contributes to an overall defense-in-depth strategy providing multiple layers of security controls aiding in the protection of bureau and office information systems and resources. As recognized by the OIG, migrating to ESN has made Interior's bureaus and offices appreciably more secure as compared to when they were independently connected to the Internet.

18. In addition to securing systems through the enterprise risk management processes and C&A process, Interior deploys a variety of incident detection and prevention technologies as part of a defense-in-depth strategy to monitor, detect, protect, and respond to potential incidents resulting from intruder attempts. These Intrusion Detection Systems and Intrusion Prevention Systems (IDS/IPS) are strategically positioned in various locations by bureaus and offices within their network infrastructures. Interior has also positioned a robust IDS/IPS architecture at the perimeter of Interior's ESN that provides the Wide-Area Network (WAN) that connects some of Interior's bureaus/offices to the Internet. IDS and IPS sensors are configured to monitor network traffic in real-time to detect known attack signatures and alert security personnel as part of Interior's incident monitoring, detection, and response processes. IPS sensors are also capable of proactively blocking and preventing potentially malicious network traffic without manual intervention. Interior's application and database servers and other networking devices are configured to automatically log

security events. Other security devices automatically monitor those security event logs and alert security administrators about potential attacks, system compromises, system misuse, and other types of related incidents. Potential incidents requiring further analysis and investigation are reported by bureaus and offices through the DOI-CIRC (Computer Incident Response and Coordination) center to the US-CERT and/or Interior's OIG Cyber Crimes Investigation Unit following Standard Operating Procedures (SOP) established by those organizations. These incident response capabilities are an integral component of Interior's continuous monitoring processes and, as indicated in the 2006 OIG report, Interior has also demonstrated significant improvements in this area.

Lawrence K. Ruffin
Lawrence K. Ruffin
Chief Information Security Officer
Cyber Security Division
Office of the Chief Information Officer

Executed this 21st day of June, 2007

Document

THE SECRETARY OF THE INTERIOR
WASHINGTON

ORDER NO. 3255, Amendment No. 1 *(Amended material italicized)*

SIGNATURE DATE: August 31, 2006

**Subject**: Delegation of Authority for Certification and Accreditation of Information Technology Systems

Sec. 1 **Purpose**. The purpose of this Order is to delegate authority to bureaus and offices to carry out the necessary activities required for information technology (IT) system security certification and accreditation (C & A), including signing the accreditation decision letter accepting the residual risk to the bureau or office. The Chief Information Officer (CIO) was previously designated the Designated Approving Authority (DAA). This Order extends the DAA authority to bureaus and offices.

Sec. 2 **Authority**. This Order is issued in accordance with the authority provided by Section 2 of Reorganization Plan No. 3 of 1950 (64 Stat.1262), as amended and the Clinger-Cohen Act of 1966.

Sec. 3 **Delegation of Authority**. The authority to carry out the responsibilities of the DAA is hereby delegated to the Inspector General, the Solicitor, and the Special Trustee for American Indians. This authority is also delegated to the Assistant Secretary - Policy, Management and Budget, the Assistant Secretary for Fish and Wildlife and Parks, the Assistant Secretary - Indian Affairs, the Assistant Secretary - Land and Minerals Management, and the Assistant Secretary - Water and Science.

Sec. 4 **Limitations**. The authority delegated to the Assistant Secretary - Policy, Management and Budget, the Assistant Secretary for Fish and Wildlife and Parks, the Assistant Secretary - Indian Affairs, the Assistant Secretary - Land and Minerals Management, and the Assistant Secretary - Water and Science may be further delegated to Deputy Assistant Secretaries and/or heads of bureaus/offices. This authority may not be further delegated.

Sec. 5 **Responsibilities**.

a. The DAA responsibilities include: planning and funding of certification and accreditation activities; acceptance of security plans; signing bureau or office accreditation documents; granting full accreditation to bureau or office IT systems based on an acceptable level of risk; and denying accreditation because risks to an IT system are not acceptable.

b. The CIO will continue to be responsible for overall management of the Department's IT resources and IT security programs.

Sec. 6 **Expiration Date.** This Order is effective immediately. It will remain in effect until its provisions are converted to the Departmental Manual or until it is amended, superseded, or revoked, whichever occurs first. In the absence of any of the foregoing actions, the provisions of this Order will expire and be considered obsolete on ***August 31, 2007.***

/s/ DIRK KEMPTHORNE
Secretary of the Interior

SO#3255A1 8/31/06
Replaces SO#3255 6/30/04

# Exhibit 32

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| NAVAJO NATION<br>f.k.a. NAVAJO TRIBE OF INDIANS<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA<br><br>*Defendant.* | ) | No. 06-945 L<br>Judge Francis M. Allegra |

**DECLARATION OF RITA BRATCHER**

I, Rita Bratcher, hereby declare, pursuant to 28 U.S.C. §1746, as follows:

1. I am currently employed by the Department of the Treasury, Financial Management Service ("FMS"), as the Assistant Commissioner, Debt Management Services. I have been employed at FMS for over 35 years, and I served as the Document Production Coordinator for the *Cobell* litigation from March of 1999 through April of 2003. *Cobell v. Kempthorne,* No. 1:96CV01285 (JR). As the Document Production Coordinator, under the direction of the Commissioner of FMS, I coordinated efforts within FMS related to the "Paragraph 19" search in support of the Defendants' Response to the Court's First Order for the Production of Information in *Cobell,* and the development of FMS' Inventory of Summary Level Accounting Records, dated June 21, 2000.

