# Exhibit 34

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NAVAJO NATION<br>f.k.a. NAVAJO TRIBE OF INDIANS<br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-945 L<br>Judge Francis M. Allegra |

DECLARATION OF GREGORY POMICTER

I, Gregory Pomicter, do hereby declare:

1. I hold the position of Assistant for Operations in the Office of Regional Records Services, National Archives and Records Administration (NARA), located in College Park, Maryland. I have been the Assistant for Operations for the past nine years. I am responsible for regional archival, records management, and administrative functions of the Office of Regional Records Services. Among my overall duties, from time to time I am called upon to act as Acting Assistant Archivist for Regional Records, at which time I supervise a staff of 25. Prior to my present position, I served as Deputy Assistant Archivist for Federal Records Centers, from 1989 to 1997.

2. I am generally familiar with the *Navajo Nation v. United States* lawsuit, and have read the Proposed Order submitted by plaintiff accompanying their Motion for Entry of Record Retention Order. I am submitting this declaration to provide the Court with additional information on the scope of NARA's holdings, and to apprise the Court of what are extraordinarily burdensome indexing requirements on NARA were plaintiff's Proposed Retention Order adopted in its present form.

3. This declaration is based on my personal knowledge as well as factual information gathered on my behalf by NARA staff.

*NARA's Regional Records System – General Overview*

4. The Archivist of the United States is responsible for the custody of all records transferred to NARA, and by statute is required to maintain adequate facilities for the housing of those records. 44 U.S.C. §§ 2108(a) and 2110. NARA currently maintains 21 regional facilities throughout the United States, in 13 states. These consist of two types of facilities: regional archives and federal records centers. Regional archives house permanently valuable records that have been transferred into NARA's legal custody, and federal records centers store temporary and permanent records that are legally owned and accessed by federal agencies. Federal agencies often possess indexes to the records to facilitate their use of the files, and until the records are transferred into NARA's legal custody the nature (*i.e.*, detail, scope, format) of the indexes may not be known to NARA.

5. Given the enormous volume of federal records that exist, agencies may also choose to physically store portions of their non-active or semi-active records in a NARA facility known as a "federal record center" ("FRC"). 44 U.S.C. § 3103 and 36 C.F.R. Parts 1253-54. Each records center facility provides reference and other services to the federal agency that owns the records, and, upon authorization by the owning agency, to the public. NARA has physical custody of such records; however, the legal custody of the records remains with the agency that transfers the records to the NARA records center facility. In the normal course of business, such records may be disposed of or

transferred to the legal custody of NARA (*i.e.,* accessioned), subject to NARA and agency approval, after all legal retention requirements have been met. (In the case of DOI records in NARA federal record centers, one or more administrative "freezes" are in effect preventing the destruction of any DOI records across all sixteen existing record groups.) *See also infra*, ¶ 17. As provided for in NARA regulations, agency record schedules normally set out a future date (*e.g.*, "after 30 years"), for the eventual transfer of legal custody to NARA of an agency's records in an FRC which have been appraised as "permanent" and therefore will be retained forever. Usually, at the time of transfer of legal custody, such permanent records are moved from FRCs to either a NARA regional or headquarters archival facility. Unless and until legal custody has been transferred to NARA, provision for access to records in FRCs is controlled by and is the responsibility of the agency that transferred the records. 36 C.F.R. 1254.8. In the normal course, once NARA has obtained legal custody of records designated as permanent, such records are open and available to the public at a NARA archival facility after processing (subject only to any restrictions imposed by the transferring agency).

6. In light of my principal duties and responsibilities for assisting in overseeing NARA's regional records programs, I will generally limit my discussion to how the proposed Order would affect NARA's regional archives in processing and working with archival holdings throughout the United States. I will also further discuss how we would handle a Proposed Retention Order covering records in federal records centers.

*NARA's Storage of Regional Records Relevant To This Litigation*

7. NARA's vast archival holdings include records in our Regional Archives situated throughout the United States. Just as in the case of headquarters archival

records, federal records in the regional archives are arranged by the name of the government agency with which they are associated (*e.g.*, the Defense Department (formerly the War Department), the Treasury Department, the Government Accountability Office, the Department of Interior, etc.), and each of these agencies has its own bureaucratic filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe. In consequence, with limited exceptions described below, NARA regional archivists would not generally be able to search records of all government agencies under the search term "Navajo," to locate all records relating to this tribe. Moreover, although, as described in more detail below, many records related to the Navajo tribe would be expected to be found within the Department of Interior's (DOI) record groups, NARA's regional archivists are also aware of many record groups outside of DOI that also might conceivably contain Navajo-related records.

8. The records of the Department of the Interior (DOI) collectively comprise sixteen record groups, including among others located in our regional archives, Record Group 75 (records of the Bureau of Indian Affairs (BIA)), Record Group 48 (Records of the Office of the Secretary of the Interior (OST)), and Record Group 473 (Records of the Mineral Management Service). Many of these NARA Record Groups potentially hold extremely substantial quantities of archival records. For example, we estimate that there are at least 43,345 cubic feet just of Record Group 75 BIA records known and cumulatively contained in NARA's regional archives which are dispersed across the country, in 13 cities. Based on NARA's estimate that each cubic foot of records contains, on average, between 2000 and 3000 pages, this record group alone approximately

contains between 117 and 167 million pages of records. As each location cares for the original records pertaining to its respective region, except for any records that may have been microfilmed, no region has a NARA-generated copy of the entire collection of records that may relate to the Navajo tribe.

9. As a general matter, although NARA's collections of records in each record group more or less have existing documentation and finding aids associated with them, which normally can be of use to researchers in locating records related to the Navajo tribe, NARA's regional offices neither have nor generate in the ordinary course of business document-level indexes of their collections sufficient to identify all records relevant to the present lawsuit. Moreover, neither NARA's regional holdings, nor our existing regional finding aids, can be said to be differentiated or segregated into what constitute "trust" and "non-trust" records pertaining to either Indian affairs generally or Navajo-related records specifically. Accordingly, to make available to plaintiff all inactive "Navajo Trust records," searches would have to be devised and conducted at each of our regional archives according to ad hoc and highly variable filing systems developed over the course of the past 100 or more years by all the pertinent government agencies involved. To the extent that the Proposed Retention Order contemplates that NARA archivists would attempt to engage in isolating "trust" records relating to the Navajo from the larger known or conceivable collections of records groups containing records relating to the Navajo tribe, the Order amounts to imposing an impossible burden on this Agency's regional staff to perform.

10. Given what might be on the order of the tens or hundreds of thousands of hours involved, *see* ¶ 14, *infra*, requiring highly-trained NARA regional staff to devote

their time to a project of segregating trust from non-trust Navajo-related records would, in my view, effectively mean shutting down the ability of the regional archival operations of the National Archives of the United States to perform the important mission of providing reference services to the public at large. Such reference services include providing guidance to individual citizens who personally visit NARA's various regional facilities, or who write, e-mail, fax, or call us, seeking guidance as to where to locate records in our vast collections. In FY 06, NARA regional staff handled 31,791 written reference requests. Also, staff of our National Personnel Records Center, which includes a regional archives, researched and responded to over one million written requests for information in personnel files (civilian and military). Most of these records are not archived; however, a significant volume of these records soon must be archived and processed for public use. In addition to handling the above forms of reference requests, NARA's regional staff also are actively engaged in processing and accessioning records, performing preservation work on existing archival record collections, screening records for privacy-related information and to ensure that only unclassified records are opened, and developing and delivering educational outreach programs supporting the needs of local educators and students. Each regional archives performs all archival functions with less than a dozen staff members and managers, only a few of which are trained archivists.