2. The "Paragraph 19 search" refers to an effort undertaken in response to a document request in *Cobell* which called upon the Government to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM [Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest."

3. I have personal knowledge of FMS's document production protocols and efforts with respect to Indian litigation. The facts set forth below are true to the best of my information, knowledge, and belief, or are as provided to me by employees of Treasury based on their knowledge, information, and belief.

4. This declaration is based on my review of the Plaintiff's Proposed Record Retention Order in this case, my knowledge of Treasury documents, systems, and retention and preservation protocols and practices, my general familiarity with the process used to plan and execute the Paragraph 19 search in *Cobell*, and facts about that search gathered by others that were included in Treasury's Paragraph 19 Document Production Report, filed in *Cobell* on January 31, 2001.

5. Paragraph 2 of Plaintiffs' Proposed Record Retention Order filed with the Court on May 21, 2007, asks Defendants to produce "active Navajo Trust Records of all of Defendant's departments, agencies, employees, agents, and contractors and all inactive Navajo Trust Records located at offices other than the BIA Navajo Offices, the AIRR in Lenexa, and OTR and OST in Albuquerque." This request is so broad in scope that it implicates a search of the same records that Treasury undertook in response to the Paragraph 19 request made by Plaintiffs in *Cobell,* which required the Government to produce "[a]ll documents, records, and

tangible things which embody, refer to, or relate to IIM [Individual Indian Money] accounts of the five named plaintiffs or their predecessors in interest."

6. Treasury's Paragraph 19 search was designed to locate documents pertaining to the IIM accounts of particular individual Indian beneficiaries. A search of the same records collections would be conducted in looking for the records of an Indian tribe, such as Plaintiff in this case. Because Plaintiff's document request here is similar in scope, the Paragraph 19 search is a useful reference for evaluating the work, time, and cost that would be involved in producing documents that would be produced under Plaintiff's proposed Record Retention Order in this case. The attached Executive Summary of the Department of the Treasury Paragraph 19 Document Production Report prepared and filed in connection with the *Cobell* case, describes, in summary fashion, the methodology for the Paragraph 19 search and some of the burdens that it entailed.
7. In 1999, Treasury began a comprehensive search for documents responsive to Paragraph 19. The search took 14 months, required research at 37 facilities in 24 cities, considered over 6 billion records, involved the work of 2,200 people, and cost over $3,900,000. For all this effort, the search found only 2,296 documents, for five individuals and their predecessors in interest.
8. If Treasury were required to repeat a Paragraph 19-type search in response to the request for production in this case, I would recommend that Treasury prepare a search protocol and plan as it did in 1999. Treasury would in all likelihood hire a contractor to assist in development of the plan. I estimate that it would take several months to prepare a thorough search plan, depending on the search scope

(including locations to be searched), the contractor's schedule, cost, and other factors.

9. The burden of undertaking a new Paragraph 19-type search would depend on assumptions in the search plan, and Treasury would propose a somewhat different plan than it used in 1999-2000 in *Cobell* by requesting that the Court impose appropriate limitations on the search, based on an analysis of the cost and burden of the search as compared to the likelihood of finding discoverable documents in certain types of record collections (for example, the request as now stated is unbounded in time, and therefore implicates all active and historical documents of the Department). However, if the Court required Treasury to undertake the same search again,[1] as appears to be required by the proposed order in this case, based on my experience with the planning and execution of the Paragraph 19 Report and my review of that Report, I estimate that the following data contained in the Paragraph 19 Document Production Report would roughly approximate some of the burden involved in the new search:

    a. During the Paragraph 19 production, Treasury searched 84,730 cubic feet of records (about 188 million pages) at the National Archives. These records took thousands of hours to search and contained only 1,573 responsive documents.

    b. During the Paragraph 19 production, Treasury searched 374,072 cubic feet of records (about 1 billion pages) at Federal Record

[1] The search procedure would be the same except for substituting "Navajo Nation" for the five named Plaintiffs and their predecessors in interest in *Cobell.* Although there would only be one name being searched, and therefore certain aspects of the search would be less time consuming, other aspects of the search would be more time consuming because of the greater number of disbursing officers servicing the tribe, so I estimate that the search time would be similar.

Centers in 11 different locations. These records took thousands of hours to search and contained no responsive documents.

c. During the Paragraph 19 production, Treasury searched 454 boxes at Federal Reserve Banks in 8 cities. No responsive documents were found.

d. During the Paragraph 19 production, Treasury searched 250 boxes of check-related records, and 3 billion check-related records that can only be searched with predicate information from the Interior Department (check symbol and serial number). The search found 222 checks and 492 check-related records.