11. No less impossible is the task of reliably segregating "all" records related to the Navajo tribe for inspection by plaintiff, even without regard to a concern for their "trust" or "nontrust" status. Records pertaining to the Navajo tribe -- but not indexed at the document level -- are known to exist within the holdings of the National Archives in the following offices: National Archives--Southwest Region (Anadarko Area Office;

Chilocco's School Records; Concho Area Office); National Archives—Rocky Mountain Region (Office of Indian Affairs—Navajo Service; Northern Navajo Agency; Laguna Sanatorium); National Archives—Pacific Region (Sacramento Area Office; Reno Agency; Navajo Agency; Navajo Training School; Gallup Area Office; Phoenix Area Office; Western Navajo Agency; Eastern Navajo Agency; Chinle Sub-agency; Fort Defiance Sub-agency; and Tuba City Sub-agency); National Archives—Pacific Sierra Region (Portland Area Office). Many potential Navajo-related records within NARA's archival collections of BIA records are subsumed within a very large number of more generic categories, or series, including such categories as Central Classified Files, Correspondence, Office Files, School Records, Subject Files, Administrative Files, Decimal Files, Employment Assistance Case Files, Employment Assistance Data Cards, and Area Relocation Specialist Records. Adding to the complexity of use issues, the employment assistance and area relocations series named above must be handled carefully respecting privacy issues.

12. As extensive as NARA's BIA archival holdings are, they represent only a fraction of the universe of record collections potentially containing Navajo-related records. As alluded to above, NARA's regional archival collections also include Record Group 48, Records of the Office of the Secretary of the Interior (596 cubic feet), Record Group 57, Records of the U.S. Geological Survey (1100 cubic feet), Record Group 79, Records of the U.S. Park Service, 1916-2005 (5919 cubic feet), Record Group 381, Records of the Office of Economic Opportunity (191 cubic feet); Record Group 115, Bureau of Reclamation (11,003 cubic feet), Record Group 435, Records of the Indian Arts and Crafts Board (26 cubic feet), Record Group 95, Forest Service (6684 cubic feet),

and Record Group 411, Records of the Government Accountability Office (124 cubic feet). In sum, these regional collection amount to 25,643 cubic feet or approximately between 51 and 77 million pages of records. Some of the record groups are known to have substantial holdings of Indian records, and may well hold information about the Navajo tribe; however, although some of these record collections have isolated references to the name Navajo, the majority of the records are neither indexed nor searchable under the name Navajo. For such collections, a labor-intensive research effort would need to be undertaken to review individual collections on a file-by-file basis, to determine if records related to the Navajo tribe existed.

13. For the foregoing reasons, the task of finding all or substantially all archival records in NARA regional collections actually relating to the Navajo is simply not possible without a close review of what adds up to literally millions of unindexed records. NARA does not have either adequate staffing or resources to attempt to engage in isolating or indexing these vast records collections.

14. As a purely hypothetical matter, based on the breakdown of the estimated time to review archival holdings contained in the Declaration of Stephen Tilley, I will estimate how long it would take to review and index just the 43,345 cubic feet of BIA records held across all NARA regional archival facilities, for the purpose of isolating Navajo-related records. Assuming 15 hours of labor would be spent indexing one cubic foot of records, and assuming one labor year equals 40 hours per week for 50 weeks, to index 43,345 cubic feet of records would take 650,175 hours of labor, or 325 person/years of labor. This equates to 20 archivists spending 16 ¼ years of their time indexing, or 100 archivists spending a full 3 ¼ years of their time. Pulling 100 (or even

20) staff members away from all of the other functions that NARA archivists perform to index Navajo-related records would cripple this agency and be unfair and do serious harm to all of the other competing priorities performed on a daily basis by NARA regional staff.

*NARA's Federal Records Centers*

15. NARA's Records Center holdings include records stored in the Federal Records Centers situated throughout the United States. Agency records transferred to a NARA records center remain in the legal custody of the agency that originally generated or maintained the particular records at issue. NARA acts as the agency's agent in maintaining those records. NARA is unable to disclose such records except to the agency that maintains the record.

16. As is the case with the archival records, the records of the Department of the Interior (DOI) can be found in sixteen record groups, including Record Group 75, records of the Bureau of Indian Affairs (BIA), Record Group 48, Records of the Office of the Secretary of the Interior (OST), and Record Group 473, Records of the Mineral Management Service. NARA's Federal Records Center in Lenexa, Kansas houses the majority of the Record Group 75 holdings. Of the 160,000 cubic feet of Record Group 75 records stored in Lenexa, all have some form of indexes. These indexes may be helpful in identifying records pertaining to either Indian affairs or Navajo-related records, but can not be used exclusively to locate all records relating to this tribe. The remaining DOI records stored at the regional records centers are not indexed. The task of finding all or substantially all record center holdings in NARA regional records centers relating to the Navajo is simply not possible without a close review of the unindexed records. The

Department of the Interior (DOI) would need to provide staff and resources to attempt to engage in isolating or indexing these vast records collections to meet the requirements of the order.

17. Since 2002, at the request of other U.S. government agencies, NARA has placed and continues to administer an administrative freeze on the disposition (*i.e.,* destruction) of all DOI records in NARA federal records centers as the result of litigation in *Cobell v. Kempthorne*, 96CV01285 (D.D.C.). Other freezes on disposition of all or some DOI records are in effect apart from the *Cobell* case. Under these freezes, even records that otherwise could be disposed of because all other legal retention requirements have been met are being retained. Meanwhile, as noted *infra*, ¶ 19, and in the Declaration of Steven Tilley, all archival holdings of NARA are, by definition, permanently retained.

*NARA's Specific Objections To The Proposed Record Retention Order*

18. On NARA's behalf, I wish to lodge the following general objections to the Proposed Record Retention Order as drafted.

19. First, any form of "retention order" is completely superfluous with respect to NARA's regional archival holdings, which by operation of law and by definition have come into the legal custody of NARA as records to be *permanently retained by the United States government.* Accordingly, there is no reason for NARA's archival holdings to be subject to paragraph 1(a) of the Proposed Order. In addition, for the reasons stated *supra,* ¶ 17, a retention order is unnecessary with respect to DOI agency records in NARA's Federal Record Centers that remain subject to one or more administrative freezes on disposition.

20. Second, NARA's founding and continuing public access policy, since the Agency's inception in 1934 has been that our public reading rooms afford access to all of our permanent archival holdings. As such, Navajo-related records that are contained in various of the above-referenced record groups generally are open and available for research and copying by plaintiff's counsel in this litigation, just as they are to all members of the public. NARA objects to any requirement set out in a Court order that would require NARA regional staff to assume duties never before performed, including isolating "trust" records on behalf of a private party, and/or engaging in wholesale indexing of records collections over and above the specificity afforded by existing finding aids. As a matter of principle, this Court should not shift the burden to NARA's regional staff to perform highly intensive research for the benefit of one party, given the fact that all other members of the public will suffer due to the diversion of staff resources that will ensue. To the extent paragraph 3 of the Proposed Order, and its subparagraphs, purport to impose an additional burden on NARA staff to provide assistance to plaintiff beyond what might be reasonably provided to a member of the public asking for reference assistance, those portions of the Order should be deemed inapplicable to NARA.

21. Third, for the reasons given above, the requirement in section 3(c) and elsewhere that would impose a burden of NARA regional staff indexing Navajo-related records must be stricken as simply impossible, given existing time and resources.

22. In lieu of the entry of the Proposed Order or its being made applicable to NARA regional archival collections, I can represent on behalf of NARA's regional staff that NARA very much wishes to assist plaintiff in providing existing finding aids that

deal primarily with records relating to the Navajo and other Indian tribes, so as to work with plaintiff and its representatives in an effort to find and review as many Navajo-related trust records as possible. We stand willing to work with plaintiff on a voluntary basis in assisting in the collection of evidence during the discovery phase of the present lawsuit.

23. In sum, the Proposed Retention Order potentially would cripple NARA's regional archives' ability to perform its important mission to U.S. citizens, by hugely diverting scarce staff resources for an indexing enterprise of vast dimension, but uncertain utility and result, in any reasonable time frame. The Proposed Order would also impose unprecedented burdens on this agency to the extent it requires the isolation or segregation of particular types of records otherwise fully open and available to the public, merely on behalf of a party in furtherance of litigation. On behalf of the regional staff of this Agency, I urge the Court to strike any provisions of the proposed Order that it would have a deleterious effect on NARA and its regional staff.