10. The cost of conducting another Paragraph 19-type search is difficult to estimate, because it depends heavily on assumptions in the search plan, such as the locations to be searched, the years to be searched, and many other factors; however, the original Paragraph 19 search, which is similar in scope to the search that would be required to comply with Plaintiff's Proposed Record Retention Order in this case, cost approximately $3.9 million.

11. In addition to the burdens described above, complying with Plaintiffs' Proposed Record Retention Order would substantially disrupt Treasury Department operations, in that human resources currently performing core Treasury functions would need to be diverted to assist in the planning and execution of the search. While contractors were used for some portions of the Paragraph 19 search, thousands of hours were devoted by Treasury personnel to the search as well, which extended over 14 months.

12. Treasury already has underway various document searches in connection with discovery requests in other pending tribal trust cases. As over 70 new tribal trust cases were filed in the final months of 2006, Treasury expects that it will continue to need to devote significant resources to such efforts. Especially against this background, to impose the broad and burdensome requirements Plaintiff proposes in its record retention order for the Navajo case would exacerbate the strain on already-extended human and financial resources of Treasury.

13. In summary, the search and other measures required by the terms of Plaintiff's proposed retention order would impose heavy burdens on Treasury, in terms of dollar cost and the diversion of human and other resources from the day-to-day operations and responsibilities of the Department.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 day of June, 2007.

Rita Bratcher

Rita Bratcher

# DEPARTMENT OF THE TREASURY
# PARAGRAPH 19 DOCUMENT PRODUCTION REPORT
*COBELL ET AL. v. SECRETARY OF THE INTERIOR, ET AL.*

**Date:** January 31, 2001

The Department of the Treasury ("Treasury") has completed its searches for, and production of, records responsive to Paragraph 19 of the Court's First Order for the Production of Information, dated November 27, 1996 ("Paragraph 19").[1] This report provides the following information: (1) background information; (2) summary information regarding search efforts, costs, and results; and (3) detailed information regarding certain elements of Treasury's searches.

## Background Information

In 1999, Treasury set forth to fulfill its obligations to conduct comprehensive searches for documents responsive to Paragraph 19.[2] Treasury's efforts focused on determining anew: (1) which departmental offices and bureaus should be included in the search and production effort; (2) which categories of records would need to be searched; and (3) what procedures should be used in searching those records.[3]

Following its decision to answer these three questions anew, Treasury initially determined that three of its constituent parts might have records responsive to Paragraph 19. These three parts were certain Departmental Offices (Office of the General Counsel; Office of the Under Secretary for Domestic Finance and its constituent parts including the Office of the Fiscal Assistant Secretary; Office of the Assistant Secretary for Legislative Affairs; and Office of the Assistant Secretary for Public Affairs) (hereinafter referred to collectively as "DO"), the Financial Management Service ("FMS") and the Bureau of the Public Debt ("BPD"). Treasury also determined that other Treasury bureaus[4] were unlikely to have any responsive records. On October 28, 1999, Treasury briefed the Special Master and Plaintiffs' counsel and advised them of these determinations.[5]

Having made these determinations, Treasury, with the assistance of the Department of Justice ("DOJ") and Arthur Andersen LLP ("Arthur Andersen"), drafted and filed with the Court, the Special Master and Plaintiffs' counsel its *Revised Document Production*

---

[1] Should Treasury receive additional predicate information from the Department of the Interior regarding either (1) checks and check-related records or (2) Treasury securities, Treasury will promptly produce any responsive documents that it can identify using the predicate information.
[2] In late 1998, Treasury searched for and identified some checks and check-related records responsive to Paragraph 19. These documents were produced to the Plaintiffs in November 1998 and January 1999. However, in February 1999, the Court found that Treasury had failed to substantially comply with Paragraph 19.
[3] Treasury had previously attempted to address these questions and determine their answers. Following the Court's February 1999 ruling, Treasury assayed to address these questions and determine their answers anew.
[4] These bureaus include the Internal Revenue Service, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, the United States Secret Service, the United States Customs Service, the Bureau of Alcohol, Tobacco and Firearms, the Financial Crimes Enforcement Network, the Federal Law Enforcement Training Center, the United States Mint, the Bureau of Engraving and Printing, the Community Development Financial Institutions Fund, and the Treasury Executive Office of Asset Forfeiture.
[5] Printouts of the two presentations that were used at this briefing are attached as Attachment F.

*Protocol* (the "*Revised Protocol*") and *Department of the Treasury Paragraph 19 Document Production Plan* (the "*Plan*"), both of which were dated November 24, 1999. These documents are attached hereto as Attachments A and B. (These documents were amended on June 21, 2000. The amending documents are attached hereto as Attachments C and D.) These documents, taken together, provided the blueprint for Treasury's search effort.