I declare under penalty of perjury that the foregoing is true and correct.

Gregory Pomicter

GREGORY POMICTER

Executed on this 30 day of June, 2007

# Exhibit 35

# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, D.C. 20240

JUL 9 2004

Memorandum

To: All Employees

From: J. Steven Griles, Deputy Secretary

Subject: Responsibility for Maintaining Electronic-Mail (E-mail) Records

This memorandum is to remind all employees and Federal contractors of their responsibility for preserving, protecting and maintaining official records created or received using electronic mail (e-mail). IRM Bulletin 96-06, 7/25/96, Policy and Guidance for Managing the Creation, Retention, and Disposition of Electronic Documents provides Department-wide policy and guidance for managing electronic records (including e-mail records). This policy is accessible at www.doi.gov/ocio/records/policy/policies.htm.

Current policy based on National Archives and Records Administration regulations (36 CFR Part 1234.24, Standards for Managing Electronic Mail Records) requires that all official electronic records should be printed out in hard copy and filed in the official paper recordkeeping system. Only after this is done can you delete the electronic version, if you no longer need the electronic version.

Official Records: E-mail documents ARE official records when they:

- Are created or received in the transaction of agency business and
- Are appropriate for preservation as evidence of the government's function and activities; or
- Are valuable because of the information they contain

Not Official Records: E-mail documents ARE NOT official records when they:

- Provide no evidence of agency functions and activities
- Lack information of value
- Duplicate information already documented in existing records

If an e-mail message meets the above criteria as an official record, the message (including all attachments and transmission information) must be printed to paper and filed according to the agency's recordkeeping system.

Special Instructions – Cobell: Because of the Cobell v. Norton litigation, special instructions apply for printing and deleting e-mail messages related to this case. Included in electronic records that must be printed and filed are all e-mail messages (with all attachments) that relate to:

- Cobell v. Norton litigation
- American Indian trust reform activities
- Administration of Individual Indian Money (IIM) accounts

E-mail messages relating to one of these three areas may be electronically deleted only after you have been notified by either your e-mail system administrator or your CIO that your regular systems backup or another approved method has captured the electronic copy.

Supervisors and managers must ensure that all employees and others who may handle Federal records (including contractors, interns, students, and volunteers) receive this memorandum and are complying with this policy. If you have additional questions about this guidance, please contact your bureau/office Records Officer first, and, if questions remain, contact the Departmental Records Officer, Mr. Ed McCeney, at (202) 208-3321.



REVRFP013_2OSTABQ0027001547

# Exhibit 36

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NAVAJO NATION,<br>f.k.a. NAVAJO TRIBE OF INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-945 L |

ORDER

Based upon the briefs filed in this case concerning Plaintiffs' Motion for Entry of Record Retention Order, **IT IS ORDERED**:

1. **General Obligation to Preserve**. During the pendency of this litigation or until further order of the court, defendant, its agencies, and its employees must take reasonable steps to preserve every document, data, or tangible things in its possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation. Plaintiff is reminded that it also has a similar duty to preserve evidence relevant to this case.

2. **Compliance**. Defendant shall establish a mechanism for monitoring compliance with this order and, on or before April 19, 2004, file a status report with the court describing that mechanism. Defendant's counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (e.g., the destruction or loss of documents).

3. **Definitions**. For purposes of this order:

   (a) "Documents, data and tangible things" is to be interpreted broadly to include writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages;

databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemicals process photographs; video; photographic tape; or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

(b) "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26,45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, or mutation of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible.

4. **Further Instructions**; Modification. Either party may apply to the court for further instructions regarding, *inter alia*: (a) defendant's obligation to preserve specific categories of documents, data, or tangible things; (b) any aspect of the inspection or indexation tasks not herein clearly defined; and © allotting copying costs and maintaining the confidentiality of information contained in various records. Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

5. **Dissemination**. This order shall be distributed by defendant to all relevant agencies, departments, offices, divisions, and individuals.

Francis M. Allegra
Judge

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al., )
)
Plaintiffs, )
)
v. ) Case No. 1:96CV01285
) (Judge Lamberth)
DIRK KEMPTHORNE, Secretary of the Interior, )
et al., )
)
Defendants. )
)

**NOTICE OF FILING OF THE TWENTY-EIGHTH QUARTERLY REPORT FOR THE DEPARTMENT OF THE TREASURY**

The Department of the Treasury has prepared its *Twenty-Eighth Quarterly Report on Actions Taken By the Department of the Treasury to Retain IIM-Related Documents Necessary For an Accounting* and submits it to the Court in accordance with this Court's Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: December 1, 2006

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director

/s/ John J. Siemietkowski
ROBERT E. KIRSCHMAN, Jr.
(D.C. Bar No. 406635)
Assistant Director
JOHN J. SIEMIETKOWSKI
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Phone (202) 514-3368
Fax (202) 514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on December 1, 2006 the foregoing *Notice of Filing of the Twenty-Eighth Quarterly Report for the Department of the Treasury* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston

DEPARTMENT OF THE TREASURY
BUREAU OF THE PUBLIC DEBT
WASHINGTON, DC 20239-0001

December 1, 2006

MEMORANDUM FOR: PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

FROM: PAUL G. WOLFTEICH
CHIEF COUNSEL
BUREAU OF THE PUBLIC DEBT
DEPARTMENT OF THE TREASURY

SUBJECT: TWENTY-EIGHTH QUARTERLY REPORT
*COBELL v. KEMPTHORNE*

Included with this cover memorandum is the "Twenty-Eighth Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting" (the Report). The Report has been prepared by the Department of the Treasury pursuant to the Court Order and Opinion in *Cobell v. Babbitt* (D.D.C. CV No. 96-1285), filed December 21, 1999.

The Report includes information concerning the Financial Management Service ("FMS"), the Bureau of the Public Debt ("BPD"), and certain Departmental Offices ("DO"). The Report was prepared based on information provided by a number of program offices from the above-described organizations. The preparation of the Report included circulation of drafts of the Report to program offices that are responsible for the actions described in the Report. Comments were received from those offices and incorporated in the Report. Senior officials of FMS, BPD and DO reviewed the Report before it was submitted to the Department of Justice.

The Department of the Treasury stands ready to respond to any questions or concerns the Court may have after reviewing the Report.

**TWENTY-EIGHTH QUARTERLY REPORT ON ACTIONS TAKEN BY THE DEPARTMENT OF THE TREASURY TO RETAIN IIM-RELATED DOCUMENTS NECESSARY FOR AN ACCOUNTING**
*Cobell, et al. v. Kempthorne*
December 1, 2006

This is the Department of the Treasury's ("Treasury") Twenty-Eighth Quarterly Report, pursuant to the Court's December 21, 1999 Order ("Order") in the above-captioned case. It covers activities occurring over a three-month period from September 1, 2006 through November 30, 2006. The Order requires Treasury to report on the steps it has taken since the last quarterly report to rectify a single breach of its trust responsibilities, namely the destruction of IIM trust materials after their age exceeded six years and seven months. Cobell, et al. v. Babbitt, 91 F.Supp. 2d 1, 50, 59 (D.D.C. 1999).

Treasury continues to preserve IIM-related documentation pursuant to the Court's August 12, 1999 Order, which defines the trust records that Treasury must retain.

The Federal Reserve Bank of St. Louis (FRB) notified Treasury that 37 boxes of records dating from 2003, 2004 and 2005 were not located during an inventory. Thirty-four of these boxes contain only "tracing" information used in sorting and processing Treasury checks, which (if needed) could be recreated from the endorsement stamps on the checks themselves, assuming the endorsements are legible. The remaining three boxes contain "control" information used in balancing Treasury checks and adjusting out-of-balance Treasury checks. Some of the information in the three "control" boxes may not be available from other sources, but the information should no longer be needed for any adjustment purposes because of the passage of time.