Both the *Revised Protocol* and *Plan* set forth Treasury's understanding that Paragraph 19 calls for the production of:

> Documents or records referring or relating to individual Indian money accounts ("IIM accounts") that, on their face, expressly:
> (1) Identify any of the five named plaintiffs or their 31 predecessors in interest by name (or by some variation of his or her name);
> (2) contain an IIM account number, *i.e.*, a number uniquely associated with one of the five named plaintiffs or their 31 predecessors in interest by name (or by some variation of his or her name), or
> (3) in the case of check-related records other than checks, contain other information (*i.e.*, check symbol and serial number, date, amount) that may enable linkage of the record to one of the five named plaintiffs or their 31 predecessors in interest.

*See Revised Protocol* at 1; *Plan* at 2. This interpretation of Paragraph 19 guided Treasury's search effort.

In addition, in the *Revised Protocol* and *Plan*, Treasury differentiated between documents responsive to Paragraph 19 and other documents such as documents that contain summary-level accounting information. Last year, pursuant to commitments made in the *Revised Protocol* and *Plan*, and in response to Plaintiffs' Sixth Formal Request for the Production of Documents, Treasury prepared, and provided to Plaintiffs, detailed information regarding records that contain summary-level accounting information with respect to the IIM trust, including descriptions of the records, the time periods for which the records are available, the locations of the records and exemplars of the records. *See* letter from Brian Ferrell to Dennis Gingold dated June 5, 2000 enclosing binders of exemplars; letter from Brian Ferrell to Dennis Gingold dated June 21, 2000 enclosing *Department of the Treasury Inventory of Summary-Level Accounting Records* dated June 21, 2000 and corresponding detail sheets.

Finally, during its fourteen-month search effort, Treasury revisited its determination to exclude the Office of the Comptroller of the Currency ("OCC") and, with the assistance of the OCC, Arthur Andersen and an OCC contractor searched certain historic OCC records. This is discussed in further detail below.

## Summary Information Regarding Efforts, Costs and Results

Treasury searched both (1) records that were (and are) within Treasury's (and its agents') custody or control and (2) records that, due to their historical value, had been

transferred to the permanent custody and control of the National Archives and Records Administration ("NARA").[6] Records falling within the first category are stored on-site (*i.e.*, at various Treasury facilities), at Federal Records Centers ("FRCs") and at Federal Reserve Banks, branches and their private storage facilities ("FRBs"). Records falling within the second category are stored in various National Archives facilities. Review of records in both categories required research at 37 facilities in 24 cities. (Figure 1.)

**Figure 1: Facilities at which Records were Reviewed**

| City | Facility(-ies) |
|---|---|
| Atlanta, GA | FRC |
| Ardmore, MD | FMS Warehouse |
| Austin, TX | FMS Regional Financial Center |
| Baltimore, MD | FRB |
| Birmingham, AL | FMS Facility |
| Boston, MA | FRC |
| Chicago, IL | FMS Regional Financial Center |
| | FRC |
| College Park, MD | National Archives II Facility |
| Dallas, TX | FRB |
| Denver, CO | FRB |
| El Paso, TX | FRB |
| Ft. Worth, TX | FRC |
| Houston, TX | FRB |
| Hyattsville, MD | FMS Hyattsville Facility |
| Kansas City, MO | NARA Archives Central Plains Facility |
| Kansas City | FMS Regional Financial Center |
| | FRCs (2 Facilities) |
| Lanham, MD | Indian Trust Accounting Division Facility |
| Los Angeles, CA | FRB |
| | FRC |
| New Orleans, LA | FRB |
| Parkersburg, WV[7] | BPD 3rd Street Facility |
| | BPD Park Center Facility |
| | BPD Warehouse |
| Philadelphia, PA | FMS Regional Financial Center |
| San Francisco, CA | FRB |
| | FRC |
| | FMS Regional Financial Center |

[6] Treasury notes that the records that it searched within the permanent custody and control of the National Archives and Records Administration are available for review by members of the public. Treasury searched these records despite F.R.Civ.P. 34 because of unique circumstances. By searching these records, Treasury does not waive its right to object to any other document request that would have it search for records not in its possession, custody, or control.
[7] In addition, thousands of reels of microfilm that are ordinarily stored at the National Underground Storage facility in Boyers, PA on behalf of BPD were shipped to Parkersburg to expedite review.

| | |
|---|---|
| St. Louis, MO | FRC |
| Suitland, MD | Washington National Records Center |
| Washington, DC | BPD Headquarters |
| | BPD C Street Facility |
| | FMS Headquarters |
| | National Archives I Facility |
| | Treasury Department main building |

In order to complete the searches as outlined in the Revised Protocol and Plan, it was necessary to consider over 6 billion records. As set forth in Figure 1 of the Arthur Andersen Paragraph 19 Document Production Procedures and Findings Report ("Arthur Andersen Report ") filed contemporaneously with this report, the estimated volumes of records considered under the first four sections of the Plan are: (1) under section 001, Records Stored at the National Archives and Federal Records Centers, over 1 billion pages; (2) under section 002, Checks and Check-Related Records, over 3 billion records; (3) under section 003, Savings Bonds, over 4 billion records; and (4) under section 004, Marketable Securities, over 350 million records.