As reported in Treasury's Twenty-Seventh Quarterly Report filed September 1, 2006, several boxes of FMS and Bureau of the Public Debt (BPD) records were affected by a water sprinkler incident at the Washington National Records Center (WNRC) in July 2006, and the National Archives and Records Administration (NARA) sent the boxes to a contractor to be freeze-dried. As of the date of this report, some of the records have been dried and returned in good condition to the WNRC. NARA has informed FMS and BPD that it may take several more months for the contractor to dry the remaining records and return them to WNRC.

As also reported in Treasury's Twenty-Seventh Quarterly Report, a portion of FMS' working copy set of microfilm copies of negotiated Treasury checks was exposed to water when the basement of FMS' Hyattsville, Maryland office flooded on June 25, 2006. The water exposure is believed to have affected the quality of the check images on at least portions of some of the water-exposed microfilm cartridges. FMS packed the water-exposed cartridges into boxes (numbering approximately 200 boxes) and moved them to a secure area on the first floor of FMS' Hyattsville, Maryland office. FMS sent sample cartridges to a contractor for assessment, and expects to receive the contractor's written assessment report before the end of this year. Throughout the reporting period, FMS packed all of the non-water-exposed cartridges into boxes at FMS' Ardmore,

Maryland warehouse and began processing those boxes (numbering approximately 1,000 boxes) for shipment to the WNRC for storage. As of the date of this report, one-third of the non-water-exposed microfilm cartridges have been shipped to the WNRC.

As previously reported in Treasury's Twenty-Third Quarterly Report, filed September 1, 2005, all digital check images and associated index data were successfully archived (moved) from the predecessor National Archive System (NAS) library at the Boston FRB to the new Image Services System (ISS) library at the Minneapolis FRB, in August 2005. The FRB has confirmed that the images and data on NAS storage media (consisting of approximately 3,000 tapes) are now merely redundant of the images and data moved to the newer storage media utilized by ISS (disks and magnetic tapes). In particular, the FRB confirmed that, of the 1.97 billion digital check images moved to ISS, 99.99% of the images are retrievable in ISS (i.e., are not defective). Further, the FRB confirmed that any images that are defective in ISS were likewise defective in NAS. The images in ISS are of Treasury checks negotiated in April 1997 or later, for which time period both original negotiated Treasury checks and electronic check data are generally available. FMS will authorize the FRB to destroy the 3,000 NAS tapes at the end of this year.

# Exhibit 38

# Status Report to the Court
# Number Twenty-Three

**For the Period**
**July 1, 2005 through September 30, 2005**

**November 1, 2005**

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1
II. SECRETARY GALE NORTON'S OBSERVATIONS ..... 2
A. INFORMATION TECHNOLOGY ..... 4
B. CADASTRAL SURVEY ..... 13
C. MINERALS MANAGEMENT SERVICE ..... 15
D. OFFICE OF HISTORICAL TRUST ACCOUNTING ..... 16
III. OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS ..... 19
A. TRUST REVIEW AND AUDIT ..... 21
B. OST-OFFICE OF THE CHIEF INFORMATION OFFICER ..... 23
1. RECORDS MANAGEMENT ..... 23
C. TRUST ACCOUNTABILITY ..... 26
1. TRUST BUSINESS PROCESS MODELING ..... 26
2. TRUST DATA QUALITY AND INTEGRITY ..... 28
3. INDIAN FIDUCIARY TRUST TRAINING PROGRAM ..... 30
4. RISK MANAGEMENT ..... 32
5. REGULATIONS, POLICIES AND PROCEDURES ..... 33
D. FIELD OPERATIONS ..... 35
1. APPRAISAL ..... 35
E. TRUST SERVICES ..... 38
1. CURRENT ACCOUNTING ACTIVITIES ..... 38
IV. BUREAU OF INDIAN AFFAIRS ..... 43
A. TRUST REGULATIONS, POLICIES AND PROCEDURES ..... 43
B. FRACTIONATION ..... 45
C. PROBATE ..... 47
ACRONYMS AND ABBREVIATIONS ..... 49

## A. INFORMATION TECHNOLOGY

**Introduction**

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior. In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

**Accomplishments and Completions**

**Computer Security:**

Interior continues to make progress in ensuring IT security. A primary focus for this reporting period has been implementing corrective actions for weaknesses identified by the Interior penetration tests and audit of financial systems. Additional efforts were focused on:

- Performing continuous monitoring of Internet-accessible systems;
- Preparing submission of the annual FISMA report;
- Conducting annual IT security awareness and role-based training;
- Submission of annual assurance statements required to complete the annual PAR; and,
- Continuing to validate and improve the C&A packages completed previously.

The most noteworthy accomplishments and completions during the reporting period are described below.

***Prevention and Monitoring***

- Interior continued its extended vulnerability scan testing of Internet-accessible systems. The extended testing checks for approximately 7,400 different types of vulnerabilities, in addition to the SANS Top 20 vulnerabilities of previous testing. Since the last reporting period, Interior tested over 5,000 Internet-accessible network devices (for example, servers, routers, switches.) Initial results from January to April 2005 indicated over 5,000 potential vulnerabilities, but included many false positives and duplications. By the end of this reporting period, potential vulnerabilities were substantially reduced. This reduction results from routinely scanning network devices for potential vulnerabilities and working toward correcting or mitigating identified weaknesses. 121 vulnerabilities remained and continued to be mitigated as of the end of the reporting period.

- Potential incidents that were reported to DOI-CIRC during this reporting period include 22 successful incidents. None appears to have resulted in any known compromise of IITD. Successful incidents are those that were not prevented or blocked by Interior at the time of their occurrence.

- OIG completed a FISMA documentation review for OST, with no deficiencies noted during the review. The draft or final report has not been received.

- BLM conducted two significant, separate table-top contingency exercises of MAs and the enclave GSS. BLM conducted an exercise of the ALIS contingency plan on August 9, 2005. Multiple other MAs participated in a contingency plan exercise on September 14, 2005.

- As reported to the court on September 2, 2005, a limited amount of IITD was discovered in BLM's LR2000 database on August 18, 2005. Internal access to LR2000 was immediately blocked. A data quality review was conducted by BLM. All IITD was removed from LR2000. The security module was modified to include access disclaimers requiring users to refrain from using LR2000 for any Indian trust-related work. Additional scans were completed on August 24, 2005. BLM's DAA approved access restoration on an internal basis as of August 26, 2005.

- MMS conducted monthly network vulnerability scans on internal servers and network devices. Due to the hurricane impacts to the Gulf of Mexico, including severe damage to MMS facilities, limited remediation occurred for the August and September scan results. The tracking system in New Orleans was not restored until after the end of the reporting period.

- As reported to the Court on August 25, 2005, MMS detected an unauthorized change of an administrator password on the MRMSS externally-hosted portal in August 2005. The incident is still under investigation with the OIG and FBI. Based upon the investigation to date, there is no reason to believe the integrity of any data was compromised. Changes have been made to increase event monitoring at both the perimeter firewalls and application. Security scans of the application have been conducted, additional scans are scheduled. Final security scans and a security review are expected to be conducted by an independent third party contractor.

- NBC initiated remediation activities to address vulnerabilities identified in the second OIG penetration testing conducted on NBC systems in July. Personnel data was accessed, in the course of testing NPS systems. Immediate action was taken on critical vulnerabilities and NBC continues to track progress of remaining tasks from both penetration testing exercises.

***Policies and Guidance***

- The Interior CIO issued OCIO Directive 2005-012, "Wireless Network Security," to the bureau and office chief information officers on July 29, 2005. This directive outlines the security requirements for wireless networking devices within Interior and requires adherence to "Wireless Security Technical Implementation Guide," Version 2.0, July 21, 2005. The CIO also approved the "DOI Wireless Data Communications Strategy" on August 3, 2005.

- The Interior CIO issued a memorandum, "Implementing OCIO Directive 2005-007 for 4th Quarter Plans of Action and Milestones (POA&M) and 4th Quarter Federal Information Security Management Act (FISMA) Performance Measures," to the heads of bureaus and offices on August 18, 2005. This memorandum provides guidance in completing POA&Ms and FISMA performance measures in accordance with OMB requirements and Interior OCIO Directive 2005-007.