The total number of personnel who reviewed records, including general office file searches stands in excess of approximately 2,200 people (including general office file searches which involved over 2,000 Treasury employees). To conduct its searches, Treasury incurred three types of costs: (1) costs for external resources; (2) quantifiable costs for internal resources; and (3) unquantifiable costs for internal resources. (Figure 2.)

**Figure 2: Estimated Costs of Searches**

| Cost Category | Amount |
|---|---|
| External Resources | In excess of $2,900,000 |
| Internal Resources | In excess of $1,000,000[8] |
| Total | In excess of $3,900,000 |

First, Treasury spent in excess of $2.9 million for the services of external resources, including Arthur Andersen, Federal Reserve Bank staff, Office of the Comptroller of the Currency contractors, and imaging and indexing services provided by Aspen Systems Corporation. Second, Treasury estimates that it incurred internal costs in excess of $1,000,000 for personnel who designed and/or conducted searches, or otherwise contributed to Treasury's compliance with Paragraph 19. While it may be obvious, Treasury notes that all of the funds that were expended on its search effort had been allocated for other uses and had to be diverted from these other activities.

Finally, Treasury's search effort resulted in the production of 2,296 documents. As indicated in the following chart, this total includes 1,573 primary and attachment documents (see below) produced from the National Archives and Federal Records

[8] This figure is based on best estimates provided by individuals knowledgeable with the search process.

Centers, 714 checks and check-related records, 0 savings bonds records, 1 marketable securities record, and 8 general office file documents. (Figure 3.)

**Figure 3: Number of Documents Produced Pursuant to the Plan, by Section**

| Section of the Plan | | Documents Produced |
|---|---|---|
| 001. | Records Stored at the National Archives and Federal Records Centers | 1,573 |
| 002. | Checks and Check-Related Records | 714 |
| 003. | Savings Bonds | 0 |
| 004. | Marketable Securities | 1 |
| 005. | General Office Files | 8 |
| Total | | 2,296 |

## Detailed Information Regarding Certain Elements of Treasury's Searches

As detailed in the Plan, Treasury's searches were conducted pursuant to five sub-plans (*i.e.*, sections of the Plan). These sub-plans addressed the following categories of records: (1) Records Stored at the National Archives and FRCs; (2) Checks and Check-Related Records; (3) Savings Bonds; (4) Marketable Securities; and (5) General Office Files.

The Arthur Andersen Report details how the searches of these categories of records were carried out in accordance with the sub-plans. The Arthur Andersen report complements the Plan, *i.e.*, it provides detailed information regarding how the sub-plans were performed. In addition, certifications relating to the completion of the searches according to the sub-plans are also attached at Appendix 64 (Section 001), Appendix 65 (Section 002), Appendices 66 and 67 (Section 003), Appendix 69 (Section 004), and Appendix 73 (Section 005). What follows is a description of the efforts and results associated with the searches pursuant to each sub-plan.

### 001. Records at the National Archives and FRCs

The searches pursuant to this sub-plan involved the following Treasury organizations: DO, FMS, BPD and OCC. Records were reviewed at National Archives, the ITAD facility in Lanham, Maryland, NARA's Central Plains facility in Kansas City, Missouri, 10 FRCs (including two in Kansas City, Missouri) and 8 FRBs.[9] The Arthur Andersen Report describes the specific work processes and procedures that were used to search

[9] Initially, the agency records to be searched under this sub-plan were thought to be kept exclusively at Federal Records Centers. As the search progressed, it became apparent that some records were stored at FRBs. Treasury therefore expanded the scope of the search of agency records under this sub-plan to include records stored at FRBs.

the various groups of records under this sub-plan. Three aspects of the work deserve discussion.

First, the National Archives II facility in College Park, MD contained significant amounts of historical accounting records that were received from the Bureau of Indian Affairs and its predecessor(s) and audited by Treasury before Treasury's auditing functions were transferred to the General Accounting Office shortly after its creation in 1921. These historical records date from 1817 through 1921. In advance of any searching, Arthur Andersen painstakingly analyzed the records to determine which boxes could be excluded from further review and which boxes would ultimately need to be pulled and searched. FMS assembled two teams of 9 people each to search these records in accordance with a search plan developed by Arthur Andersen. After being trained regarding search protocols and procedures,[10] these teams worked full time at the College Park facility for four months in two-week shifts. During that time, with the assistance and oversight of Arthur Andersen, the FMS searchers reviewed 2,378 settled account packages in 2,626 boxes. Each settlement package consisted of numerous papers of varying shapes and sizes that had been folded and tied into a bundle. Many of the documents were brittle and therefore required careful handling. In addition, many of the documents were handwritten and at times barely legible. In fact, some documents in the packages (e.g., annuity payrolls) contained hundreds of Indian names that were handwritten in cursive style. Under these conditions, the review of settled account packages was difficult and extremely time-consuming. Forms completed by the searchers certifying that they searched the settled account packages can be found at Appendices 1, 2 & 31.