- The Interior CIO issued a memorandum, "External Vulnerability Scans – MCI Service," to the Deputy Secretary, assistant secretaries and heads of bureaus and offices on September 12, 2005. This memorandum outlines the vulnerability scanning program conducted by MCI. It requires bureaus to address systems with critical vulnerabilities first, and to isolate from the Internet vulnerable systems or services until the issue can be resolved, if the vulnerabilities can not be immediately remediated or identified as false positives.

- The Interior CIO issued a memorandum, "Temporary Approval of Wireless Technologies Waiver Requests to Support Emergency Efforts," to the assistant secretaries and heads of bureaus and offices on September 23, 2005. This memorandum provides specific criteria and conditions regarding the use of wireless technologies or access to non-Interior provided wireless networks to enable efficient implementation of the Federal National Response Plan.

- The Interior CIO issued OCIO Directive 2005-015, "Information Technology (IT) Audit Findings and Corrective Actions," to the heads of bureaus and offices on September 26, 2005. This directive supplements existing policies and guidance to improve the overall quality of IT audit findings and responses.

***Training and Awareness***

- Overall, 98% of Interior employees and contractors who use or access Interior computer systems completed the Interior FY2005 required annual end user Federal information systems security awareness training. 66% of employees with significant IT security responsibilities received specialized training, as described in NIST Special Publication 800-16 *Information Technology Security Training Requirements: A Role- and Performance-Based Model.*

  - All required BLM, MMS, SOL, OHA, Office of the Secretary and Office of the Assistant Secretary – Indian Affairs employees and contractors completed the end user training. 98% of the required OST employees and contractors completed the Interior FY2005 annual training. 97% of BIA staff completed the training. The remaining BIA staff who did not receive training (289 Indian Education employees) do not require computer access, or left BIA employment prior to the reporting deadline.

  - The BLM, MMS and OHA employees and contractors with significant IT security responsibilities received specialized training. 97% of Office of the Secretary, 66% of

SOL and 58% of OST employees with significant IT security responsibilities received specialized training

- In September 2005, the Deputy Assistant Secretary – Indian Affairs/CIO sponsored three workshops on recent and evolving NIST security requirements, specifically covering FIPS 199 and NIST SP 800-53 guidance for system characterization and for selecting appropriate security controls. A total of 50 BIA and other Interior bureau staff (including both Federal employees and contractors) attended the three sessions offered.

- The quarterly Fall 2005 MMS Information Security Awareness Newsletter was distributed to MMS employees and contractors on September 23, 2005, to keep users abreast of IT security issues.

**Plans of Action and Milestones:**

Interior tracked 1,730 POA&M recorded weaknesses, of which 529 weaknesses were identified this quarter and 1,201 (reported incorrectly in the previous status report as 1,206 due to a data transposition error) weaknesses were carried over from the third quarter. Interior remediated and closed out 416 weaknesses this quarter. Interior is currently tracking 1,314 open weaknesses. All bureaus and offices with trust systems certified the completion of POA&M corrective actions.

**A-130 Certification and Accreditation:**

Ninety-eight percent of Interior systems have full authority to operate (ATO) status. The C&A packages for all of those systems have been reviewed by a qualified third party for compliance with A-130 standards and requirements. 74% of the reviewed packages received passing scores. C&A packages that had not met minimum compliance review scores on initial reviews continue to be improved.

OST completed an update of its IT contingency plan, its disaster recovery plans for 5 minor applications running within OSTNet, and its SSP for OSTNet. OST updated its ST&E Guide for OSTNet to incorporate FIPS 199 and NIST SP 800-53 requirements. OST evaluated OSTNet using the updated ST&E, which resulted in an update to the OSTNet risk assessment. OST conducted a table-top disaster recovery and continuity of operations exercise.

Due to the recent implementation of Active Directory and new security controls, OHA initiated a re-certification and accreditation of OHANet. As part of this process, OHA validated the information types, information security categorization, and corresponding system characterization.

SOL completed its first C&A and received full authority to operate SOLNet.

**IT Systems Architecture:**

Interior completed a Departmental Solution Development Life Cycle document, which more tightly couples EA, CPIC, and security requirements during development or acquisition of IT systems.

EA is dynamic. As systems are deployed and others are decommissioned, the architecture changes. Therefore, the updating, population and maintenance of the DEAR is a continual process that occurs every quarterly reporting period. Bureaus are required to keep the repository accurate and current.

***DOI Land and Resource Management System (DLRM)***

As previously reported, the DLRM system is expected to provide a long-term solution for the legacy functionality of the CGI leasing software module, formerly a part of the TAAMS project. A pre-solicitation notice for DLRM was published on August 21, 2005, but the solicitation was subsequently cancelled. In order to go forward with the project, functional requirements for all Interior land and resource management mission areas need to be validated to define a comprehensive enterprise capability and funding strategy.

**ESN:**

- MMS completed the connection to the ESN Internet gateway for the Herndon, VA, and Denver offices this reporting period. The New Orleans Regional Office was connected to ESN in mid-October, having been delayed due to the recent hurricanes in the Gulf.

- NBC, NPS and OSM were connected to the ESN Internet gateway this reporting period.

**Current Status**

**ZANTAZ**

- ZStage refers to a ZANTAZ software indicator which shows whether an e-mail message has been properly processed. Interior addressed the ZStage issue in a September 11, 2005, filing and at a September 15, 2005, status conference.

- During this reporting period, OST discovered a limited processing problem identified by reviewing ZStage data and took steps to mitigate it. OST is expecting to send 160 tapes to ZANTAZ to recover missing data from February 19, 2005, to September 8, 2005. OST engaged an independent third party contractor to conduct a complete review of the OST electronic mail environment, identify any ZANTAZ issues or problems, and develop corrective actions. Receipt of analysis reports and corrective actions plans is pending.

- NBC determined that the incident discovered on June 21, 2005, noted in the previous reporting period, will require 419 back-up tapes to be sent from DC to ZANTAZ for

processing. The incident covered the period of August 28, 2004, through August 13, 2005, when a fix was implemented. NBC Denver has not yet resolved the incident, but estimates 46 back-up tapes will need to be sent for processing.

- On October 7, 2005, SOL's configuration was corrected by ZANTAZ. All messages are now going to the Digital Safe. SOL expects to send 96 tapes to ZANTAZ to recover missing data from February 22, 2005 to October 7, 2005.

- BIA expects to send 280 backup tapes to ZANTAZ to recover missing data from October 25, 2003 through January 27, 2005. Tapes covering earlier periods were previously sent to ZANTAZ (the last tape processed by ZANTAZ was on October 24, 2003, which included the Juneau server.)

- Tape delivery and subsequent restoration cannot proceed until Interior has completed its contract negotiations with ZANTAZ. Accordingly, the OCIO cannot at this time estimate a date for the delivery of the tapes to ZANTAZ.

**Reports:**

These reports are likely to be of interest to the Court, including several that were issued following the end of this reporting period.

- Interior anticipates filing the FISMA report and the OIG annual evaluation with the Court in the near future.

- OIG issued *The Department of the Interior's Process to Manage Information Technology Security Weaknesses*, Report No. A-EV-MOA-0001-2005, on September 23, 2005. OIG recommended that Interior declare a material weakness with respect to the POA&M process based on its review of POA&Ms from September and November 2004. OIG sampled 133 corrective actions that were reported as having been completed, and opined that 48% of those actions had not been implemented to his satisfaction.

  As noted in this OIG report, the CIO concluded that Interior's existing POA&M process is adequate, and that the OIG assessment of POA&Ms was based on reviews conducted early in FY2005 and did not reflect subsequent improvements implemented to correct noted issues. These improvements included requiring additional verification and validation of completed corrective actions. For each quarterly POA&M submission, bureau and office CIOs review the completed POA&M corrective actions, and attest to their implementation prior to noting the action as closed on the POA&M.