In the review of settled account packages, FMS searchers identified documents that contained a name or AKA of one of the five named plaintiffs or their 31 agreed predecessors or any individual whose name was similar in some way to a plaintiff or agreed predecessor. For each of the documents that were discovered, Arthur Andersen would, as part of its quality control review, review the settled account package in question to (1) confirm that the name identified was potentially responsive and (2) identify any documentation in the settled account package that served to explain or support the document identified by the FMS searcher. Arthur Andersen saw to it that the documents and all supporting documentation were copied (some of these materials, due to their fragility, required processing by NARA document preservationists). Then, Arthur Andersen forwarded the copies to Treasury attorneys for review, along with logs compiled by Arthur Andersen indicating basic information regarding each document and its supporting documentation (year, settlement package number, storage unit number, title, name(s) and/or AKA(s) identified, and total number of pages). These logs are attached as Attachment E. Treasury attorneys reviewed all of the documents and supporting documentation and determined which were either responsive to Paragraph 19 or could not be determined to be non-responsive. Thereafter, as required by imaging and indexing protocols, all of these documents were marked (as appropriate) either as primary documents or attachment documents, and subsequently imaged, indexed, and

---

[10] A printout of the presentation that was used for training purposes is attached as Attachment G.

reviewed before final production. In total, 1,573[11] primary documents and attachment documents were produced to Plaintiffs in 8 productions. (Figure 4.) A certification regarding Treasury's responsiveness review of the documents and supporting documentation, Treasury's preparation of documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached in Appendix 64.

**Figure 4: Primary and Attachment Documents Produced from Settled Account Packages, by Date**

| Date | Number of Documents Produced |
|---|---|
| June 9, 2000 | 136 |
| June 27, 2000 | 214 |
| August 8, 2000 | 311 |
| September 5, 2000 | 205 |
| September 22, 2000 | 372 |
| October 20, 2000 | 181 |
| November 20, 2000 | 47 |
| December 19, 2000 | 107 |
| Total | 1,573 |

In addition to providing these documents to Plaintiffs, as part of each production, Treasury offered to: (1) provide Plaintiffs with the aforementioned logs as well as exemplars of documents that contain names of the plaintiffs and agreed predecessors but are not responsive to Paragraph 19; and (2) assist Plaintiffs in locating such non-responsive documents at the National Archives.

A second aspect of Treasury's work at the National Archives and FRCs deserves discussion because the records in question – OCC records – were originally outside the scope of Treasury's planned search. Treasury initially determined that OCC was unlikely to have any responsive records, for the reason that bank regulators, OCC included, typically review banks' total assets and liabilities at a high level in order to assess their health rather than monitor individual deposits and account activity. In addition, Plaintiffs made no objection to Treasury's determination in this regard, which was stated during the aforementioned October 28, 1999 briefing. However, as a matter of diligence, Arthur Andersen reviewed all NARA Record Groups in the Treasury cluster, not just those Record Groups associated with Treasury bureaus that Treasury had determined were likely to have responsive records. During this review, Arthur Andersen discovered an entry that prompted a review of certain historic OCC records at

[11] It should be noted that counting the number of documents produced to the Plaintiffs is by nature inexact. Q Systems (the photocopy contractor at the National Archives), sometimes photocopied multiple documents, especially checks, onto one page in order to save time and paper. Therefore, one "document" produced by Treasury could contain images of 3 checks, each of which could be counted as one document. In addition, it should also be noted that any given document could contain any number of pages.

NARA's Central Plains facility in Kansas City, MO. That review, consisting of a review of some or all of the contents of 63 boxes, was conducted by Arthur Andersen. That review did not identify any responsive documents. Nonetheless, that review did suggest the possibility that two sets of records in the custody and control of NARA at its National Archives II facility in College Park might contain information relating to IIM accounts – those sets of records being Bank Examination Reports from 1865-1939 and Records of the Division of Insolvent National Banks from 1865-1950.

Treasury, in conjunction with Arthur Andersen, developed a listing of national banks that potentially could have held IIM funds. This list was developed from four sources: (1) national banks listed in Record Group 75 (Records of the Commissioner of Indian Affairs) and identified by Arthur Andersen as potentially relevant; (2) national banks listed in responsive documents identified by the FMS searchers in Record Group 217 (*i.e.*, the historical accounting records discussed above); (3) national banks listed in responsive documents identified by Arthur Andersen searchers (working on behalf of the Department of the Interior) in Record Group 411 (Records of the General Accounting Office) ("GAO"); and (4) the *Report of the Commissioner of Indian Affairs to the Secretary of the Interior*, for the fiscal year ended June 30, 1909. Working with a team of searchers hired by OCC, Arthur Andersen supervised a search that included a total of 1,498 boxes, specifically 260 boxes of records relating to insolvent banks and 1,238 boxes of records of bank examination reports. No responsive records were identified in these searches.