- OIG, through its contractor, was unsuccessful in its efforts to penetrate the MMS systems. OIG Report *NSM-EV-MMS-0021-2005 MMS Penetration Testing* noted that no significant vulnerabilities were discovered that would allow penetration into MMS networks or

unauthorized access to information. MMS is reviewing the final report for inclusion of identified weaknesses on the POA&M.

- As reported to the Court on September 28, 2005, OIG issued the results of its Phase 3 penetration testing on September 6, 2005. Phase 3, conducted between May and mid-August 2005, included penetration testing on FWS, NPS and OSM. The report also included the completion of BOR National Critical Infrastructure Information Systems reviews. Phase 3 test results show that OIG was not able to penetrate FWS and OSM, but that a penetration of NPS allowed testers to traverse to NBC's systems without detection. OIG also found that "the SCADA systems are operating in relative safety from potentially catastrophic cyber-security threats."

- GAO issued "Information Security: Weaknesses Persist at Federal Agencies Despite Progress Made in Implementing Related Statutory Requirements" (GAO-05-552). This report is based on agency reports of FY2003 and FY2004 and related GAO reports from FY2003 through FY2005. Although it notes that the government is making progress in implementing FISMA, it finds pervasive weaknesses in information security policies and practices across all major agencies. As this report assesses the challenges in implementing IT security programs government-wide, it may or may not be of interest to the Court.

## Delays and Obstacles

There are many challenges that must be addressed regarding the integration, performance, funding, security, and data integrity of IT systems generally. Like other federal agencies, Interior must address these challenges for its IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed here impede progress in achieving Interior's IT management goals:

### Hurricane Katrina

- Hurricane Katrina has had severe impacts on resources. Key staff members for MMS IT security are based out of the New Orleans office, and were unable to work or only able to work sporadically since the event. MMS temporarily shut down its computing facility in New Orleans. This facility will be restored to service as soon as conditions warrant and resources are available. Essential systems have been relocated and/or restored at other MMS sites and are available. A temporary office was established in Houston that may operate for up to one year. The results of these efforts demonstrated the workability of the MMS business continuity plan.

### Litigation

- Collection and production of documents and court appearances continued to place significant strain on available staff and contractor resources throughout much of this reporting period, resulting in substantial delays in accomplishing planned and required work. The extent of the effort required for this document production resulted in significant backlogs and

rescheduling that will hamper Interior's efforts for months to come. Production of documents has exceeded 4.5 million pages. This litigation continued to impact:

- FISMA compliance actions
- Interior's financial audit
- OMB and Congressional reporting requirements
- Migration to a single e-mail messaging system
- Migration to a single Active Directory system
- Complying with HSPD-12 for implementing E-Authentication in Interior
- Delay in moving Interior bureaus and offices to a single WAN
- Updating Interior policies to fully comply with issued guidance and regulations

- Employee fears about becoming personally implicated in the *Cobell* litigation continued to be heightened as individuals from varying levels in Interior were required to testify at the evidentiary hearing. These fears continue to undermine communication and decision-making, and along with burn-out from demands for volumes of document production, are contributing factors to low employee morale.

**Staffing**

Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security. For example, the Department's Chief Information Security Officer resigned on October 11, 2005. Resulting impacts to communication, efficiency, and oversight are impeding IT security service area functions.

**Funding and Resources**

- Considerable expense was incurred as a result of collecting and producing over 4.5 million pages of material for the litigation. This expense diminished the funding available for security improvement and program evaluation.

- With the significant increase in FISMA reporting required by OIG, the resources (time, personnel, and funding) provided for IT security-related activities were diminished. Interior continues to prioritize its FISMA needs in its budget requests within fiscal constraints.

- Funding availability will continue to dictate the timing of IT-related initiatives. Interior's FY2006 budget will require managing a variety of IT-related requirements and tradeoffs.

**Denied Internet Access**

- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001. Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally. For example, lack of connectivity hampers internal communication among bureaus providing customer service to individual Indians at FIMO located in the BLM Farmington Field Office.

- Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management. Similarly, promulgation of policy and training is substantially hampered by the lack of interconnectivity and Internet access.

**Assurance Statement**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Three.* The information provided in this section is accurate to the best of my knowledge.

Date: October 31, 2005

Name: *Signature on File*
W. Hord Tipton
Interior Chief Information Officer

## B. OST-OFFICE OF THE CHIEF INFORMATION OFFICER

### 1. RECORDS MANAGEMENT

**Introduction**

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations. The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

As reported in the *Status Report to the Court Number Eleven*, the line authority for supervision and management of OTR was vested in the Assistant Deputy Secretary by the Deputy Secretary by memorandum dated September 5, 2002. On September 30, 2005, the memorandum was rescinded by the Associate Deputy Secretary. Accordingly, effective October 1, 2005, OTR reports to the Chief Information Officer, OST, in accordance with the pertinent provision of the Departmental Manual.

**Accomplishments and Completions**

**American Indian Records Repository**

Approximately 122,420 indexed boxes are located in the AIRR as of the end of this reporting period. As previously reported, OTR has historically reported the number of boxes transferred to AIRR for storage. However, NARA uses cubic feet as the measure for records stored. Thus far, NARA reports that they are currently storing 128,790 cubic feet of indexed inactive records at AIRR. Some boxes are larger than one cubic foot (e.g., map boxes).

**Records Indexing Project**

Indexing of approximately 124,325 boxes has been completed as of the end of this reporting period. The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes were sent to AIRR from the Annex before the end of the reporting period.

Approximately 6,745 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period. Once indexed, these boxes will be stored in the AIRR.

As previously reported, the electronic BISS was classified as a Privacy Act system of records by Interior. The Privacy Act notice for this system was published in the Federal Register on

July 29, 2005. The notice provided that the classification would be effective as proposed, unless comments requiring a contrary determination were received within the 40-day comment period. No comments were received by the end of the 40-day comment period.

**Training**

OTR provided records management training for 261 BIA and OST identified records contacts and 13 tribal employees during this reporting period.

**Equipment Purchases**

91 pieces of fireproof filing equipment were delivered to BIA and OST offices during this reporting period. Additional requests will be responded to as received.

**Current Status**

**Safeguarding Records**

As reported, 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation in the previous reporting period. All boxes have been reviewed and cleaned. There are approximately 30 boxes which NARA has determined require further care. These records were previously exposed to fire and water. It is anticipated that these records will receive further attention in the next reporting period.

**Record Keeping Requirements**

The "Final Decision Regarding Self-Determination and Self-Governance Funding Agreement Language on Fiduciary Trust Records Management" was published in the Federal Register on August 29, 2005. The Final Decision states that "the Department decided not to institute the proposed policy on fiduciary trust records management for Title I and Title IV Tribes/Consortia; rather, the Department will negotiate with each Tribe/Consortium a specific section in the funding agreement that addresses the Tribe's/Consortium's and the Secretary's respective responsibilities regarding the management of fiduciary trust records." The notice did provide specific language for fiduciary trust records management which was to be negotiated into the agreements for FY2006.

**National Archives Records**

As reported in the OTR Activity Report for August 2005 (filed on September 19, 2005), OTR received a copy of a letter dated September 13, 2005, from NARA to the Assistant Deputy Secretary of the Interior regarding an incident involving records at the Main Archives in Washington, DC. OTR also received a copy from the Assistant Deputy Secretary of a letter dated September 28, 2005, from NARA to Dennis Gingold, Esq.

**Records Retention Schedules**

OTR has not yet received approval from the Archivist of the United States of the following electronic systems records schedules that were submitted in the previous reporting period: Anadarko REM, InfoDat and CFI. OTR is working with BIA to provide NARA with additional technical analysis related to the GIS schedule. The BISS records schedule was submitted to NARA during the previous reporting period and was inadvertently not included in the previous report. NARA requested that certain changes be made to the BISS records schedule and it was resubmitted on September 29, 2005 after the changes were made.

The following five BIA electronic systems records schedules were submitted to NARA for appraisal and approval on September 29, 2005: MADS, Keyfile System, GLADS, Alaska Title Plant Database, and Land Title Mapper.

**Records Evaluation**

As previously reported, 31 boxes set aside for evaluation remain at OTR in Albuquerque pursuant to a litigation hold. There has been no change during this reporting period.