A third aspect also deserves discussion. BPD, with the assistance of Arthur Andersen, conducted a comprehensive review of records (primarily relating to marketable Treasury securities) at 46 FRCs and FRBs. In total, approximately 50,000 boxes were reviewed by BPD with the assistance of Arthur Andersen, most of which were reviewed using finding aids and other indices, but some of which (in excess of 3,000 boxes) required manual search. These approximately 3,000 boxes were located in 10 FRCs and 8 FRBs.[12] A team of BPD and FRB employees along with Arthur Andersen spent approximately 1,800 person-hours searching records. These searches did not identify any documents responsive to paragraph 19. Finally, on the subject of FRCs, it should be noted that Treasury, working jointly with Arthur Andersen, used finding aids and other indices to conduct a review of DO and FMS records maintained at FRCs. This review determined that no additional searches were required.

## 002. Checks and Check-Related Records

As detailed in the Plan and Protocol, to search for checks issued to IIM beneficiaries and records relating to those checks, Treasury requires predicate information (*i.e.*, check

[12] During Treasury's review of FRC records, it discovered that eleven boxes of records stored by the Federal Reserve Bank of Atlanta, New Orleans Branch at the Fort Worth FRC had been destroyed. Treasury reported the destruction to the Special Master and subsequently has provided additional information to him.

symbol, serial number, date and dollar amount[13]) from the Department of the Interior ("Interior"). During the past year, Treasury received eight tapes of predicate information from Interior and conducted searches of its checks and check-related records. To date, using the information contained on the eight tapes submitted by Interior, Treasury has located and produced to Plaintiffs 222 copies of checks, 222 corresponding items of information from the Check Payment and Reconciliation System ("CP&R"), 82 copies of information from CP&R for which corresponding checks could not be located, and 178 other assorted documents including check claim forms. The total number of documents identified and produced using these tapes of predicate information is 704. (Figure 5.) Certifications regarding Treasury's searches for checks and check-related records using the tapes of predicate information are attached in Appendix 65. A certification regarding Treasury's preparation of the identified documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached in Appendix 65.

**Figure 5: Checks and Check-Related Records Identified and Produced Using Tapes of Predicate Information, by Date**

| Date | Number of Documents Produced |
|---|---|
| December 20, 1999 | 304 |
| February 23, 2000 | 68 |
| May 2, 2000 | 17 |
| August 8, 2000 | 10 |
| September 5, 2000 | 200 |
| September 22, 2000 | 94 |
| October 20, 2000 | 11 |
| Total | 704[14] |

In the event that Interior submits additional tapes to Treasury, Treasury will search for checks and check-related records in the manner set forth in the Plan.

One additional aspect of this search deserves special comment. In the aftermath of the destruction of approximately 162 boxes in the basement of the FMS Hyattsville facility, Treasury undertook an extensive review of the remaining approximately 250 boxes in an attempt to determine their relevance, if any, to this case. This review consisted of three steps. First, during May 1999, the Richmond Federal Reserve Bank, as Treasury's Fiscal Agent, built a database from all of the transactions identified by payee name. The number and names of the payees were identified by a page-by-page search of the contents of the files, the ledgers, and the boxes of uncurrent checks. This information was then captured manually by a data entry process and then placed in the database, with the result being that the database consisted of approximately 273,000 payee names.

[13] Check symbol and serial number are necessary to conduct the actual search for any given check; date and dollar amount are not necessary for the search but they are used to confirm a match.
[14] Excludes 10 documents that were produced without the use of predicate information.

A search of this database was conducted on November 8, 1999, using the agreed upon names of the five named plaintiffs and the 31 agreed predecessors and the 60 AKAs known as of that date. This search identified two entries in the ledgers from the Hyattsville basement. Treasury does not believe that the ledger pages containing these entries are responsive because of the common nature of the names listed in the entries ("Mary Mack" and "Amy White"). Nonetheless, these two ledger pages were produced to Plaintiffs in December 1999. As new AKAs were identified, this database was searched again but no additional transactions were found. A certification regarding Treasury's search of the Hyattsville payee name database is attached in Appendix 65. A certification regarding Treasury's preparation of the identified documents for imaging and indexing, and final pre-production review of the imaged and indexed documents, is attached as Appendix 65.

Second, Treasury sought to determine whether duplicate documents existed of the approximately 162 boxes of material that had been destroyed. Because Treasury determined that the destroyed material included check cancellation requests made by Disbursing Officers that were sent to GAO, Treasury decided to search certain records stored in Record Group 411 (the GAO Record Group) at the National Archives, specifically audit reports of Indian accounts. FMS staff did a page-by-page search at the National Archives of approximately 600 settled Indian accounts for 3 Disbursing Officers whose files were contained in the Hyattsville basement records. Treasury did not locate any duplicate documents.

The third step involved the creation of a second searchable database of transactions that were identifiable only using predicate information (*i.e.*, check symbol, check serial number, date and dollar amount). Treasury, working with Arthur Andersen, compiled a list of Disbursing Officers who serviced the Indian tribes with which the five named plaintiffs and their agreed predecessors were affiliated, and used that list to identify transaction information (including check symbol and serial number) in the Hyattsville basement boxes. The check symbol and serial number for each transaction were then captured manually by a data entry process and then placed in the database by the Richmond FRB. Using the aforementioned eight tapes of predicate information, Treasury searched the new database, identified one probable responsive check transaction (in the amount of $16.50), and produced the documents associated with that transaction to the Plaintiffs in May 2000. A certification regarding Treasury's searches of the Hyattsville "numbers" database is attached at Appendix 65.