**Delays and Obstacles**

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes.

**Assurance Statement**

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Three.* The information provided in this section is accurate to the best of my knowledge.

Date: October 17, 2005

Name: *Signature on File*
Ethel J. Abeita
Director, Office of Trust Records
Office of the Special Trustee for American Indians

## 3. INDIAN FIDUCIARY TRUST TRAINING PROGRAM

### Introduction

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

### Accomplishments and Completions

OST offered one session of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 14 OST, BIA and tribal personnel attending during this reporting period. A total of 684 people have attended this course since March 2003. This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

During this reporting period, Cannon Financial Institute personnel also presented the *Risk Management, Guardianship, Fiduciary Behavior* and *Asset Management* specialty courses to 145 OST, BIA and tribal personnel. These four courses are part of the previously reported certification program. Additional sessions of *Risk Management, Wills & Probate, Accounting and Asset* Management are expected to be presented during the next reporting period.

During this reporting period, OST training staff conducted 4 sessions to provide training in TFAS, CSS, StrataVision and the historical query database to 41 OST, BIA and contractor staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals,* to 30 OST, BIA and tribal staff. This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships. This course is expected to be presented again during the next reporting period.

During this reporting period, OST training staff conducted 9 sessions to provide Lockbox process training to 250 OST, BIA and contractor staff.

### Current Status

Construction continues on the NIPTC in Albuquerque and is expected to be completed by the end of CY2005. The first NIPTC governance board meeting was held this reporting period. The governance board consists of employees from OST, BIA, MMS, BLM, the U.S. Fish and Wildlife Service National Conservation Training Center and DOI University. At this meeting, the board discussed its roles, responsibilities and objectives. It plans to meet on a quarterly basis.

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

**Assurance Statement**

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Three.* The information provided in this section is accurate to the best of my knowledge.

Date: October 20, 2005

Name: *Signature on File*
Dianne M. Moran
Director, Trust Training
Office of the Special Trustee for American Indians

# Exhibit 39

Financial Management Service
**memorandum**

Date: July 2, 1999

To: All FMS Employees

From: Wallace K. Fung
Acting Director, Platform Services Directorate

Subject: Technical Directions for Retaining Electronic Documents in the Cobell Case

We are obligated to retain Cobell-related e-mails, attachments, and other electronic documents. Therefore, in support of retaining these documents in a centralized manner, a procedure has been established using the e-mail address: Archive Cobell@PSMD@INFORES-FMS. This procedure can be used no matter which e-mail system you currently use, Banyan/Happy Mail or Lotus Notes mail. Records should be e-mailed to the address of Archive Cobell@PSMD@INFORES-FMS to be maintained centrally in a secure manner by Information Resources. Please follow the guidelines listed below for archiving Cobell related e-mails, attachments, and other electronic documents:

> The e-mail address, Archive Cobell@PSMD@INFORES-FMS, can be typed in as shown, or selected from the list of names in the FMS directory. To select from the list of names, type Cobell, as you would a user's last name.
>
> If you are the originator of a document, you have the responsibility to retain that document by sending a cc: to Archive Cobell. To keep the duplication of the same e-mail to a manageable manner, recipients of internal FMS e-mail need not *forward* the same document for archiving.
>
> *General* Global e-mails with an address such as "*@*@*" will be blocked from Archive Cobell. If an originator sends a *Cobell related* Global e-mail, the originator should send that e-mail to the global address *as well* as the "Archive Cobell@PSMD@INFORES-FMS." Again, this is the responsibility of the originator.
>
> All external e-mail, including Internet mail, that originates from outside FMS, is blocked from going directly into Archive Cobell. A Cobell related e-mail message or forwarded outside e-mail message must come from an FMS e-mail address in order to be archived in Archive Cobell.
>
> If you receive a Cobell-related e-mail from outside of FMS, you must forward that external e-mail to Archive Cobell by selecting the Forward option and typing in the name.
>
> Cobell related e-mail which you currently retain should be forwarded to Archive Cobell. Electronic files should be sent as attachments. For Banyan/Happy Mail users, to include an attachment, type in the file name on the Attachment: line, or select it by browsing the appropriate drive. For Lotus Notes users, use the File-Attachment-Create option to attach an electronic document.

*FMS — Quality People — Quality Service*

Previous Page | Next Page

**Cobell/Tribal Litigation Page** | **OCC Welcome Page**

Content Owner: **Margaret Marquette**

2

Page 2 - Technical Directions for Retaining Electronic Documents in the Cobell Case

Please remember that once you have sent or forwarded an e-mail message to Archive Cobell and then have deleted the e-mail from your e-mail system, you will no longer be able to directly retrieve that e-mail message. Decisions concerning the Archive Cobell mailbox account will be made by the Commissioner, Deputy Commissioner, and the Chief Counsel. The Platform Services Directorate will administer the account on behalf of the Commissioner, Deputy Commissioner and the Chief Counsel. Access to this account is strictly limited under the direction of the Commissioner, Deputy Commissioner, and the Chief Counsel, and is not available for general use by other employees of FMS.

If additional assistance in archiving e-mail is required, please call the Help Desk at 202-874-HELP (4357). Please keep in mind that the retention of documents in the Cobell case is an ongoing effort which is the responsibility of all FMS employees.

PSD #99-10.wf

# Exhibit 40

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

COMMISSIONER

AUG 30 1999

MEMORANDUM FOR FMS EMPLOYEES WITH CUSTODY OF IIM RECORDS

FROM: RICHARD L. GREGG *Richard L. Gregg*

SUBJECT: Retention of Documents and Data Identified in Attachment A Relating Individual Indian Money (IIM) Trust Monies

On February 1, 1999 and June 4, 1999, memoranda were issued to inform employees of their obligations regarding the retention of documents and data relating to IIM trust monies. Pursuant to an Order issued on August 12, 1999, by the Court in the pending class action lawsuit Cobell et. al., v. Babbitt et. al., Civ. No. 1-96CV01285 (D.D.C.), the Department is required to send this memorandum to clarify the scope of the record retention directives and to further advise Department personnel of the specific responsibilities to safeguard documents, records, and data necessary to complete an accounting to individual trust beneficiaries. A copy of this Order is attached.

Attachment A to this memorandum is a list of the documents which are subject to this record retention directive and includes not only documents relating to the IIM deposit fund account, 14X6039, but also records evidencing Department of the Interior IIM activity posted to any other account to the extent that the Department of the Interior informs, or has informed, the Department of the Treasury ("IIM Records"). It is important that you review this list carefully and identify those documents which you may have. Preservation and safeguarding of these documents are to continue until new written instructions are issued by the Department.

Please be advised that the Department of the Treasury Employee Rules of Conduct ("Rules"), published in the Federal Register at 31 CFR Part 0, sets forth the Department's policies and procedures regarding the proper maintenance of records. The Rules require that records be protected against loss, unauthorized destruction or mutilation, and illegal removal. The Rules contain the following provision:

> § 0.205 Care of documents and data.
> (a) Employees shall not conceal, remove, alter, destroy, mutilate or access documents in the custody of the Federal Government without proper authority.
> (b) Employees are required to care for documents according to Federal law and regulation, and Department procedure (18 U.S.C. 2071, 5 U.S.C. 552, 552a.).
> (c) The term documents includes, but is not limited to, any writing, recording, computer tape or disk, blueprint, photograph, or other physical object on which information is, recorded.

Previous Page | Next Page

Cobell/Tribal Litigation Page | OCC Welcome Page

# Commissioner Gregg (August 30, 1999 memo) - Page 2

print





Moreover, preservation of records identified in Attachment A is a responsibility that can be enforced by the Court presiding over the Cobell litigation. As the Order of August 12, 1999, directs, the Special Master appointed by the Court, Alan Balaran, is authorized to oversee and independently verify our compliance with our document preservation duties. Mr. Balaran may exercise his responsibilities by visiting any location where IIM records are maintained and inspecting the IIM records at that location. These inspections may occur with no advance notic Please provide full cooperation should Mr. Balaran visit your office.