## 003. Savings Bonds

BPD searched primary savings bond records for responsive documents. As indicated in the Plan, initially, BPD looked for bonds issued in trust forms of registration that contained the names of offices or officials identified as relevant to Paragraph 19 searches. Any records meeting these criteria were then reviewed to determine whether they contained any names or AKAs of the five named plaintiffs or their agreed predecessors.

Subsequently, although not required by the Plan, BPD also searched for bonds issued in trust forms of registration that contained any names or AKAs of the five named plaintiffs or their agreed predecessors, regardless of whether or not these records contained the names of offices or officials identified as relevant to Paragraph 19 searches.

Savings bond records were reviewed in a variety of ways, which depended on the particular records being searched. See Section 003 of the Plan. These methods included the review of microfilm and electronic indexes. The various work papers used by BPD to document its searches of savings bond records are attached and briefly explained at Appendix 66. In addition, it should be noted that while Arthur Andersen was not directly involved with BPD's searches of its savings bond records, it did review BPD's search plan for these records, including the procedures that were to be used.

In total, BPD reviewed approximately 10,500 reels of microfilm. The review of microfilm and electronic indexes took over 1,550 person-hours to complete. No responsive documents were found. Certifications regarding Treasury's searches of savings bond records are attached at Appendix 67.

## 004. Marketable Securities

As indicated in the Plan, BPD extracted over 22 million records from its automated systems relating to registered marketable securities and searched them for records of securities issued in trust forms of registration and containing the names of offices or officials identified as relevant to Paragraph 19 searches. In addition, although not contained in the Plan, BPD also searched for bonds issued in trust forms of registration that contained any names or AKAs of the five named plaintiffs or their agreed predecessors, regardless of whether or not these records contained the names of offices or officials identified as relevant to Paragraph 19 searches. Arthur Andersen oversaw BPD's electronic extraction and search of registered marketable securities records from its securities systems. (The computer code of the extraction and search programs are attached at Appendix 68 .) BPD expended roughly 270 person-hours on the development, programming, testing and documentation of the extraction and search programs written to perform a search looking for the offices and officials and names of the five named plaintiffs, their agreed predecessors and AKAs.

BPD did not receive any predicate information (*i.e.*, CUSIP number or loan title, denomination and serial number) relating to bearer securities, and therefore was unable to conduct any systematic search of bearer security records. BPD also searched all case file folders that are maintained with respect to certain marketable securities transactions. Most of these files were searched electronically, but a subset required a manual search of 125 boxes, which required approximately 370 hours of employee time to complete.

BPD reviewed approximately 5,800 reels of microfilm containing marketable securities data. Approximately 1,500 of these reels required a more detailed review. BPD's search of these records identified one responsive document, which was produced to the

Plaintiffs in August 2000. This document indicated that a $50 Liberty Loan bond had been issued on behalf of Stella C. LaRose (an agreed predecessor of plantiff James LaRose) in 1918 and paid in 1920.

Certifications regarding Treasury's searches of marketable securities records are attached at Appendix 69. A certification regarding the responsiveness review of the one document identified, Treasury's preparation of this document for imaging and indexing, and Treasury's final pre-production review of the imaged and indexed document, is attached at Appendix 65.

005. General Office Files

All offices within DO, FMS and BPD that could possibly maintain responsive documents in their general office files (which do not include records covered by sections 002, 003 and 004 of the *Plan*) initially were instructed to retain records and thereafter undertook two office file searches; these searches involved over 2,000 Treasury employees. Certifications with respect to the document retention and searches are attached at Appendix 73. The first search effort was conducted in June and July of 1999. The second search effort was conducted in January, February and March 2000 and was narrower in scope because of exclusions that were made based on the results of the first search effort. Treasury cannot quantify the person-hours consumed by these search efforts but believes they were considerable. The searches of general office files identified only eight responsive documents, which were produced to the Plaintiffs in May 2000. Seven of these eight documents related to FMS's identification and production of checks and check-related records in late 1998 and early 1999 using predicate information provided by the Department of the Interior, *e.g.*, they listed the predicate information provided and the documents identified with that information.

BPD and FMS also conducted several searches of the dedicated e-mail mailboxes, which were set up respectively in June 1999 and July 1999 as repositories for e-mail related to this litigation. No responsive documents were identified. Certifications regarding FMS's and BPD's search of the dedicated e-mail mailboxes are attached at Appendix 73.

## Conclusion

Treasury's search for documents responsive to Paragraph 19 was time-consuming, thorough and costly. The searches were executed in the manner outlined in the Revised Protocol and Plan as amended on June 21, 2000, except where Treasury decided to do more than the Revised Protocol and Plan required. Treasury decided to do more than was required in order to ensure review of any category of records that could possibly contain responsive documents, even though those decisions had the effect of increasing the already high costs of Treasury's search effort.