The Department's ability to move IIM records to different storage locations under proper authority (e.g., Federal Records Centers or the National Achieves) is not prohibited by the litigation or orders of the Court, nor is the authorized disposal of non-IIM records or non-recor affected.

Again, I appreciate your continued cooperation and assistance with this record retention initiative.

Attachments: List of Documents to be Preserved
Court Order

## Commissioner Gregg (August 30, 1999 memo) - Page 3





IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOISE PEPION COBELL, et al.,

Plaintiffs,

v.

BRUCE BABBITT, Secretary of the Interior, et al.,

Defendants

No. 1:96CV01285 RCL

FILED

ORDER REGARDING TREASURY DEPARTMENT
IIM RECORDS RETENTION

Motion having been made, and based upon the recommendation of the Special Master, and the entire record herein,

It is hereby ORDERED, that the Treasury Department shall distribute, in final form, the attached memoranda (Exhibit A) regarding retention of all documents and data relating to Individual Indian Money trust funds and Individual Indian trust assets as identified in Attachment A to the memoranda ("IIM Records") as follows:

(1) It shall distribute the appropriate memorandum to each employee with custody of IIM Records in each of the Department's offices, bureaus, services or similar sub-department organizations;

(2) It shall distribute this Order and a letter in substantially the same form as the appropriate memorandum to the representative of each contractor that (a) performs services for the Department and (b) has custody of IIM Records;

(3) It shall distribute this Order and a letter in substantially the same form as the

# Commissioner Gregg (August 30, 1999 memo) - Page 4

printer-

Previous Page | Next Page



appropriate memorandum to the appropriate officials at the National Archives and Records Administration, General Accounting Office, Federal Reserve Banks, banks which process Treasury's General Account, and appropriate lockbox financial institutions.

If the Department of the Treasury has sent a contractor or organization a letter in the form of Exhibit B, the obligation to send a memorandum or letter under paragraphs (2) and (3) above shall be deemed satisfied.

It is FURTHER ORDERED, that Alan L. Balaran, Special Master ("Special Master"), is hereby authorized to oversee the Treasury Department's retention and protection from destruction of IIM Records through, among other things, on-site visits to any location where IIM Records are maintained. In the event that the Special Master determines that IIM Records are not being protected from destruction or threatened destruction, he may recommend to the Department that it take reasonable steps to protect IIM Records found to be in jeopardy of destruction. He may also recommend to the Court such remedial action as he deems appropriat pursuant to Rule 53, Federal Rules of Civil Procedure

It is FURTHER ORDERED, that nothing in the foregoing is intended to prevent the Department of the Treasury from disposing of a record or group of records if such disposal is ir accordance with the stipulation filed with the Court on July 6, 1999, or after approval of the Special Master.

It is FURTHER ORDERED, that nothing in the foregoing is intended to prevent the disposal of non-IIM Records authorized by a final records schedule approved by the Archivist the United States or materials which are not "records" as defined in 44 U.S.C. § 3301. In

-2-

# Commissioner Gregg (August 30, 1999 memo) - Page 5

printer





addition, this Order shall not be interpreted to prevent the movement of IIM Records to different storage facilities, including Federal Records Centers and the National Archives.

Dated: 8-11-99

Royce C. Lamberth
UNITED STATES DISTRICT JUDGE

-3-

# Commissioner Gregg (August 30, 1999 memo) - Page 6

printer

Previous Page | Next Page

Home
Phonebook
News
AC Mgmt. Services
Training
Forms
User Manuals
Standards & Policy
Organization
App Launch
CITRIX Apps
Reports

ATTACHMENT A

Documents Relating to the Cobell Litigation that Every FMS Employee Must Preserve

A. Documents required to be preserved by a stipulation filed on behalf of the Government o July 6, 1999

Original checks, and digitized and microfilm copies of negotiated checks; check information from these same checks in electronic form (i.e., check serial number, date and amount); and monthly reports of canceled checks (either in electronic form or hard copy as retained in the normal course of business).

B. Documents required to be produced by the November 27, 1996 order from U.S. District Court Judge Royce Lamberth

All documents, records, and tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest. The five named plaintiffs are: (1) Elouise Pepion Cobell, (2) Earl Oldperson, (3) Mildred Cleghorn, (4) Thomas Maulson, and (5) James Louis LaRose. Exhibit 1 to this attachment contains the final list of the predecessors in interest.

C. Documents required to be preserved by Commissioner Gregg's February 1, 1999 Memorandum

The documents delineated in this memorandum are:

1. All payment records and information, including but not limited to: all microfilm copies of checks, all cancellation information (i.e., Available Check Cancellation Unavailable Check Cancellation, Limited-Payability Cancellation); all claims related information; and, all payment reconciliation related information. Althoug the Department of the Interior ("DOI") is a Non-Treasury Disbursing Office with respect to IIM payments, payment records and information includes any document, record or information which potentially could be in the possession of Regional Operations (including all RFCs).

2. All accounting records and information, including but not limited to: SF 6652s, SF6653s SF 1219/1220s, SF 224s, and 1081s. (Clarification: The documents in this section should be preserved for all Interior agency location codes and for all accounts to which activity is posted under an Interior agency location code).

# Commissioner Gregg (August 30, 1999 memo) - Page 7

printer-





3. All deposit and collection information for all active and inactive DOI agency location codes, including but not limited to: CASH-LINK data and SF-215s; and all records or data held by lockbox depositories, TGAs or Federal Reserve Banks.

4. All correspondence, internal or external, which refers or relates to Individual Indian Money. This includes all electronic communications, such as e-mails or Internet messages.

5. All documents, records and information listed in paragraphs 1-4 which are stored at Federal Records Centers and National Archives.

D. IIM Deposit Fund Investment Records

IIM deposit fund investment records (in hard copy as retained in the normal course of business), specifically requests for investment/redemption, transaction confirmations, and monthly account statements, including records stored at Federal Records Centers.

E. Other Account Information

Records evidencing Department of the Interior IIM activity posted to any account in addition to the IIM deposit fund account, to the extent that the Department of the Interior informs, or has informed, the Department of the Treasury that it has deposited IIM monies into another account or accounts and has identified that account or accounts.

F. Electronic Communications

Electronic communications, such as e-mails or Internet messages, relating to documents described in Paragraphs A-E in either electronic form, such as a dedicated mailbox, or hard copy form. However, FMS may follow its regular practice for purging e-mails and reusing backup tapes.

If you have any questions about this memorandum, please contact Debra N. Diener at 874-6680.

Exhibit 1

# Commissioner Gregg (August 30, 1999 memo) - Page 8

printer-

Previous Page | Next Page

Home
Phonebook
News
AC Mgmt. Services
Training
Forms
User Manuals
Standards & Policy
Organization
App Launch
CITRIX Apps
Reports

EXHIBIT 1 TO ATTACHMENT A

PREDECESSORS IN INTEREST

For Mildred Cleghorn

1. Amy Imach (Enohn)
2. Richard Imach

For Elouise Pepion Cobell

1. Shorty Whitegrass
2. Kate Pearl Woman Clearsup Wolftail
3. Annie Stephenson Pepion
4. Frank Pepion
5. Polite Lawrence Pepion
6. Alex DuBray
7. Catherine DuBray Pepion

For James LaRose

1. Nettie Harmes
2. Charley Mack
3. Stella Chapoose LaRose
4. Milton LaRose, Jr.
5. Milton LaRose, Sr.
6. Fred LaRose
7. Albert Chapoose
8. Mary Mack
9. Jane Towats
10. Anna Bess Mallory

For Thomas Maulson

1. Hannah Alace Bigjohn Maulson
2. Mary Ackley Bigjohn Potts
3. Maggie Ackley Kenosha
4. Ogimakwe
5. John Big John
6. Ogimasinokwe
7. Big John/Nawaquabitunk

For Earl Oldperson

1. Mollie (Molly) Bearmedicine Oldperson
2. Juniper Oldperson
3. Ragged Woman Bearmedicine
4. Bearmedicine
5. Rollingupacalf Middlecalf